RAMÓN OCASIO, demandante y recurrido, *v.* ANDRÉS DÍAZ, demandado y recurrente (CASO NÚM. R-85); REINALDO LEÓN, ETC., demandante y recurrido, *v.* JOSÉ L. ZAYAS, demandado y recurrente (CASO NÚM. 12490); FÉLIX LÓPEZ, ETC., demandante y recurrente, *v.* NICOLÁS CANCELA, demandado y recurrido (CASO NÚM. R-275); CARMEN GLORIA RIVERA, ETC., demandante y recurrente, *v.* ARTURO DEFONTAINE, demandado y recurrido (CASO NÚM. 11437); ANGELITA ROBLES, ETC., demandante y recurrida, *v.* MARIO HERNÁNDEZ, demandado y recurrente (CASO NÚM. 11657); IRIS CAÑIZARES QUIÑONES, demandante y recurrida, *v.* JOSÉ GODREAU, demandado y recurrente (CASO NÚM. 11377); ROBERTO CASTILLO, ETC., demandante y recurrente, *v.* MANUEL NIEVES BONET, demandado y recurrido (CASO NÚM. R-62-164); ESTHER CAMACHO TORRES, demandante y recurrente, *v.* ANGELINA TORRES ET AL., demandados y recurridos (CASO NÚM. R-62-215).

*Números:* R-85*, etc. *Resueltos:* 27 de junio de 1963

————

*Nota del Compilador: Por esta opinión quedan revocados los casos de *Miranda* v. *Costas* 77:791, *Alvarez* v. *Alvarez* 77:909, *Sánchez* v. *Díaz* 78:811, *Márquez* v. *Avilés* 79:988, *Abintestato de Clara Vélez, Ex Parte* 81:653 (parcialmente derogado) y los casos que se relacionan en el escolio número 5 de esta opinión.

*Félix Ochoteco, Jr.,* y *José Luis Feliú Pesquera,* abogados del recurrente; *José C. Jusino,* abogado del recurrido.

*E. Ramos Antonini* y *Alvaro Ortiz,* abogados del recurrente; *Ramón R. Cabrera,* abogado del recurrido.

*Mario Báez García,* abogado del recurrente; *Amador Ramírez Silva,* abogado del recurrido.

*B. Sánchez Castaño* y *R. Rivero Cervera,* abogados de la recurrente; *Antonio J. Matta,* abogado del apelado.

*E. L. Belén Trujillo,* abogado del recurrente; *Mario A. Rodríguez,* abogado de la recurrida.

*Leopoldo Tormes García,* abogado del recurrente; *Inéz Acevedo de Campos* y *Rafael Muñoz Ramos,* abogados del recurrido.

*José Rafael Gelpí,* abogado del recurrente; *Ildefonso Freyre,* abogado del recurrido.

*Enrique González, Luis E. Gandía Argüelles, Justina Carrión de
González, Mariano Canales* y *Enrique Segarra,* abogados de la
recurrente; *Félix Ochoteco, Jr., Rivera Zayas, Rivera Ces-
tero & Rúa, Miguel Angel Ortiz Lugo* y *F. Fernández Cuyar,*
abogados de los recurridos.

El Juez Asociado Señor Hernández Matos emitió la opinión
del Tribunal.

Por la relación de semejanza existente entre los ocho
recursos filiatorios arriba intitulados, el Tribunal acordó
su acumulación a los fines de resolverlos conjuntamente,
mediante una sola ponencia.

En ánimo de lograr claridad y orden en la relación de los
hechos y circunstancias concurrentes en cada recurso y el
mejor entendimiento en la aplicación de los preceptos cons-
titucionales y estatutarios envueltos, expondremos breve y
separadamente los eventos de mayor relieve para los propó-
sitos de sus respectivas resoluciones. Empezaremos por el
segundo recurso en el orden de títulos expuesto, es decir,
por el caso de Reinaldo León, Núm. 12490, y seguiremos hasta
el octavo recurso de Esther Camacho Torres, Núm. R-62-215.
Después, pero en forma más amplia y detallada, nos referire-
mos al primer recurso, el de Ramón Ocasio, Núm. R-85 (cuyo
estudio se encontraba casi terminado al acordarse la acumula-
ción), discutiendo las cuestiones debatidas en estos ocho
recursos. Al final de la presente opinión se expondrá la dis-
posición de cada recurso.

*REINALDO LEÓN, ETC.* v. *JOSÉ L. ZAYAS, Núm.
12490.* El demandante nació el 3 de diciembre de 1938; de
padre casado; acción instada en mayo de 1956, para todos los
efectos, fundada en la posesión continua del estado de hijo
natural; el demandado, al contestar la demanda de filiación,
aceptó "todos y cada uno de los hechos alegados en la de-
manda", pero, "condicionando la aceptación a que se dicte sen-
tencia declarando al demandante su hijo natural reconocido
al solo efecto de llevar el apellido." Posteriormente, al con-

testar, bajo juramento, un interrogatorio de la parte demandante, hizo constar que "Reinaldo León es el producto de sus relaciones con Eladia León" y que "es cierto que el demandado le ha suministrado ayuda económica al demandante Reinaldo León en las ocasiones en que éste ha venido a Coamo" y que así lo manifestó al abogado del demandante. Se dictó sentencia final el 28 de febrero de 1958, a base de las alegaciones, el interrogatorio y la contestación jurada al mismo, declarando al demandante "hijo natural reconocido del demandado José L. Zayas, con todos los derechos como tal hijo y sin limitación alguna."

En apelación se imputa la comisión de dos errores: (1) el haber declarado al demandante hijo del demandado a todos los efectos legales por lo aceptado en la contestación a la demanda y el interrogatorio; y (2) al dictar sentencia a favor del demandante "en la forma en que lo hizo". En la discusión se invocan la Ley Núm. 229 de 1942 y su enmienda por la Núm. 243 de 1945 y la doctrina del caso de *Alvarez* v. *Alvarez*, 77 D.P.R. 909 (Sifre) (1955). Se sostiene por el recurrente que no hubo un reconocimiento voluntario.

*FÉLIX LÓPEZ, ETC.* v. *NICOLÁS CANCELA, Núm. R-275.* El demandante nació el 2 de mayo de 1944; de padre casado; acción instada el 6 de agosto de 1959; se funda en el concubinato y en la posesión continua del estado de hijo natural; se pidió sentencia al único efecto de llevar el apellido del padre—nótese que el hijo nació en mayo de 1944; la contestación negó todos los hechos alegados en la demanda; se celebró juicio en sus méritos el 8 de enero de 1960; por una de las conclusiones de hecho el juez de instancia determinó que "el demandado Nicolás Cancela . . . a juicio del Tribunal es el padre del menor demandante"; sin embargo, se dictó sentencia el 25 de enero de 1960 desestimando la demanda, bajo las normas de prueba del Art. 125, porque "nunca existió un estado de concubinato", citándose a *Rodríguez* v. *Cruz,* 68 D.P.R. 751, 755 (1948), *Sánchez* v. *Díaz,* 78 D.P.R. 811, 814

(1955) y *Armaiz* v. *Santamaría*, 75 D.P.R. 579 (1953). En revisión se señaló como error el "resolver que la prueba . . . no estableció la existencia de un estado de concubinato" y que éste es indispensable "aunque se haya probado la paternidad."

*CARMEN GLORIA RIVERA, ETC.*, v. *ARTURO DE-FONTAINE, Núm. 11437.* La demandante nació el 9 de diciembre de 1942; de padre casado; la acción se instó en abril de 1953, fundada en el concubinato y en la posesión del estado de hija natural; se solicitó sentencia a todos los efectos de ley; en su contestación el padre demandado sólo negó que la demandante "naciera en Fajardo el día 4 de diciembre de 1943" y como defensas especiales alegó que durante las fechas a que se refería la demanda él era un hombre casado pero que se había divorciado después de nacer la demandante; que "en la fecha que fue concebida la menor Carmen Gloria Rivera, siendo el demandado un hombre casado, dicha hija era adulterina" y que "el demandado no tiene obstáculo que ofrecer a que dicha menor lleve su apellido pero sin derechos hereditarios", suplicando a la "Hon. Corte . . . que en su día dicte sentencia declarando a la menor Carmen Gloria Rivera hija del demandado pero solamente con derecho de apellido"; una moción sobre sentencia sumaria fue desestimada; se celebró el juicio en marzo de 1954; determinó el juez de instancia que la demandante era hija de Arturo Defontaine. Se dictó sentencia el 27 de mayo de 1954, declarando con lugar la demanda (aunque en una de sus conclusiones de derecho el tribunal sentenciador hizo constar que "no procede la filiación en este caso", porque no se habían probado los requisitos del Art. 125 del Código Civil) "al solo efecto del uso del apellido del padre demandado", pero "sin lugar en cuanto al derecho de heredar . . .". En revisión, la demandante alegó como error (1) el haberse declarado sin lugar la solicitud de sentencia sumaria; (2) el haber negado a la demandante "la filiación reclamada" y (3) al no concederle honorarios de abogados. Se discute la aplicación al caso del Art. 125 del

Código Civil y de varias decisiones nuestras, entre ellas *Vargas* v. *Jusino*, 71 D.P.R. 389, 395 (1950).

*ANGELITA ROBLES, ETC.* v. *MARIO HERNÁNDEZ*, *Núm. 11653.* La hija demandante cuyo nombre es Alba Nydia Robles, nació en noviembre de 1948; de padre casado; se instó acción en julio de 1954 para todos los efectos, fundada en el concubinato y en la posesión del estado de hija natural del padre demandado; éste negó la paternidad; el juicio fue celebrado el 1 de marzo de 1955; en sus determinaciones de hecho el juez consideró probada la paternidad a base de la posesión continua del estado de hija natural. Dictó sentencia el 9 de marzo de 1955 declarando a la demandante hija natural del padre demandado a todos los efectos legales, con imposición de costas y honorarios de abogados. Ante nos se imputa como error por el padre recurrente el haberse declarado probada la posesión continua del estado de hija natural y el haber decidido "que establecida la paternidad mediante sentencia los actos que dan derecho al reconocimiento no tienen que ser los mismos que se exigirían si la paternidad ya no hubiera sido establecida." Invoca la doctrina de *Vargas* v. *Jusino*, supra. La parte recurrida sostiene, con razón, que el juez sentenciador tuvo ante sí suficiente evidencia para concluir que la demandante estuvo en esa posesión continua del estado de hija natural del padre demandado justificada por actos directos de éste. Las declaraciones de Angelita Robles González, Conchita Vélez y del propio demandado constituyen base suficiente para dar por establecido el hecho de la paternidad comprobado por una posesión continua del estado.

*IRIS CAÑIZARES QUIÑONES* v. *JOSÉ GODREAU*, *Núm. 11377.* El hijo llamado Víctor Manuel Cañizares nació el 13 de diciembre de 1951; al momento de su concepción sus padres eran solteros; el padre demandado contrajo matrimonio con otra mujer en agosto de 1951; la demanda fue presentada el 7 de febrero de 1952, contiene dos causas de

acción, una sobre filiación para todos los efectos, fundada en "relaciones de público y notorio concubinato" y la otra sobre alimentos. Respecto a la primera causa de acción contestó el demandado negando sus alegaciones; expuso que la madre en el período en que alegaba haber tenido relaciones con el demandado "era una mujer pública que sostenía relaciones maritales con distintos hombres en esta ciudad de Ponce." Negó los hechos expuestos en la segunda causa de acción sobre alimentos. El caso fue a juicio el 13 de abril de 1953. Concluyó el juez de instancia que el niño demandante "se halla en posesión continua del estado de hijo natural de José Godreau justificada por actos de éste." Declaró probado el público y notorio concubinato entre sus padres y al tiempo de su concepción, y, además, que ambos hubieran podido casarse entre sí para esa época. Declaró probado que "el 12 de febrero de 1952, se celebró una vista de conformidad con la Ley núm. 108 de 1940, y el demandado aceptó la paternidad y alegó estar dispuesto a pasarle una pensión mensual de $10.00 para dicho menor, suma que desde entonces le ha venido pasando." Respecto al alcance y significación en derecho de estos actos, se expresó acertadamente así el juez sentenciador:

"Si la admisión de la paternidad bajo el procedimiento establecido por la Ley núm. 108 no tuviera más alcances jurídicos que el de garantizarle un mendrugo de pan a una criatura, ni tuviera otras consecuencias jurídicas que la de contraer una obligación para mitigar un poco el hambre, le estaríamos dando un alcance jurídico de exageradas limitaciones. Si bien es verdad que la Ley 108 es una ley de carácter procesal y que su propósito como carácter procesal es el de asegurar alimentos para los menores de edad, en su sección 4 establece un procedimiento a virtud del cual se le da la oportunidad al querellado para que acepte o niegue la paternidad. Una vez la paternidad ha sido aceptada no puede ser revocada. En el caso de *Nicolás Cortés Córdova* v. *Alfredo Cortés y otros,* nuestro más alto tribunal dijo: 'El hecho en sí del reconocimiento conlleva las consecuencias legales que ya hemos mencionado y el causando no pudo con sus

expresiones coartar o limitar esas consecuencias legales ni cercenar los derechos hereditarios de sus hijos naturales válidamente reconocidos al igual que un testador no puede privar de su legítima a herederos forzosos. Una vez que el padre reconoció válidamente a esos hijos él no podía limitar personalmente los alcances de la ley.'

"Si bien es verdad que en el caso que está ante nos no se trata de un reconocimiento sino de una admisión de la paternidad, como quiera que la misma se hizo en un procedimiento judicial y no se hizo constar voluntariamente en documento auténtico, o sea, el acto de la vista en relación con la Ley 108, la admisión de tal paternidad no puede tener los limitados alcances de una mera obligación de pasar los mismos. Para los fines del procedimiento de la Ley 108, como eso es el único propósito, tiene ese alcance, por sus consecuencias de perpetuidad y publicidad producen la consecuencia jurídica de convertirla en prueba auténtica de la paternidad."

La sentencia, de fecha 25 de junio de 1953, declaró con lugar la demanda en sus dos causas de acción, reconociendo al niño demandante como hijo natural reconocido del padre demandado e imponiendo a éste el pago de $20.00 mensuales para alimentos de su hijo, con costas y honorarios de abogados. Posteriormente el tribunal enmendó su sentencia a los efectos de que la suma concedida por alimentos fuera satisfecha "desde la interposición de la demanda." En apelación se imputó la comisión de tres errores: (1) al resolver que la sentencia dictada bajo la Ley Núm. 108 de 1940 "ha causado estado y que solamente se necesita probar la paternidad", a los fines de establecer la posesión continua del estado; (2) "Al admitir en evidencia el récord de la Corte Municipal en el caso 52-184, sobre alimentos, contra José Godreau, como un documento auténtico, acreditativo de la filiación . . ." y (3) al apreciar la prueba.

La resolución del caso 52-184, dictada por la Corte Municipal de Ponce, es como sigue:

"En la Corte Municipal del Distrito Judicial Municipal de Ponce, P.R. Estados Unidos de América, El Presidente de los

Estados Unidos, El Pueblo de Puerto Rico vs. José Godreau. *Criminal Núm. 52-184. Por: Abandono de Menores (Ley Núm. 108 de 1940).*

ACTA DE LA VISTA. Siendo hoy el día señalado para la vista en este caso, según lo dispuesto en la Ley Núm. 108 de 1940, comparecieron ambas partes. Alegó la peticionaria que el acusado es padre del menor Víctor Manuel de dos meses de edad respectivamente, y que lo tiene abandonado sin excusa legal alguna, dejando de proveerle lo necesario para la subsistencia de dicho menor. El acusado aceptó la paternidad y alegó estar dispuesto a pasarle una pensión de $10.00 mensuales a dicho menor. El Juez que suscribe hizo a las partes las advertencias que señala la ley sobre la materia y ordenó que el caso se archivara y que de incumplirse con el compromiso de pasarle la cantidad de $10.00 a dicho menor el caso se traslade a la jurisdicción del Tribunal Tutelar. Ponce, P.R., a 12 de feb. de 1952. (Fdo.) Jorge Meléndez Vela, Juez Municipal."

*ROBERTO CASTILLO, ETC.* v. *MANUEL NIEVES BONET, Núm. R-62-164.* Hijo nacido el 17 de junio de 1944, de padre casado; la acción se instó a todos los efectos en octubre de 1961,—fundada en la posesión continua del estado de hijo natural del padre demandado; éste, en su contestación negó los hechos de la demanda; fue el pleito a juicio el 1 de marzo de 1962; en sus conclusiones de hecho el tribunal de instancia determinó que el demandante era hijo del padre demandado y que éste "una vez nacido el niño comenzó a darle a la demandante una suma de $5.00 semanales, llevándole además en ocasiones comestibles del colmado de su propiedad . . . habiendo el demandado continuado pasándole esos $5.00 a la demandante hasta que ésta se fue para la ciudad de Nueva York en el año 1946." En su única Conclusión de Derecho dice el juez sentenciador: "Aunque hemos estimado probado que el demandado es el padre del menor demandante, la prueba presentada por los demandantes no es suficiente para haber establecido que este menor hubiese gozado en momento alguno de la posesión continua del estado de hijo natural del demandado, siendo forzoso concluir que debe

desestimarse esta acción de filiación." Cita a *Berdecía* v. *Tyrell*, 82 D.P.R. 698. Consecuentemente, en 2 de mayo de 1962, dictó sentencia desestimando la demanda. En moción posterior el demandante solicitó que se reconsiderara el fallo a los fines de declararse "con lugar la demanda al único efecto de que el menor pueda llevar y usar el apellido de su padre." Se fundó en *Figueroa* v. *Díaz*, 75 D.P.R. 163, 174 (1953), *Salas* v. *Doe*, 75 D.P.R. 571 (1953) y *Cruz* v. *Santiago*, 24 D.P.R. 108 (1916). La reconsideración fue de plano denegada. En revisión el demandante recurrente señala la comisión de cinco errores: (1) declarar sin lugar la filiación, no obstante haber concluido que el demandante era hijo del demandado; (2 y 3) indebida aplicación al caso del Art. 125 del Código Civil; (4) no aplicar "las reglas de evidencia a la fecha en que se vio el juicio y sí las existentes en el momento de la concepción del menor", y (5) dictar "sentencia prematura al amparo de la Ley núm. 229 de 1942, que es anticonstitucional por constituir una invasión del poder legislativo en el poder judicial, tendiendo a maniatar la función de los tribunales."

En su alegato, al discutir su cuarto señalamiento, plantea la cuestión el recurrente de que después de aprobada la Constitución, el Art. 125 del Código Civil "no gobierna dichos casos y que lo único que es necesario probar es la paternidad", citando en apoyo de esa contención lo resuelto en *Pabón* v. *Morales*, 79 D.P.R. 154 (1956), y "la igualdad de derechos concedidos a todos los hijos en forma general por la Constitución." Expone que la Ley Núm. 229 de 1942 es inconstitucional porque discrimina entre el hijo reconocido voluntariamente por su padre y el declarado hijo judicialmente, toda vez que a aquél le concede el derecho a heredar a su padre que le reconoció y a éste le niega ese derecho.

A su vez el padre recurrido sostiene que la ley aplicable al caso es la Núm. 229 de 1942, puesto que el demandante nació en 1944; que en tal caso "para obtener su filiación tiene que probar cuando menos uno de los requisitos señalados

en el artículo 125 del Código Civil. . . ." y que ninguno de esos requisitos fue probado; que la paternidad no se establece "con una mera prueba no auténtica de la paternidad . . .", y que ni la Constitución, ni la Ley Núm. 17 de 20 de agosto de 1952, ni la doctrina del caso de *Pabón* v. *Morales*, supra, eran aplicables al caso ya que el nacimiento del demandante ocurrió en 1944, bajo las disposiciones de la Ley Núm. 229 de 1942, y que debía aplicarse dicho Art. 125.

*ESTHER CAMACHO TORRES* v. *ANGELINA TO-RRES ET AL., Núm. R-62-215.* Hija nacida en diciembre de 1927; de padre casado; la acción de filiación fue instada el 9 de noviembre de 1959, fundada en la posesión continua del estado de hija natural; además se impugna en la demanda, una inscripción que se practicó en el Registro Demográfico de la demandante como supuesta hija legítima de Agustín Camacho, quien contrajo matrimonio con la madre de la demandante cuando ésta tenía 6 años de edad; se dedujo la acción filiatoria contra los herederos del padre Rafael Arrieta Ríos, fallecido el 8 de noviembre de 1958; la de impugnación del acta de nacimiento, contra Angelina Torres, madre de la demandante, y su actual esposo Agustín Camacho. Se presentó en febrero de 1960 una demanda enmendada. La madre y el padrastro de la demandante contestaron la demanda enmendada alegando como ciertas todas sus alegaciones. Los herederos codemandados Rafael y Carmen Arrieta Negrón presentaron un escrito sobre defensas y objeciones de derecho contra la demanda enmendada alegando (1) la incapacidad legal de la demandante "para impugnar la legitimidad de su nacimiento conforme aparece del Registro Demográfico", (2) que la acción de impugnación estaba prescrita; (3) que dejaba de exponer "una reclamación que justifique lo solicitado por la demandante." En su cuarta defensa y objeción de derecho expuso textualmente:

"4. Que en el supuesto que la demanda enmendada expusiera una reclamación, y que la demandante fuera hija del padre de los

comparecientes, don Rafael Arrieta Ríos, los que niegan los comparecientes, la actora sólo podría ser declarada .hija del citado causante, sin derecho alguno a heredar a éste, por razón a que él, tanto a la fecha de la concepción, como del nacimiento de la demandante, se encontraba casado con doña Margarita Negrón, desde el 24 de mayo de 1913, persona ésta que no era la madre de la referida demandante; *Alvarez* v. *Alvarez,* 77 D.P.R. 909; *Sánchez* v. *Díaz,* 78 D.P.R. 811, y *Márquez* v. *Avilés,* resuelto per curiam por nuestro Tribunal Supremo el 29 de mayo de 1957, confirmado en *Márquez* v. *Avilés,* 252 F.2d 715, ya que no se alega en la demanda enmendada que exista documento público alguno en que el alegado padre de la demandante la hubiera reconocido como tal hija, ni que dicho reconocimiento hubiera tenido lugar en el acta de nacimiento, o por acción voluntaria de su alegado padre, o en su defecto por las personas con derecho a su herencia; (31 L.P.R.A. 502 y 504)."

A base de esas objeciones de derecho el Juez Luis R. Polo, en 12 de enero de 1961 dictó una sentencia desestimando la demanda "en cuanto a su reclamación de derechos hereditarios", pero ordenó continuarse el caso a los demás efectos. Contestaron, además esos codemandados la demanda enmendada, aceptando el fallecimiento de Rafael Arrieta Ríos en 8 de noviembre de 1958, negando que la demandante fuera su hija y que ésta hubiera disfrutado de la posesión continua del estado de hija del causante y otros hechos, aceptando la alegada inscripción en el Registro Demográfico de la demandante como hija legítima de Agustín Camacho y que el causante dejó bienes, pero negando que la demandante "tenga derecho sobre los mismos a título de herencia o en cualquier otro concepto." Alegaron también que en el supuesto de ser la demandante hija del causante, sólo tendría derecho a llevar su apellido pero nunca a heredarlo.

Los demás coherederos demandados contestaron la demanda en forma idéntica a la contestación de los coherederos Rafael y Carmen Arrieta Negrón. Celebrado el juicio, fue dictada sentencia final el 29 de junio de 1962, declarando a la demandante hija de Rafael Arrieta, pero limitada la deter-

minación al solo derecho a llevar el apellido de su padre y decretanto la nulidad de la inscripción de ella como hija de Agustín Camacho.

De esta sentencia sólo ha pedido revisión la demandante Esther Camacho Torres y ante nos sostiene que habiendo fallecido su padre en 1958 tiene derecho a heredarlo, debiéndose revocar toda jurisprudencia contraria a ello. En las conclusiones se determinó por el tribunal de instancia que la demandante "es hija del señor Rafael Arrieta", y que esa paternidad se había establecido como cuestión de derecho y que, además, "la demandante gozó y disfrutó de la posesión continua del estado de hija del señor Arrieta, evidenciada por la actitud de su padre."

En esas conclusiones el tribunal de instancia, por voz de su ilustrado Juez Miguel A. Velázquez Rivera, hizo constar:

"Como se sabe, la Ley de 1942 limitaba en estos casos los derechos de los hijos que eran adulterinos al derecho de alimentarlos cuando el padre estaba vivo y el derecho a llevar el apellido del padre.

"Sin embargo, la Sección 1 del Artículo 2 de la Constitución de Puerto Rico eliminó todo discrimen por razón de nacimiento. Esa disposición constitucional fue instrumentada por la Ley 17 de 20 de agosto de 1952 que dispone que todos los hijos [tienen] frente a sus padres y los bienes relictos por éstos iguales derechos que un hijo legítimo.

"El Tribunal Supremo de Puerto Rico ha resuelto en el caso de *Márquez* v. *Avilés* que esa disposición de la Constitución y esa disposición de la Ley no tienen efecto retroactivo. Es decir, esa es la ley en Puerto Rico.

"El Tribunal desea hacer constar específicamente que cree y entiende de buena fe que esa decisión del Tribunal Supremo es totalmente equivocada, porque no tomó en cuenta como en las decisiones anteriores sobre la misma materia, el hecho de que lo importante para evitar el discrimen que trata de evitar la Constitución no es la fecha de nacimiento de la demandante sino la fecha en que falleció el padre. Es decir, que si a la fecha de fallecimiento del padre ya estaba vigente la Constitución y la

Ley de agosto de 1952, ese es el momento en que se hace la transmisión del derecho. Por tanto, si ya es hijo no debería establecerse discrimen alguno por razón de su nacimiento. Pero este Juez, en su ministerio, tiene una obligación primordial y esa obligación es acogerse a la Ley. La ley ha sido establecida por el Tribunal de última instancia en Puerto Rico en el caso de *Márquez* v. *Avilés* y esa ley este Juez sería el último en no acatarla no importa lo que crea en cuanto a los méritos de lo que se ha resuelto."

Por los alegatos presentados y los argumentos de las partes durante la vista oral celebrada el 23 de mayo último, la contienda en este caso quedó centrada en la cuestión siguiente: si la doctrina del caso de *Márquez* v. *Avilés*, 79 D.P.R. 988 (1957) es correcta o errónea; en el primer caso deberá confirmarse el fallo recurrido; en el segundo caso, deberá revocarse esa doctrina y modificarse la sentencia a fin de declarar que la demandante es también heredera.

Como ya anunciamos, pasaremos ahora a la exposición detallada del recurso Núm. 85, de *Ramón Ocasio* v. *Andrés Díaz*. En el curso de la amplia discusión y estudio que haremos del mismo, expresaremos nuestros criterios sobre las distintas cuestiones suscitadas y debatidas en los ocho recursos bajo consideración y a base de los cuales dispondremos de los mismos.

En el caso de *Ocasio* v. *Díaz*, es objeto de revisión una sentencia dictada sumariamente, el 5 de junio de 1958, por la Sala de Bayamón del Tribunal Superior, que declara con lugar, a todos los efectos legales, una acción filiatoria instada el 15 de enero de 1957, por un hijo extramatrimonial nacido el 26 de enero de 1939, de padre casado y madre soltera a las fechas de su concepción y nacimiento, asentándose la declaración judicial en un reconocimiento del hijo demandante por acción voluntaria del padre demandado al contestar la demanda.

La contienda gira en torno a las consecuencias de derecho atribuibles a la aceptación de paternidad que hizo el padre

demandado en su contestación, a la luz de principios consagrados en nuestra Constitución de 1952 y de las disposiciones aplicables contenidas en las leyes Núms. 17 de 20 de agosto de 1952 y 229 de 12 de mayo de 1942, según enmendada por la Núm. 243 de 12 de mayo de 1945.

La secuencia cronológica de los hechos y circunstancias envueltos es como sigue: El 10 de mayo de 1936, Andrés Díaz contrajo matrimonio con Sixta Nieves. En 1938 Díaz mantiene relaciones maritales con Carmen Ocasio, mujer soltera. De ellas nace Ramón Ocasio el 26 de enero de 1939. El 15 de enero de 1957 Ramón demanda a su padre ante la Sala de Bayamón del Tribunal Superior, solicitando "sentencia contra el demandado, declarándolo hijo natural reconocido con todos los derechos inherentes a tal estado." Alegó en los únicos dos párrafos de su demanda:

"1. Que el demandante Ramón Ocasio fue procreado en relaciones maritales habidas entre el demandado Andrés Díaz y su señora madre doña Carmen Ocasio, allá por el año 1938 y nació en Bayamón, Puerto Rico, el 26 de enero de 1939, y fue inscrito en el Registro Demográfico bajo el número 7105 el día 4 de febrero de 1939.

"2. Que desde el nacimiento del demandante siempre ha sido tenido, y atendido en todas sus necesidades como hijo por su señor padre, como tal lo ha llamado y llama públicamente, y por su consejo y orden usa su apellido de Díaz, cuya paternidad y apellido necesita el demandante acreditar y legalizar conforme a la ley, para todos los efectos legales, ya que el demandado hasta esta fecha no ha cumplido con tal deber, no obstante así habérselo ofrecido, ya que el demandante tendrá que registrarse en el servicio militar de los Estados Unidos, el 27 de este mes, y debe hacerlo con su apellido legal, Díaz."

El 17 de enero de 1957 el padre demandado fue personalmente emplazado. El 28 de ese mes compareció por escrito en la acción y solicitó una prórroga de veinte días "para alegar en el caso del epígrafe." Le fue concedida. El 12 de febrero siguiente presentó una "moción de desestimación" fundada en la insuficiencia de hechos de la demanda. En el curso de este

incidente, las partes citan, comentan y discuten ampliamente las disposiciones del Código Civil y leyes especiales aprobadas desde el año 1942, sobre filiación de hijos nacidos fuera de matrimonio, los derechos que a los mismos se les ha reconocido por las sucesivas legislaciones puertorriqueñas, incluyendo la mencionada Ley Núm. 17 de 1952, sobre igualdad de los derechos de los hijos, y los indicados principios aplicables a la cuestión, contenidos en nuestra Constitución. Discutieron el efecto retroactivo de esas disposiciones y la aplicación al caso de varias decisiones nuestras. Finalmente, no prosperó la moción de desestimación.

El 10 de junio de 1957, casi a los cinco meses después de haber sido emplazado y después de esa extensa discusión sobre la legislación y jurisprudencia relativas a los derechos de los hijos extramatrimoniales, el padre demandado presentó su contestación a la demanda. En ella expuso textualmente:

"1. Del párrafo primero de la demanda, el demandado *acepta que el demandante fue procreado en relaciones maritales habidas entre el demandado Andrés Díaz y doña Carmen Ocasio;* por falta de suficiente información para formar una opinión con respecto a su veracidad, el demandado niega general y específicamente todas y cada una de las demás alegaciones contenidas en el primer párrafo de la demanda. [Énfasis suplido.]

"2. Del párrafo segundo el demandado *acepta que desde el nacimiento del demandante siempre lo ha atendido en todas sus necesidades como hijo.* Niega que lo haya llamado públicamente como hijo o que lo llame actualmente. Niega que por su consejo u orden use su apellido de Díaz. Por falta de información niega que el demandante tuviera que registrarse en el servicio militar el 27 de enero de este año. Niega las demás elegaciones del párrafo segundo. [Énfasis suplido.]

"DEFENSA ESPECIAL. Como defensa especial el demandado expone:

"1. Que desde el día 10 de mayo de 1936 y hasta el presente, el demandado ha estado legalmente casado con doña Sixta Nieves. Por tal razón el demandante no podría ser declarado, como se

pide en la demanda, hijo natural reconocido· con todos los derechos inherentes a tal estado.

"POR TODO LO CUAL, solicita el demandado de ese Hon. Tribunal que se sirva dictar resolución de acuerdo con las alegaciones expuestas por el demandado."

El 24 de febrero de 1958 presentó el demandante en el caso una moción sobre sentencia sumaria, acompañada de copia fotostática de su partida de nacimiento. En ella aceptó como cierta "la alegación única que ha establecido el demandado como defensa especial", es decir, que su padre estaba casado con Sixta Nieves desde el 10 de mayo de 1936, y que "por tal razón el demandante no podría ser declarado, como se pide en la demanda, hijo natural reconocido con todos los derechos inherentes a tal estado." Suplicó en esa moción así:

"Por lo que, con vista de *Cruz* v. *Andrini,* 66 D.P.R. 124, se declare hijo natural reconocido con derecho a llevar su apellido del demandado con los demás pronunciamientos a que haya lugar."

Se opuso a esa moción el demandado por el único fundamento de "que hay controversia real en cuanto a hechos materiales alegados en la demanda." A su oposición no unió documentos o declaraciones de clase alguna.

El 5 de junio de 1958 el tribunal de instancia dictó sentencia sumaria a favor del hijo demandante, no con los efectos restrictivos que interesaba en su moción, sino con los amplios y plenos suplicados en su demanda. Por su relativa brevedad insertamos a continuación su texto completo:

"SENTENCIA SUMARIA. Se nos pide que dictemos sentencia sumaria ya que en la presente acción de filiación el demandado acepta que 'el demandante fue procreado en relaciones maritales habidas entre el demandado Andrés Díaz y doña Carmen Ocasio.'

"No hay controversia en cuanto a que el hijo nació mientras el demandado 'ha estado legalmente casado con doña Sixta Nieves.' Se niega por falta de información la alegada fecha del nacimiento: 26 de enero de 1939, pero en su memoranda el demandado al oponerse a la solicitud de sentencia sumaria, está

conforme, que, el nacimiento fue anterior al año de 1942. Los reparos a que se dicte sentencia sumaria son que alegaciones fundamentales de la demanda han sido puestas en controversia. Así, que el demandado haya tenido como su hijo a Ramón Ocasio, que lo llame como tal hijo públicamente y que le haya permitido y aconsejado usar su apellido Díaz.

"En la resolución del planteamiento hecho, consideramos al hijo como nacido con anterioridad al año de 1942, aunque para todos los efectos legales y prácticos—como veremos—poco importa en este caso que el nacimiento haya sido con posterioridad a dicho año.

"Reza nuestra Ley (31 L.P.R.A. 502):

'Los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de esta Ley y que no tenían la condición de hijos naturales según la legislación anterior, podrán ser reconocidos por acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, a todos los efectos legales. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

'En caso de que los hijos a que se refiere esta sección no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. La acción para este reconocimiento se tramitará de acuerdo con el procedimiento que fija este título para el reconocimiento de hijos naturales; *Entendiéndose, sin embargo,* que tal reconocimiento sólo tendrá el alcance que aquí se expresa.'

"Se notará del precepto citado que se contempla dos tipos de reconocimiento para los nacidos antes de 1942: el voluntario y el involuntario. Aquel 'a todos los efectos legales', y éste 'al solo efecto de llevar el apellido.' y la acción para reconocimiento se tramitaría de acuerdo con el procedimiento que se fija para el reconocimiento de hijos naturales.

"¿Cuándo está el padre obligado a reconocer al hijo natural? Dice nuestro Código Civil (31 L.P.R.A. 504):

'1. *Cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad.* (Énfasis suplido.)

'2. Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia.

'3. Cuando la madre fue conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo.

'4. Cuando el hijo pueda presentar cualquier prueba auténtica de su paternidad.'

"Si bien convenimos con el demandado en que negó una serie de causales alegadas en la demanda, no requiere mayor esfuerzo darse cuenta que aceptó su parternidad expresamente en un escrito indubitado como lo es su contestación a la demanda. *Ex parte Morales*, 30 D.P.R. 907. Constituye un acto de reconocimiento solemne de un hijo natural el que hace el padre en el acta de nacimiento, en testamento o en otro documento público. *Amsterdam* v. *Puente*, 16 D.P.R. 554; *Rijos* v. *Folgueras*, 16 D.P.R. 624.

'Las cortes se inclinan siempre a favor del hijo natural cuando el reconocimiento resulta claro y hecho públicamente, cualquiera que pueda ser la forma en que se verifique *siempre que quede de él constancia auténtica y fehaciente.' Iturrino* v. *Iturrino*, 24 D.P.R. 467. (Énfasis suplido.)

"Es distinto cuando se trata de meras admisiones orales que se hagan en conferencias con anterioridad a juicio que distan ser escritos indubitados o solemnes. *Alvarez* v. *Alvarez*, 77 D.P.R. 909.

"La contestación a la demanda en este caso constituye un reconocimiento válido y voluntario por lo que resolvemos declarar como declaramos con lugar la solicitud de Sentencia Sumaria y en consecuencia proclamamos a Ramón Ocasio hijo natural reconocido de Andrés Díaz a todos los efectos legales."

Solicitó el demandado la reconsideración del fallo "en el sentido de limitar los derechos del demandante como hijo del demandado, exclusivamente al uso del apellido, y por tanto, sin derecho alguno a heredarle." El tribunal se negó a reconsiderar.

A petición del demandado libramos el auto para revisarlo. Como único error éste sostiene que la sentencia "no limita los

derechos del allí demandante y aquí recurrido al exclusivo uso del apellido del allí demandado y aquí recurrente, como hijo ilegítimo del mismo, y que por el contrario, le reconoce al allí demandante el derecho a heredar en su día a su padre el aquí recurrente."

I

En primer término discutiremos los puntos suscitados a la luz de las disposiciones de la Ley Núm. 229 de 1942, según enmendada en 1945, ya que se trata de uno más de "Los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de esta Ley y que no tenían la condición de hijos naturales según la legislación anterior . . .", siguiendo el tenor de ese estatuto cuyo texto comprendiendo esa enmienda, aparece insertado en la sentencia recurrida.

Para el año 1942 nuestra Legislatura contaba con plenos poderes para implantar, de una sola vez, la más cabal y absoluta igualdad ante la Ley de todos los hijos, sin que necesitara para ello facultades especiales de constitución alguna. —Arts. 25 y 35, Carta Orgánica de 1917.—Pero considerando pasadas experiencias adversas a la resolución de graves problemas sociales de una sola vez y de que "en reformas sociales de esta índole la prudencia aconseja un proceso de evolución que vaya corrigiendo la injusticia sin crear conflictos de clase alguna",—Actas del Senado, Año 1942, pág. 800—prefirió caminar cautelosamente, paso entre paso, sobre un terreno tan sensitivo como el campo del derecho familiar. Con la Ley Núm. 229 de ese año levanta el macizo pórtico de la reforma que realizaría en el decenio 1942–1952. Mediante ella empieza por eliminar el adulterio de las posibilidades de reconocimiento y filiación respecto a hijos ilegítimos no naturales. Después se van ensanchando cauces, concediendo mayor dignidad, mejorando el futuro económico. A esos fines se suceden: las leyes 13 y 243 de 1945; las 354, 446 y 447 de 1947; las 171 y 255 de 1949 y la 253 de 1950. Sin embargo, para el

adulterino no reconocido, la hora de su plena justicia no le llega hasta el 20 de agosto de 1952 en que se aprueba la Ley Núm. 17, sobre igualdad de derechos de los hijos, con efectos retroactivos al 25 de julio de 1952.

El acto *realizado en junio de 1957*, en el curso del litigio de filiación, por Andrés Díaz, demandado como padre, al aceptar en su Contestación a la demanda, y respecto a lo alegado en su párrafo 1, que Ramón Ocasio, el joven de 18 años que alegaba ser su hijo y que pedía al tribunal que así lo declarara "con todos los derechos inherentes a tal estado", era hijo suyo porque "fue procreado en relaciones maritales entre el demandado Andrés Díaz y doña Carmen Ocasio". ¿Debe juzgarse, con arreglo a esa Ley Núm. 229, un reconocimiento por acción voluntaria, válido, eficaz y pleno? Nuestra inmediata, categórica y precisa respuesta es: Sí. Y lo es aun dentro del criterio restrictivo y conservador prevaleciente en *Correa* v. *Sucn. Pizá* y otras decisiones que mencionaremos. Vamos a explicarnos.

Como hemos visto, el 10 de junio de 1957, mediante un documento público([1]) el padre aceptó que el demandante fue procreado en sus relaciones maritales con Carmen Ocasio y que "desde el nacimiento", y siempre, lo ha atendido en "todas sus necesidades como hijo." Es decir, en forma expresa, directa, clara y precisa, Andrés Díaz reconoce, proclama y notifica especialmente al Tribunal Superior y a la otra parte litigante, y, en general, a la sociedad en que convive, por medio de un escrito público redactado y firmado por un perito en Derecho, el hecho de que Ramón Ocasio es el fruto de las relaciones maritales que tuvo con Carmen Ocasio y que siem-

---

([1]) El letrado que representa en este recurso al padre recurrente, en su alegato, ha aceptado repetidamente que el escrito de Contestación a la Demanda es un documento público en su sentido general. Desde luego, su posición, respecto a este punto, está amparada por lo dispuesto en el Art. 49 de nuestra Ley de Evidencia y lo resuelto en *Vélez* v. *Camacho*, 8 D.P.R. 37 (1905); *Ex parte Morales*, 30 D.P.R. 907, 911 (Franco Soto) (1922) y *Díaz Fontánez* v. *Sucn. Díaz*, 86 D.P.R. 798 (Belaval) (1962).

pre lo ha atendido "como hijo" suyo. Este público reconocimiento de paternidad que causó la declaración judicial de *status* de hijo, lo ha verificado en su contestación a la demanda, después de cinco meses de haber sido emplazado en la acción, y de haber estado en ella discutiendo intensamente durante ese período el alcance y significación de la Ley Núm. 229 de 1942 y su enmienda de 1945 como al principio expusimos.

No se trata aquí de una declaración de paternidad arrancada por la fuerza, ni en la cual exista una voluntad de reconocer viciada o procedente de una persona demente o incapacitada síquica o físicamente para hacerla, ni se ha reconocido a uno que intimidaba al reconociente para que lo hiciera, ni ha resultado reconocido Ramón en vez de Juan, ni una en que las circunstancias en base a las cuales se creyó en la paternidad son falsas o inexistentes. Cf. Art. 1188, Código Civil.

La simple circunstancia de establecerse o reconocerse por el padre demandado el vínculo consanguíneo existente entre él y su hijo, en el curso de una acción filiatoria, no significa que el reconocimiento es involuntario. Lo que ello realmente significa es que en su demanda el hijo expuso un hecho cierto y verdadero, y que haciendo honor a esa certeza y verdad, el padre demandado, que la conoce, por su propia determinación la acepta y confiesa. Y realiza libremente algo más que proclamar su condición de progenitor: admite, acepta y confiesa que desde su nacimiento, y siempre, lo ha atendido en todas sus necesidades *como hijo*. Si luego de un examen sincero de conciencia se decidió a cumplir con su deber moral—que también lo es jurídico—de reconocer esa verdad, que constituye una reparación debida por leyes naturales tanto al hijo como a la que lo alumbró, ¿por qué hemos de resolver que no lo hizo libre y voluntariamente o sin ánimo de reconocer? Como dice Albaladejo, *"El Reconocimiento de la Filiación Natural"*, Barcelona, 1954, pág. 190, ". . . normalmente la declaración de ciencia del reconocimiento de paternidad, implica la volun-

tad del reconocedor de declararla." Puede ser que en algún caso no sea así, como afirma el propio autor. Pero nada que no fuera el peso de su propia conciencia de padre o su sentido del deber moral, social y ético para su hijo, o su culto a la verdad, lo obligaba a reconocer de por sí esa paternidad. En nuestro sistema procesal se espera la veracidad de las partes, por obligado acatamiento a la Ley y respeto elemental a la justicia. Ellas deben hacer afirmaciones de hecho conformes a la verdad. Las Reglas de Procedimiento Civil no contienen reproche alguno de matiz penal para el demandado que no conteste una demanda o que deje de aceptar la verdad de los hechos bien alegados en la misma. No impiden que dentro de una acción filiatoria un padre demandado, por su acción voluntaria, se disponga a ocupar jurídicamente su puesto de padre y exteriorice espontáneamente las circunstancias que originaron esa situación, con todas las consecuencias jurídicas que procedieran, como aquí lo hizo Andrés Díaz.

La Ley Núm. 229, que le concede al padre la facultad de reconocer al fruto de su pecado, que anteriormente en casos como el presente, se le negaba; que le cede la oportunidad de ser el primero que lo dignifique, no le exige que la ejercite en un momento determinado, ni fija el sitio ni la forma en que debe hacerlo. A su arbitrio, libre y sin trabas, dondequiera y comoquiera, y hasta el último segundo de su existencia, podrá "derramar por piedad o misericordia sobre la cabeza de su hijo el preciado óleo de la filiación."

El espíritu de la generosa evolución legislativa y jurisprudencial respecto a hijos habidos fuera de las justas nupcias, impide que el hijo reconocido voluntariamente por su padre, disfrute parcialmente y no a plenitud, de las prerrogativas inherentes a la filiación. Al padre que por virtud de su acto crea una situación paternofilial que antes no existía, no se le debe permitir destruir económicamente a su hijo oponiendo obstáculos infranqueables entre éste y sus bienes, ni al hijo consentir su propia ruina. Los Arts. 744 y 1713 del

Código Civil prohiben las renuncias o transacciones sobre la legítima futura, el estado civil y los alimentos futuros.

El reconocimiento es un acto jurídico. Su efecto es la constitución del *status* de hijo. De por sí no es un acto creador de derechos y obligaciones. Éstos no se conceden ni se imponen por la voluntad del padre, que sólo tiene el poder autónomo de dar vida a la declaración de paternidad. Es la ley la que lo considera como causa de determinados efectos jurídicos, atribuyendo a ese *status* las prerrogativas que define.

Como dijimos en *Cortés* v. *Cortés*, 73 D.P.R. 693, 705 (Ortiz) (1952), "el hecho en sí del reconocimiento conlleva las consecuencias legales que ya hemos mencionado y el causante no puede, con sus expresiones, coartar o limitar esas consecuencias legales, ni cercenar los derechos hereditarios de sus hijos naturales válidamente reconocidos . . . ni limitar personalmente los alcances de la ley." (²) Así volvimos a expresarnos en *Rivera* v. *Rivera*, 78 D.P.R. 908 (Saldaña) (1956).

---

(²) Albaladejo, en las páginas 44 y siguientes de su citada obra, comenta:

". . . Tales efectos se producen, pues, *ex lege* y no *ex voluntate*. Se producen porque se reconoció independientemente de que aparezcan o no como queridos. A diferencia de los efectos del negocio jurídico que, en tesis de principio, se producen porque aparecen como queridos por su autor, siempre que sean conformes y no contrarios a las disposiciones del ordenamiento jurídico.

"Que la producción del efecto tiene lugar *ex lege* se deduce de lo siguiente:

"1. El reconocimiento no contiene esencialmente una voluntad negocial, sino sólo una afirmación de paternidad. Luego los efectos del acto no pueden basarse en un querer privado que no es preciso que exista.

"2. Si el padre al declarar solemnemente su paternidad manifiesta, a la vez, que no desea atribuir un estado al hijo, sino simplemente dejar constancia segura de su paternidad biológica, el estado, no obstante, se atribuirá.

"Obsérvese que contra lo anterior no se puede alegar que frecuentemente en el Derecho de familia se producen efectos *ex voluntate* y, sin embargo, no se concede al particular el poder de limitarlos

■ Es cierto que la admisión, aceptación o confesión de hechos en una controversia judicial desempeña una función probatoria: hace prueba contra su autor, releva a la otra parte de la obligación de probarlos, y, generalmente, obligan al juzgador a fallar con arreglo a los hechos admitidos, aceptados o confesados. Cf. Arts. 1169, 1185 y siguientes, Código Civil y *Miranda* v. *Costa*, 77 D.P.R. 791, 808 (Belaval) (1954). Pero también es cierto, que a los fines y propósitos de la vigente Sec. 2 de la Ley Núm. 229 de 1942, la admisión, aceptación o confesión expresa, directa, clara y terminante que en su contestación a la demanda hizo el 10 de junio de 1957, el padre demandado Andrés Díaz del hecho de su paternidad biológica sobre su hijo demandante, desempeñó la función constitutiva de un pleno reconocimiento de hijo por acción voluntaria, autónoma y de por sí suficiente en derecho para generar la relación paternofilial entre ambos con todas las consecuencias legales que de la misma se derivan, no obstante el intento del padre demandado de someter su naturaleza a sus propios términos y condiciones. A partir de esa

---

o modificarlos. Y entender así que el efecto en el reconocimiento se produciría *ex voluntate*, pero que al reconocedor no se le permite realizar la anterior protesta, lo mismo que, por ejemplo, no se permite contraer matrimonio *sub conditione*.

"Tal objeción sería equivocada en cuanto que en el caso del reconocimiento con protesta de no querer atribuir un estado al hijo reconocido, se trata precisamente del único supuesto en el que es posible afirmar con seguridad que el reconocedor no quiere los efectos jurídicos normales del reconocimiento (sino que quiere, por ejemplo, dar sólo un derecho de alimentos), y carecería de fundamento afirmar que tales efectos se *producen siempre porque son queridos,* menos en el caso de no ser queridos, en el que se producen aún *a pesar de no ser queridos.*

"En definitiva, la voluntad del reconocedor no es relevante para fundamentar los efectos del reconocimiento, que se producen *sin ella* (por ejemplo, declaración solemne de paternidad exclusivamente, es decir, sin declaración de atribución de estado) o *contra ella* (reconocimiento con protesta de no querer atribuir estado). Y cuando una voluntad de efectos jurídicos existe (así, si se declara expresamente querer atribuir el estado) es perfectamente inoperante y los efectos no se siguen de ella." (Énfasis en el original.)

fecha el hecho fundamental de la paternidad natural, ya constante en un documento público, había dejado de estar sujeto a la apreciación judicial, se hizo inútil la continuación de la controversia y ni era necesario que la misma finara con sentencia para considerar creado el *status*.

El 11 de julio de 1922 se resolvió el caso de *Ex parte Morales*, 30 D.P.R. 907 (Franco Soto). Consideramos —a pesar de lo que en contrario sostiene el recurrente—que entre la situación de hecho en él envuelta y la del caso de autos existe una gran analogía, excepto que en aquél la disposición que permitía al padre reconocer voluntariamente a un hijo extramatrimonial en documento público era el Art. 131 del Código Civil español y en éste es la Sec. 2 de la Ley Núm. 229 de 1942.

En el caso de *Ex parte Morales*, supra, se había solicitado por Joaquín Morales Flores ante la extinta Corte de Distrito de Humacao que se le declarara único y universal heredero abintestato de su padre Eduardo Morales. Para probar su relación de parentesco con el causante, presentó los autos de un pleito civil sobre filiación seguido por él y otros cuatro hermanos suyos contra dicho Eduardo Morales. De esos autos resultaba probado que "cuando el padre se vio demandado, por su propia voluntad admitió en su contestación que Joaquín de la Cruz, el . . . peticionario, fue procreado por el demandado en sus relaciones con la demandante (María Flores, madre de los allí demandantes) y que lo había reconocido como hijo suyo por actos directos que implicaban la posesión continua del estado de hijo natural y la negó en cuanto a los cuatro restantes . . ." En el pleito no llegó a dictarse sentencia por haber desistido de la acción la madre demandante. La mencionada Corte de Distrito apelada declaró sin lugar la petición fundándose en que la admisión hecha por el padre demandado al contestar la demanda en aquel litigio de filiación de que Joaquín Morales Flores era el fruto de sus relaciones con María Flores, *no constituía un reconocimiento voluntario* del peticionario como hijo natural del padre de-

mandado. Rovocamos al tribunal de instancia y resolvimos que tal actuación constituía, sin más, un reconocimiento voluntario válido, que, fallecido el padre natural, ponía al hijo en condiciones de pedir y obtener una declaratoria de heredero.

Refiriéndose a este caso, que con gran empeño trata de destinguir el recurrente, éste admite a la página 6 de su alegato:

"Es decir, que lo que resuelve el citado caso es que consignada en una Contestación en acción filiatoria la admisión de la paternidad, tal admisión, por haberse hecho en un documento público, como admitimos que es una Contestación en un litigio, constituye un reconocimiento auténtico.

"Es precisamente conforme con la citada doctrina, que en la presente acción nosotros no negamos, y por el contrario sostenemos, que a virtud de la admisión del demandado en su citada Contestación en la acción de epígrafe, él admitió con carácter incuestionable y definitivo que es el padre del demandante."

En *Velázquez* v. *Velázquez*, 82 D.P.R. 619 (Blanco Lugo) (1962), al fijar la naturaleza y efectos de cierto documento notarial denominado "Compraventa y División Material de Bienes", y de otro documento privado aclaratorio otorgado por las mismas personas, resolvimos que ellos de por sí eran suficientes para constituir un reconocimiento de hijo por acción voluntaria de los herederos de su padre.

El 18 de diciembre de 1962, en el caso de *Díaz Fontánez* v. *Sucn. Díaz*, 86 D.P.R. 798 (Belaval), también resolvimos que el hecho de hacer constar un contribuyente en sus planillas de ingresos correspondientes a varios años, que determinadas personas,—nacidas mientras él estaba casado—eran hijos dependientes de él, constituía, conforme a lo dispuesto en la Ley Núm. 229 de 1942, según enmendada, un reconocimiento de hijos por acción voluntaria a todos los efectos legales. [3]

---

[3] En la opinión de ese caso, dijimos en parte:

"En cuanto al carácter de expreso del documento público, la norma sentada por la ilustrada Sala sentenciadora es todavía más ri-

Sostiene el recurrente que en *Correa* v. *Sucn. Pizá*, 64 D.P.R. 987 (Snyder) (1945) y *Alvarez* v. *Alvarez*, 77 D.P.R. 909 (Sifre) (1955), decidimos que admisiones de paternidad hechas en la contestación a la demanda de filiación o en el curso de la conferencia preliminar al juicio, no constituyen el reconocimiento por acción voluntaria dispuesto por la Sec. 2 de la Ley Núm. 229.

La impresión inmediata que se produce al leerse por primera vez las opiniones emitidas en esos casos, inclina al lector en esta contienda hacia la vertiente del padre demandado. Pero subsiguientes y más cuidadosas lecturas, suplementadas por el conocimiento cabal de las circunstancias concurrentes en ellos a la luz de nuestros expedientes de apelación formados en ambos casos, nos advierten claramente: (a) que en el caso de *Correa* nada se decidió respecto al efecto, en una acción filiatoria, de la admisión de paternidad en una contestación a la demanda, y (b) que el de *Alvarez* fue erróneamente re-

---

gurosa que la que exige la jurisprudencia española para el escrito indubitado de acuerdo con el art. 125, puesto que además de la declaración expresa en el documento privado, se permite la incidental—*incidencia*—siendo suficiente que aparezca la intención de hacerlo, aunque el propósito del documento fuera otro. Tal criterio lo hemos encontrado admirablemente expuesto en la parte dispositiva de la Sentencia de 22 de enero de 1948 del Tribunal Supremo de España que dice así: 'Considerando que si bien la Base quinta de la Ley de 11 de mayo de 1888—invocada por el recurrente en apoyo de su tesis—declara que "no se permitirá la investigación de la paternidad sino en los casos de delito o cuando exista escrito del padre en el que conste la voluntad indubitada de reconocer por suyo al hijo, deliberadamente expresada con ese fin o cuando medie posesión de estado", es lo cierto que entre esta redacción y la del artículo 135 del Código Civil se observa una marcada diferencia bajo dos distintos aspectos: es el primero que la Base quinta emplea el término genérico *hijo*, mientras que el artículo 135 se refiere de manera específica al *hijo natural* y consiste el segundo aspecto—que es el de interés ahora a efectos de decidir la cuestión planteada—en que la Base quinta aplica las palabras *deliberadamente expresada con ese fin* refiriéndose a la voluntad indubitada de reconocer, en tanto que lo exigido con carácter de indubitado por el artículo 135 es el escrito en que el padre reconozca su paternidad, no el propósito que haya inspirado tal declaración'."

suelto y no nos sentimos obligados por su doctrina. Vamos a explicarnos con mayor amplitud.

En el caso de *Correa*, resuelto en 9 de mayo de 1945, como más adelante demostraremos, cometimos nuestro pecado original al hacer el primer contacto con la reforma social iniciada efectivamente en 1942 a través de la Ley Núm. 229 de ese año. Decidimos allí, y por primera vez, que la conducta o actuaciones externas del padre realizadas después de la aprobación de esa Ley Núm. 229, por las cuales admitía su paternidad no constituían el reconocimiento por acción voluntaria y que por disposición del Art. 125 del Código Civil, éste sólo podía hacerse otorgando el padre un acta de nacimiento, una escritura o cualquier otro documento público. La demanda de filiación fue presentada el 15 de mayo de 1944 contra los herederos de Juan Pizá, fallecido el 23 de mayo de 1943. Los herederos demandados *no presentaron contestación a la demanda*, ni en forma alguna admitieron que su causante había sido el padre de la allí demandante, nacida en 1917, mientras su supuesto padre estaba casado. Se decidió el caso a base de una moción de los demandados solicitando que se dictase sentencia sumaria a favor de ellos, fundada en que la condición de hija adulterina de la allí demandante, no reconocida en documento público, le impedía obtener su filiación. A esa moción se unió copia de un testamento de Juan Pizá, otorgado en 1941, donde hizo constar que "carece de hijos naturales reconocidos y sin reconocer." Al final del primer párrafo de la opinión se hace referencia a esa solicitud. Desde luego, muerto el padre antes de iniciarse el litigio y no contestada la demanda, ni admitida la paternidad en forma alguna por sus herederos, no puede afirmarse que en ese caso de *Correa* decidimos lo señalado por el recurrente. Sin duda alguna un error de traducción del último párrafo de la opinión, (3a) cuyo texto

---

(3a) En su texto original inglés se dice: ". . . it is obvious that the acts and statements of the father subsequent to 1942 described in the complaint herein admitting parenthood are not the 'voluntary action' contemplated by sec. 2."

inserta el recurrente en su alegato, dio pie a la creencia de que en el caso se había radicado una contestación a la demanda, puesto que en él hicimos referencias a "las actuaciones y manifestaciones del padre admitiendo la paternidad contenidas en la demanda." Realmente nos referíamos al trato y comportamiento que se alegaba había dado y observado el padre respecto a su hija y a una promesa de reconocerla que le había hecho poco antes de fallecer, que podían considerarse como "actuaciones y manifestaciones del padre admitiendo la paternidad" que se expusieron después en la demanda que jamás se contestó, como ocurrió en el caso de autos.

*Alvarez* v. *Alvarez*, supra, fue iniciado ante el tribunal de instancia en diciembre de 1951. Los demandantes eran hijos de padre casado, nacidos entre 1922 y 1927. El padre había fallecido en enero de 1951, por lo que fueron demandados sus herederos. En su contestación éstos negaron la paternidad, el concubinato y la posesión del estado de hijos naturales alegados en la demanda. Pero en la conferencia anterior al juicio los herederos demandados admitieron que los demandantes eran hijos del padre fallecido, y se dejó "para que el tribunal determine por la prueba la clasificación de los mismos, ya como hijos naturales, o ya como legítimos o ya como adulterinos, lo que resulte de la prueba."

Al comenzar el juicio el juez hizo constar para el récord todo el contenido de la orden del *pretrial* y respecto a la acción de filiación el juez y los herederos demandados hicieron constar lo siguiente que tomamos de la página 7 del expediente original de apelación:

"La Corte: Está bien. Pero lo que yo estaba diciendo era que el Tribunal podía dictar sentencia, de acuerdo con las admisiones hechas por las partes, en cuanto a la primera causa de acción, o sea que los demandantes son hijos de Félix Alvarez y de Victoria Alvarez, ambos fallecidos; que los demandantes nacieron cuando Félix Alvarez era casado con otra mujer, que no es Victoria Alvarez, o sea que él estaba casado con Obdulia Alvarez; y que habiendo los demandantes nacidos al amparo de esa situación

de hechos, ellos tienen derecho a llevar el apellido del padre de acuerdo con la legislación vigente, pero no tienen derecho, de acuerdo con la ley, a ser considerados como hijos naturales reconocidos. Quiere decir que en cuanto a esa causa de acción no hay contención, después de hechas esas admisiones y con vista de las alegaciones de las partes. Y clasificados así, no tienen derecho a la herencia.

"DEMANDADOS: Estamos conformes.

"La Corte: Esa es la ley y esos son los hechos, y así lo declara judicialmente este Tribunal. Vamos a oir la prueba en cuanto a las otras causas de acción de la demanda."

En sus conclusiones, tanto en las de hecho como en las de derecho, hizo constar el juez sentenciador que "los demandantes son hijos de Félix Alvarez Santana habidos por él con Victoria Alvarez en estado de concubinato y mientras se encontraba casado con Obdulia Alvarez"; que son hijos naturales de ese causante "pero sólo con derecho a llevar su apellido, pero no a heredarle." Citó como autoridad el caso de *Vargas* v. *Jusino*, 71 D.P.R. 389 (1950).

Se dictó sentencia el 6 de mayo de 1953, declarando con lugar la acción de filiación, pero sólo al efecto de usar el apellido del fenecido padre, negándoseles todo derecho a heredarlo.

En apelación confirmamos la sentencia el 28 de enero de 1955, en plena vigencia de la Constitución y de la Ley Núm. 17 de 20 de agosto de 1952.

El primer señalamiento que en el recurso hicieron los hijos demandantes (que apoyaron con interesante argumentación que en algunos puntos coincide con las ideas que aquí exponemos), es como sigue:

"PRIMER ERROR: Erró el Tribunal inferior al declarar que los demandantes-apelantes, que ya habían sido reconocidos por acción voluntaria de los herederos de su padre (los demandados-apelados) con antelación al juicio, como hijos de Félix Alvarez Santana, ratificando los actos de su padre, no son hijos naturales y sí adulterinos, y que como consecuencia sólo tienen derecho a llevar el apellido de su padre, pero no a heredarle; violando

así las disposiciones de la Sección 2 de la Ley #229 de 12 de mayo de 1942, según ha sido enmendada por la Ley #243 de 12 de mayo de 1945, y la Sección 1 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico y en violación al Artículo 22 del Código Civil de Puerto Rico, Ed. 1930."

No, obstante haber en ese caso aceptado los herederos demandados, en el año 1953, que se hiciera constar en el acta u orden del *pretrial* y en el récord del juicio—dos documentos públicos—el hecho cierto y entonces indubitado de que el padre de ellos lo era también de los demandados, resolvimos que tales admisiones expresas, hechas libremente, constantes en dos documentos públicos, no constituían un reconocimiento voluntario conforme a la Ley Núm. 229 de 1942 y que no había "razonamiento alguno que nos permita llegar a la conclusión de que esa admisión tiene el alcance que le atribuyen los apelantes." (pág. 915.)

Sin duda alguna que lo resuelto en ese caso de *Alvarez* v. *Alvarez*, al enfrentarse con nuestro criterio en el presente recurso, no constituye un precedente persuasivo que en algo ayude a la causa del recurrente.

## II

¿Autorizó la Ley Núm. 229 el reconocimiento implícito o tácito? A juicio nuestro, lo autorizó. Concede al padre, en términos generales, la facultad, que antes le negaba, de poder reconocer por acción voluntaria a "los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia. . . que no tenían la condición de hijos naturales según la legislación anterior." Pero no definió el término "acción voluntaria". No prescribió la forma o modo en que el padre podría exteriorizar o expresar la manifestación de voluntad en el reconocimiento, es decir, esa acción voluntaria. Desde luego, entre la variedad de formas posibles, estaría siempre la expresión directa de voluntad en documento privado escrito y firmado por él, en testamento, en el acta de nacimiento y en cualquier otro

documento público. Estarían también la conducta, el trato, el comportamiento, todos los actos realizados por el padre respecto a su hijo y de los cuales se puede racionalmente inferir la paternidad, o podrían considerarse como una confesión tácita de paternidad, aunque ello no encuadrara dentro de la norma de posesión continua del estado de hijo del Art. 125, que no es, después de todo, nada más que el grado legal que debe dar el reconocimiento tácito dentro de las facultades discrecionales de apreciación de los tribunales.

Tomó en cuenta la ley la experiencia humana, las realidades de la vida. La variedad de la conducta del hombre frente a las diversas situaciones sociales. No quiso enmarcar la acción voluntaria dentro de fórmulas imposibles, rechazadas tradicionalmente por exigencias sociales.

Ya hemos visto que el padre demandado, en su contestación también expuso: ". . . acepta que desde el nacimiento del demandante siempre lo ha atendido en todas sus necesidades como hijo." Con ello admitió Andrés Díaz que desde el día 26 de enero de 1939 hasta el 10 de junio de 1957—por más de 18 años, quince de los cuales transcurrieron después de aprobada la Ley Núm. 229—en forma constante y en todo tiempo, tuvo a Ramón Ocasio como hijo y como tal lo atendió "en todas sus necesidades." Díaz no alegó que lo hizo involuntariamente, bajo violencia o intimidación, por miedo o por error, o sólo por piadosa devoción hacia el prójimo.

Esa prolongada y persistente conducta, proceder, trato y comportamiento externos del propio Andrés Díaz para con su hijo, es lo que siempre hemos considerado como "la posesión continua del estado de hijo natural del padre demandado."

Nos cita varias veces el recurrente el caso de *Correa* v. *Sucn. Pizá*, 64 D.P.R. 987 (Snyder) (1945).[4]

---

[4] Como ya expusimos, este caso de filiación, de hija nacida en 1917 de padre casado, fue instado ante la extinta Corte de Distrito de Arecibo en 15 de mayo de 1944. El supuesto padre había fallecido el 23 de mayo de 1943. Fueron demandados sus herederos.

Entre otras cosas allí resolvimos:

"Cuando la sección 2 es leída a la luz del artículo 125 del Código, es obvio que las actuaciones y manifestaciones del padre admitiendo la paternidad contenidas en la demanda, no son la 'acción voluntaria' que contempla la sección 2. Acción voluntaria, según se indica en el artículo 125, significa el otorgamiento por el padre de un acta de nacimiento, escritura o cualquier otro documento público. Las alegaciones de la demanda muy bien pudieron dar derecho a la demandante bajo el artículo 125 a obligar al padre a reconocerla involuntariamente como hija natural a tenor con una orden judicial a ese efecto, de no haber sido una hija adulterina. Pero la sección 2 de la Ley núm. 229, al disponer el posible reconocimiento de los hijos adulterinos que, como la demandante, nacieron antes de mayo de 1942, lo limita al reconocimiento voluntario solamente, dentro del significado de dicha frase en el artículo 125 (Actas del Senado, supra; Muñoz Morales, supra). Esto exige una inscripción, un testamento o cualquier otro documento público otorgado por el padre. Y eso no ocurrió aquí."

A base de un aspecto de esa doctrina—eliminación del reconocimiento tácito—la filiación de Ramón Ocasio fundada en aquellas alegaciones originales de la demanda que sólo exponían las actuaciones y conducta del padre a partir de la fecha de vigencia de la Ley Núm. 229, hubiera fracasado. Pero, también a base de otro aspecto de esa doctrina—la acción voluntaria debe manifestarse por documento público—hubiera prosperado tan pronto como fue archivada y unida al expediente del caso, ya convertido en documento público el escrito de contestación en que aceptaba la existencia de sus actuaciones y pedía al Tribunal Superior que lo declarara padre del demandante, aunque, desde luego, sujeto a los términos que al organismo judicial y a su propio hijo él pretendía imponerles.

La interpretación de la frase "acción voluntaria" se apartó grandemente de la regla de oro provista por el Art. 19 de nuestro Código Civil que dispone que el medio más eficaz para describir el verdadero sentido de una ley cuando sus

expresiones son dudosas, es considerar la razón y el espíritu de ella o motivos que indujeron al poder legislativo a dictarla. Según el Art. 15 del mismo Código debieron entenderse "en su más corriente y usual significación" y el uso general y popular de ellas.

Es cierto que nuestra Legislatura aprobó, poco después de resolverse *Correa* v. *Sucn. Pizá*, la Ley Núm. 243 del 12 de mayo de 1945, enmendando la Sec. 2 de la Ley Núm. 229 de 1942, a los fines de conceder al hijo ilegítimo no natural, nacido antes de ese año, que no fuera voluntariamente reconocido por su padre, una acción para su filiación, pero limitada al efecto de llevar el apellido del padre.

Se interpretó el contenido de esa enmienda de 1945 en *Cruz* v. *Andrini*, 66 D.P.R. 124 (Travieso) (1946), bajo la influencia de la estrictísima doctrina del caso de *Correa* v. *Pizá*, supra. Se volvió a declarar ineficaz al reconocimiento voluntario tácito e implícito que permite la Ley Núm. 229 de 1942. Se fue más lejos: se eliminó de nuevo la posesión continua de estado de hijo natural como razón para declararse judicialmente la filiación en estos casos de hijos adulterinos nacidos antes de 1942. (⁵)

Ni el caso de *Correa* v. *Sucn. Pizá*, ni los que bajo su signo se consideraron, fueron correctamente resueltos. Es nuestra

---

(⁵) La progenie del caso de *Correa* v. *Sucn. Pizá*, aunque no ha contado siempre con la unanimidad del Tribunal, es bastante copiosa. Véanse: *Cruz* v. *Andrini*, 66 D.P.R. 124 (Travieso) (1946); *Fernández* v. *Sucn. Fernández*, 66 D.P.R. 881 (De Jesús) (1947); *Elicier* v. *Sucn. Cautiño*, 70 D.P.R. 432 (Marrero) (1949), opinión disidente del Juez Negrón Fernández; *Rossy* v. *Martínez*, 70 D.P.R. 737 (Marrero) (1949), opinión disidente del Juez Negrón Fernández; *Vargas* v. *Jusino*, 71 D.P.R. 389 (Marrero) (1950), op. disidentes de los Jueces Todd y Negrón Fernández; *Armaiz* v. *Santamaría*, 75 D.P.R. 579 (Per Curiam) (1953); *Álvarez* v. *Álvarez*, 77 D.P.R. 909 (Sifre) (1955); *Sánchez* v. *Díaz*, 78 D.P.R. 811 (Pérez Pimentel) (1955), op. disidentes de los Jueces Negrón Fernández y Belaval; *Márquez* v. *Avilés*, 79 D.P.R. 988 (Per Curiam) (1957) (no intervino el Juez Negrón Fernández); *Ex parte Vélez*, 81 D.P.R. 653 (Pérez Pimentel) (1960) (voto separado del Juez Santana Becerra).

indeclinable obligación revocarlos como autoridad de precedentes y así lo hacemos. ($^6$) Veamos.

El Código Civil Revisado de 1902 separó en dos grandes divisiones a los hijos: en legítimos y en ilegítimos. Estos eran todos los nacidos fuera de matrimonio, pudieran o no casarse entre sí sus padres a la fecha de la concepción o del nacimiento. Ese cuerpo legal no sometió a formas específicas ni a mágicos tabúes el reconocimiento de éstos, como lo hacía imperativamente—y lo sigue haciendo—el Art. 131 del Código Civil español. ($^7$) Simplemente dispuso:

"Art. 187.—El hijo ilegítimo *puede ser reconocido de cualquier modo,* por el padre y la madre conjuntamente, o por uno solo de ellos."

Para decretarse el reconocimiento judicial podía bastar, conforme al Art. 189, si no existía un escrito del padre que reconocía su paternidad, que el padre lo tuviera como hijo de él, pública o privadamente, o que le hubiera llamado tal en conversación, o se ocupara de su educación y sostenimiento.

----

($^6$) Nuestra jurisprudencia no es estática, tiene que ser dinámica, como las mismas leyes, que teniendo el carácter de permanentes en sus derechos, son variables en su evolución progresiva, al tener en cuenta las nuevas necesidades y las realidades de la vida. En la histórica decisión de *Giménez et al.* v. *Brenes,* 10 D.P.R. 126, 170 (Figueras) (1906), en que se debatió la constitucionalidad del procedimiento sumario hipotecario, el ilustre Juez Asociado MacLeary, en su famoso disenso, nos legó la siguiente admonición:

"Si para llegar a una correcta decisión de este caso es necesario modificar las opiniones dictadas anteriormente por este Tribunal, que se modifiquen de cualquier modo, o que se anulen, si fuere necesario. Al error no se le puede nunca convertir en verdad, por más que se insista en él; si se ha seguido un camino equivocado, volvamos sobre nuestros pasos antes de que nos perdamos en el laberinto de los engaños; atrevámonos a proceder correctamente."

($^7$) Ese Art. 131 dice:

"El reconocimiento de un hijo natural *deberá hacerse* en el acta de nacimiento, en testamento o en otro documento público."

Nunca nuestro Código adoptó esa exclusiva forma de realizar el reconocimiento. La edición de 1911, en parte de su Art. 193, se limitó a fijar, respecto al hijo natural, la siguiente norma permisiva:

"El hijo natural *puede ser reconocido* por el padre . . . en el acta de nacimiento, o en otro documento público."

Incluía a todos los hijos ilegítimos reconocidos entre los herederos forzosos.—Art. 795(2)—y disponía que tendrían "los mismos derechos hereditarios que los hijos legítimos y sus descendientes."—Art. 913.

Calderón, Jr., en su magnífica monografía *"La Filiación en Puerto Rico"*, en Rev. C. Abo. P.R., Vol. XX, Núm. 4, agosto 1960, pág. 287–290, entre otros atinados comentarios, hace los siguientes:

"El tercer período en el desarrollo de las relaciones paternofiliales en Puerto Rico, que comienza con la aprobación del Código Civil Revisado de 1902, acusa una marcada desviación de las antiguas orientaciones y se caracteriza por una actitud de vanguardia, fundamentalmente liberal. Es quizás la primera expresión de lo que podríamos llamar Derecho Puertorriqueño, sobre el problema. En 1902 el legislador puertorriqueño adoptó un nuevo Código Civil, muy parecido al Español en su mayor parte, pero distinto especialmente en lo concerniente al Derecho de Familia. El Libro Primero del Código de 1902 se aparta radicalmente de los previos ordenamientos y lleva a cabo una verdadera revolución en el tratamiento de la filiación natural. Estas innovaciones, repetidas con ligeras variaciones en 1942, como veremos más adelante, fueron, no hay duda, las precursoras, las bases del sistema de completa liberalidad que hoy impera en Puerto Rico en lo concerniente a esta materia. Es cierto que fueron luego rechazadas en 1911 y que se volvió al sistema tradicional; pero no pueden menospreciarse los efectos permanentes producidos por la victoria temporera lograda por las tendencias modernas en 1902; victoria que abrió el camino a nuevos ambientes y exigencias sociales que finalmente derrumbaron el dique de la tradición e implantaron en nuestra sociedad unos conceptos totalmente diferentes de los que hasta entonces habían prevalecido.

" . . . . . . . .

"Aunque el Código de 1902 copió extensamente del Código Civil de Luisiana, no conservó, como ya hemos dicho, la clasificación tradicional de los hijos extramatrimoniales. Muñoz Morales es de opinión que se incurrió en grave error al adoptarse ese texto mutilado y que esto hizo necesaria la enmienda efectuada

en 1911, retornándose a la doctrina antigua del Código Civil Español. Por nuestra parte creemos que las enmiendas de 1911 no estaban encaminadas meramente a corregir errores de redacción u ordenación sino que obedecieron a motivaciones más importantes. Sencillamente, por razones histórico-sociológicas y por tradición religiosa el pueblo no estaba preparado para asimilar un cambio de esa magnitud y reaccionó vigorosamente contra ese desajuste traumático. Ya veremos que en 1942, por el contrario, las tendencias modernas de liberalidad habían preparado el camino para otro cambio similar y que el ambiente jurídico-social se había tornado receptivo al mismo.

" . . . . . . . .

"En 1902, el Código Civil Revisado no contenía disposición alguna respecto a la forma a que habría de ajustarse el reconocimiento voluntario. Por tal razón Muñoz Morales entiende que éste podía ser 'expreso, tácito, directo o indirecto, o de cualquier modo', o sea, que no tenía que hacerse en el acta de nacimiento, en testamento o en otro documento público, como era necesario en el período anterior. Estamos de acuerdo."

El hijo de matrimonio, aun cuando la unión entre sus padres haya terminado, como hecho, antes de su nacimiento, o aun cuando haya sido concebido antes del matrimonio de sus padres pero nacido después, tiene padres y siempre asegurada su filiación. Pero el hermano que procreó su padre fuera de matrimonio, ése nació sin padres, y, desde luego, sin filiación, ante la misma ley, por obra y gracia del mismo derecho legislado.

De otra magnífica monografía sobre la materia, del ilustre profesor Mascareñas, publicada en Revista de Derecho Puertorriqueño, Núm. 4, abril–junio 1962, pág. 14, con el título de *"La Filiación en el Derecho Puertorriqueño"*, tomamos el siguiente párrafo:

"Cuando se trata de hijos extramatrimoniales, la cuestión se plantea de otra manera. En el momento de nacer no tienen padres determinados, no tienen filiación determinada. Serán hijos ilegítimo si nacieron en una época; hijos ilegítimos naturales o hijos ilegítimos no naturales si nacieron en otras épocas; hijos natura-

les todos si nacieron después de la vigencia de la Ley de 12 de mayo de 1942. Pero en todos los casos en el momento de nacer carecen de filiación. Los padres podrán surgir después o podrán no surgir. Podrán surgir espontáneamente, si reconocen voluntariamente al hijo y, en tal caso, podrán surgir pronto, si reconocen al hijo al hacer la inscripción de nacimiento, o tarde en el transcurso de los años. Podrán surgir obligadamente, mediante acción que se ejercite contra ellos ante los tribunales. Y podrá ser que no surjan nunca, porque nunca reconozcan al hijo; o porque nunca se ejercite una acción, ya que sea, simplemente, por que deje de ejercitarse, ya sea porque habiendo ejercitado una acción el tribunal no dé lugar a ella por no ser suficiente la prueba.

"Puede, pues, comprobarse fácilmente que los principales problemas referentes a la filiación extramatrimonial girarán en torno al reconocimiento y a la acción de filiación.

"Como sea que los hijos extramatrimoniales, a diferencia de los legítimos, en el momento de nacer no tienen padres, no hay problemas referentes a destruir una filiación. Los problemas son de *adquirir* la filiación. Y así, surgen los referentes al reconocimiento voluntario por parte de los padres y al ejercicio de las correspondientes acciones de filiación (reconocimiento obligado)."

A pesar de que la Ley Núm. 229 de 1942 representaba un franco renacimiento de la política liberal de Art. 187 de 1902, o el regreso al reconocimiento "de cualquier modo", implícito en la entraña misma de la simple frase "acción voluntaria", única condición impuesta por ella al reconocimiento del hijo adulterino nacido antes del 1942, en *Correa* v. *Sucn. Pizá*, despojamos a esa frase de todo sentido y significación humanos afines a sus propósitos e intenciones. Resolvimos, en síntesis, en ese caso, que esa ley "se aprobó a la luz de nuestro Código Civil, especialmente del artículo 125 del mismo" y que la frase "acción voluntaria" significaba, "según se indica en el artículo 125, (en el cual ni siquiera aparece usado el adjetivo 'voluntario'), el otorgamiento por el padre de un acta de nacimiento, escritura o cualquier otro documento público", y que cualquier acción de filiación bajo la Ley Núm. 229 tenía que fundarse en el párrafo 2 del Art. 125 del Código Civil, ed.

de 1930. En otras palabras, le dimos vigencia al Art. 131 español.

Contra la doctrina de *Correa* v. *Sucn. Pizá*, se pronunció en *Elicier* v. *Sucn. Cautiño*, supra, la razonada opinión del compañero juez, hoy Presidente de este Tribunal, señor Negrón Fernández, en la que, en parte, expuso:

"Creo que la doctrina sentada en *Correa* v. *Sucn. Pizá*, supra, y seguida en los de *Cruz* v. *Andrini*, 66 D.P.R. 124 y *Fernández* v. *Sucn. Fernández*, 66 D.P.R. 881, debe ser revocada y una nueva interpretación y alcance dados a la expresión *por acción voluntaria*, en el sentido de que bajo los incisos 1 y 2 del párrafo 3ro. del artículo 125 del Código Civil, ed. 1930, que establecen, respectivamente, que el padre está obligado a reconocer al hijo natural (1) cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad y (2) cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia, el reconocimiento declarado en pleito instado por el hijo a ese fin, lo es por *acción voluntaria*, dentro del alcance y propósito de la sección 2 ya mencionada.

"Con la decisión en el caso de *Correa* v. *Sucn. Pizá*, este Tribunal dio una interpretación restrictiva a la Ley 229. Al resolver que la expresión *acción voluntaria* significa el otorgamiento por el padre de un acta de nacimiento, escritura o cualquier otro documento público, según lo provisto en el párrafo 2 del artículo 125 del Código Civil, incluyó en la sección 2 de la Ley 229 una limitación en ella no contenida. Al así hacerlo, perdió de vista el hecho innegable y cierto de que bajo los dos primeros incisos del párrafo tercero del mismo artículo 125—escrito indubitado y posesión de estado—los actos del padre, para dar derecho al hijo natural a instar la acción judicial para su reconocimiento, tienen que ser, y de hecho y en derecho son, tan voluntarios y espontáneos como los del reconocimiento que, bajo el párrafo segundo de dicho artículo, puede hacer el padre en el acta de nacimiento o en documento público.

"La frase *reconocimiento voluntario* no está contenida en el artículo 125. Se le ha dado tal calificativo al reconocimiento en acta de nacimiento o documento público, porque en el segundo párrafo del mismo se provee que 'El hijo natural *puede ser reconocido* por el padre o la madre conjuntamente, o por uno solo

de ellos, en el acta de nacimiento, o en otro documento público.'

" . . . . . . . .

"La falta de solemnidad de que adolece el reconocimiento por escrito indubitado y posesión de estado no afecta, y en nada perjudica, el carácter voluntario y espontáneo de los actos previos de reconocimiento, que luego, en juicio declarativo, ratifica el tribunal. Con tal ratificación se suple únicamente la falta de solemnidad de dichos actos; mas no el carácter voluntario y espontáneo de los mismos, que es condición indispensable para dicha ratificación. En ausencia de indicación alguna en la sección 2 de la Ley 229 de restringir el alcance del término 'acción voluntaria' usado en la misma para indicar los casos en que los hijos nacidos con anterioridad a la fecha de su vigencia, y que no tenían la condición de hijos naturales según la legislación anterior, pueden ser reconocidos por sus padres—o por las personas con derecho a la herencia—dicha ley debe interpretarse en forma liberal, no restrictiva; no a la luz de la rúbrica dada a las *formas* de reconocimiento contenidas en el artículo 125 del Código Civil, si que más bien a la luz de la condición voluntaria de los actos previos, determinantes del reconocimiento y generadores del derecho a que éste se declare, según los comentaristas y la jurisprudencia del Tribunal Supremo de España, que, por tan citados en el estudio de nuestro Código Civil, han venido a formar parte, por adopción, de nuestro sistema jurisprudencial; y si en nuestras decisiones anteriores no se penetró en el fondo de la condición 'voluntaria' de los actos previos de reconocimiento que contemplan los incisos 1 y 2 del tercer párrafo del artículo 125, se impone, al interpretar una ley de tanta trascendencia social como la 229, que vayamos a la raíz del artículo 125 del Código Civil para medir, en toda la extensión de la justicia social que persigue, la acción legislativa aprobando la Ley 229. 'La jurisprudencia no puede permanecer extraña a las funciones del derecho público y a las inspiraciones del medio social'—Sentencia del Tribunal Supremo de España de 21 de noviembre de 1934, 216 Jurisprudencia Civil 91."

Al socaire de la doctrina de *Correa* v. *Sucn. Pizá*, seguimos sosteniendo y confirmando fallos apelados en acciones de filiación llevadas bajo el amparo de la Ley Núm. 229 de 1942, según enmendada en 1945, que negaban toda declaración de

*status,* porque la prueba no era suficiente para que la acción voluntaria pudiera considerarse comprendida entre los casos previstos por el Art. 125 del Código Civil.

En *Miranda* v. *Costa,* 77 D.P.R. 791 (1955), resuelto por sentencia, sin opinión, el 30 de diciembre de 1954—dos años y medio luego de estar en vigor la Constitución—así lo hicimos por mayoría. Pero frente a la escueta sentencia dictada en ese caso se encuentra el luminoso disenso de nuestro compañero juez del Tribunal, Sr. Belaval. De él reproducimos el siguiente párrafo:

"El ilustrado juez sentenciador no tuvo, sin embargo, al momento de fallar el caso, el beneficio de la amplia discusión que sobre la regla de la 'prueba robusta y convincente' se hizo en nuestra decisión de *Figueroa* v. *Díaz,* 75 D.P.R. 163, (Negrón Fernández), (Ortiz), (Marrero), (Sifre), (1953), citas precisas a las págs. 174, 185, 189, 190, 191, 192, 196, donde se resolvió que 'nada hay en la ley que exija determinado quantum o calidad de prueba para justificar el cumplimiento de tal requisito' y por lo tanto, los casos de filiación deben resolverse de acuerdo 'con una auténtica preponderancia de la evidencia'. La necesidad de la nueva regla era evidente. Cuando se adoptan los arts. 189 del Código de 1902, 193 del Código de 1911 y 125 del Código de 1930, el legislador consideró una relación sexual ilícita entre un hombre soltero y una mujer soltera, donde es posible una mayor investigación de la paternidad. Cuando se adopta la Ley núm. 229 de 12 de mayo de 1942 y la Ley núm. 243 de 12 de mayo de 1945, el legislador consideró una relación sexual ilícita entre un hombre casado con una mujer soltera o una mujer casada con un hombre soltero, o un hombre casado con otra mujer casada con otro hombre, que no resultaban cónyuges entre sí. Mientras en el caso de la descendencia natural de hombre y mujer solteros, el escrito indubitado puede ser expreso, abierto, deliberado, por no existir conflicto con ninguna otra descendencia legítima, en el caso de la descendencia adulterina del hombre o la mujer casados, el escrito indubitado puede ser menos preciso, más cauteloso, más contradictorio. Mientras en el caso de la descendencia natural de hombre y mujer solteros, la posesión de estado de hijo natural, puede ser continua y notoria, por no existir conflicto con ninguno otro estado matrimonial; en el caso de la

descendencia adulterina de hombre o la mujer casados, la posesión de estado de hijo natural puede ser discontinua, menos notoria, más circunstancial. Mientras en el caso de la descendencia natural de hombre y mujer solteros, el estado de concubinato puede ser público y evidente, por no existir conflicto con las relaciones conyugales legítimas; en el caso de la descendencia adulterina del hombre o mujer casados, el estado de concubinato puede estar rodeado por una mayor secretividad y prudencia. Mientras en el caso de la descendencia natural de hombre y mujer solteros, la relación sexual de la cual deba inferirse la paternidad, puede ser manifiesta y espontánea, por no existir conflicto con los intereses sociales de una familia; en el caso de la descendencia adulterina de hombre o mujer casados, la relación sexual de la cual deba inferirse la paternidad, puede estar rodeada por una atmósfera de clandestinidad y mortificación moral. Por esta razón, la anterior jurisprudencia de este tribunal, hasta el año 1942 sobre el art. 125, que se refería al reconocimiento de hijos naturales de padres solteros, en todo lo referente al reconocimiento de hijos adulterinos de hombre o mujer casados, no tenía base para una aplicabilidad estricta. Por ello, dos Jueces de este tribunal, el Juez Asociado señor Negrón Fernández y el que estas líneas escribe, hemos mantenido el criterio que la investigación de la paternidad adulterina no debe hacerse dentro del marco de la naturalidad tradicional que dispone el art. 125 para hombres y mujeres solteros, y sí dentro de una acción civil genérica, donde las relaciones sexuales al momento de la concepción, sean el hecho esencial para el establecimiento de la paternidad."

En *Armaiz* v. *Santamaría*, 75 D.P.R. 579 (1953) (Per Curiam), y *Vargas* v. *Jusino*, 71 D.P.R. 389 (Marrero), (Todd Jr.), (Negrón Fernández y Belaval) (1950), recursos en filiaciones instadas bajo la Ley Núm. 229 y su enmienda de 1945, para el efecto limitado del uso del apellido, por mayoría resolvimos que la mera prueba de la paternidad, sin prueba alguna de cualquiera de los requisitos exigidos por el Art. 125, no bastaba para establecer el reconocimiento autorizado por esa Ley Núm. 229. En el primero de ellos, con la concurrencia del compañero juez Belaval, se produce por el hoy Juez Presidente señor Negrón Fernández, una de las expresiones disi-

dentes mejor concebidas en nuestra jurisprudencia sobre la materia de filiación. Su texto completo es como sigue:

"La regla sancionada en *Vargas* v. *Jusino,* 71 D.P.R. 389, negando a un hijo nacido bajo la vigencia de la Ley núm. 229 de 12 de mayo de 1942, enmendada por la núm. 243 de 12 de mayo de 1945, el derecho a llevar el apellido paterno—no obstante haber quedado establecida plenamente su paternidad y creado ésta obligaciones legales en el padre—no debería prevalecer más en nuestra jurisprudencia.

"Esa misma regla vuelve hoy a negar a otro hijo—cuyo origen se ha establecido y cuyo padre ha sido judicialmente señalado como tal—el derecho a tener nombre.

"Ayer fue Claribel Vargas—quien justamente debería llamarse Claribel Jusino—la que inmoló su derecho al apellido paterno porque sólo pudo demostrar quién era su padre. Hoy es Liliana Armaiz—quien justamente debería llamarse Liliana Santamaría—la que inmola ese mínimo derecho que nuestra legislación positiva le reconoce, porque sólo ofreció prueba de una adjudicación judicial previa de paternidad. Como si la paternidad, como verdad jurídica, pudiera relitigarse después de haberse consagrado judicialmente. Como si la paternidad no fuera una sola y, al adjudicarse, no generara, como consecuencia inherente de su propia existencia, el derecho a un nombre, que es con el que comienza el disfrute de su dignidad el ser humano.

"Comentando el 'silencio prohibitivo' del Código Civil Español sobre el derecho de los hijos adulterinos e incestuosos a llevar el apellido del padre—estado de derecho cambiado, en su claro propósito de reparación social, por la Ley 229—Scaevola se expresa así:

'Calla el Código sobre uno de los derechos que señala a los otros hijos, como es el de usar el apellido del padre o madre que los reconozca. ¿Lo tendrá el hijo ilegítimo no natural cuando disfrute de alimentos, por concurrir alguna de las circunstancias expresadas en los diversos casos del art. 140? El 139 dice que tendrán sólo derecho a exigir alimentos, omitiendo el de que venimos hablando, mencionado expresamente en el Código tratándose de los legítimos, legitimados y naturales, debiendo, por tanto, deducirse que la ley fundamental civil no les concede tal derecho. Ahora bien; todo individuo desde su nacimiento ha de llevar un apellido. . . .

No estamos conformes en modo alguno con el silencio prohibitivo del Código, dimanante del empleo del adjetivo *sólo*. La paternidad y la maternidad lleva, y ha llevado siempre, como consecuencia inherente la de que los hijos puedan usar el apellido de sus padres. Prueba de ello es que esto ha sucedido, a pesar de no contener el derecho sustantivo vigente hasta ahora ningún precepto expreso sobre el particular. Desearíamos, por tanto, que la jurisprudencia viniese a interpretar el silencio de la ley en el sentido favorable al uso por el hijo del apellido paterno o materno, por creerlo conforme a los principios de justicia. Una vez asentada judicialmente la paternidad y maternidad, o sea la causa, precisa admitir el efecto, la filiación, y ésta se acredita ante la sociedad por el uso del apellido.' 3 Scaevola, *Código Civil*, 437–438.

"La justicia, en el más depurado concepto de su misión, tiene una función social que realizar y un objetivo humano que atender. No realiza esa función ni atiende ese objetivo la interpretación restrictiva de la Ley 229, contradictoria del propósito de justicia social que la inspiró, y que produce la negación de un derecho que dimana de una relación filial comprobada judicialmente. Dicha legislación no permite que haya más hijos sin nombre—verdaderos parias en nuestra sociedad—cuando tienen padres a quienes el Estado ha señalado como tales, y a quienes impone el cumplimiento de obligaciones específicas que nacen de esa condición. La paternidad no tiene etapas, ni clases, ni grados. La Ley 229 no requiere, no puede requerir, otra prueba que la de paternidad, *Vargas* v. *Jusino*, supra, op. dis., pág. 396, *Figueroa* v. *Díaz*, ante pág. 163, opinión propia. Por eso disiento."

Ya en su opinión en *Figueroa* v. *Díaz*, 75 D.P.R. 163–178 (1953), había demostrado hasta la saciedad que las normas del Código Civil, especialmente las contenidas en su Art. 125, no eran aptas para la plena efectividad de la reforma implantada por la Ley Núm. 229 de 1942. De ella citamos: (págs. 174–176.)

"Resulta un anacronismo jurídico que el poder judicial niegue consecuencias a, y anule en su propósito esencial de igualdad real —en su hondo sentido de dignidad humana— un precepto de ley sustantiva, por la razón de que el poder legislativo no fijó expresamente un medio para que esa igualdad pudiera manifestarse.

Pero el derecho a tener un padre no debe hacerse depender del grado de eficiencia con que se redacta un estatuto. Conocido su objetivo y la filosofía que lo inspira, debemos hacer efectivo su propósito fundamental. La igualdad no permite discrímenes ni autoriza privilegios. No puede haber igualdad real entre los hijos naturales y los adulterinos e incestuosos mientras se someta a éstos a los rigores de un reconocimiento basado en *posesión continua de estado* y en *concubinato,* porque en la vida real, bajo el orden social establecido, esos estados si se producen no se consolidan, y si se consolidan no se manifiestan abiertamente para que los adulterinos e incestuosos puedan beneficiarse de ellos constituyendo la exigencia de su prueba, en efecto, una negación del derecho, reconocídoles por la Ley 229, a investigar su origen.

"Nuestra generación tiene el deber de desarraigarse de tradiciones y precedentes que resultan arcaicos en nuestro tiempo porque no responden al estado actual de nuestra conciencia colectiva ni al progresivo desarrollo de nuestra filosofía judicial. El derecho a la filiación de los hijos adulterinos e incestuosos, bajo la Ley 229, debe predicarse en la investigación de la paternidad, a través de cualquier medio legítimo de prueba, que es la implicación natural de dicha ley; no en admisiones públicas de la paternidad, que es lo que exige el requisito de posesión de estado, ni en relaciones públicas de adulterio, que es lo que en cuanto a ellos exige el requisito de concubinato.

"El *sentido de injusticia* que inquieta a veces la conciencia en su busca de la verdad, y que como fuente espontánea de la formación del derecho contribuye con su corriente a la integración activa del acervo jurídico marca una diferencia fundamental en la actitud práctica de los tribunales al convertirse en criterio adecuado para llegar a un verdadero *sentido de justicia* en las controversias judiciales. Cahn, *The Sense of Injustice,* 11, 31. No sería justo privar de su filiación a un hijo adulterino o incestuoso bajo la Ley 229 porque no pueda judicialmente probar el improbable hecho de que su padre *confesó* o *admitió* públicamente su paternidad o proclamó públicamente su delito. Las leyes se hacen por los hombres y se interpretan para los hombres. Por eso, en su interpretación, debe ser factor preeminente la realidad humana de la vida, no la abstracción dogmática de reglas eternas e inmutables; mucho menos las normas de discrimen social repudiadas ya por la ley fundamental del Estado, aunque ésta con efecto prospectivo. Véanse, Max Radin, *Law as Logic and*

*Experience,* pág. VIII, 46, 160 et seq.; Cardozo, *Growth of the Law,* págs. 87 et seq. y *The Paradoxes of Legal Science,* pág. 31 et seq.; Pound, *Contemporary Juristic Theory,* págs. 11, 17 et seq.; Garlan, *Legal Realism and Justice,* pág. 13 et seq. En esta época de justicia social debemos marchar hacia la humanización de la justicia y el derecho, dejando atrás en su decadencia rigorista el sentido dogmático del derecho y la justicia.

"El alcance de la Ley 229 debe fijarse, para dar viabilidad al propósito esencial del legislador, poniendo énfasis en el bienestar social según lo concibe *'el sentido social de la justicia inmanente en el pensamiento del hombre común',* ya que 'Quizá el avance más significativo en la ciencia moderna del derecho es el cambio de actitud, de la analítica a la funcional. . . . El énfasis ha cambiado del contenido del precepto y la existencia del remedio, al efecto del precepto en acción y la capacidad y eficiencia del remedio en el logro de los fines para los cuales el precepto fue concebido'. Cardozo, *The Nature of the Judicial Process,* págs. 72 et seq., y teniendo presente que 'Lo que está en el espíritu de un estatuto está en el estatuto, aunque no esté en su letra; y lo que está en su letra no está en el estatuto, a menos que esté en su intención', *In Re Lambrecht* (Mich.) 100 N.W. 606; *Common Council* v. *Rush* (Mich.) 46 N.W. 951; cf. artículo 19, Código Civil, ed. 1930. Al así hacerlo no estaríamos legislando, ni siquiera en la esfera permisible de la 'legislación intersticial', Cardozo, ob. cit., págs. 98, 113 et seq."

Ante la desventajosa posición que ese Art. 125 creaba a los hijos favorecidos por las Leyes Núms. 229 de 1942 y 243 de 1945, era lógico que, al no contener éstas normas de pruebas específicas, se impusiera la adopción de la simple norma de la prueba de paternidad. ([8])

Pero por el principio de igualdad ante la Ley y en el trato jurídico, esa simple norma de prueba debe aprovechar también a los hijos naturales en el concepto de la legislación

---

([8]) En casos de reclamación de alimentos instados por hijos ilegítimos en quienes no concurran la condición legal de naturales, bajo el Art. 128 del Código Civil ya habíamos resuelto que bastaba la prueba de la paternidad para concederlos. Cf. *Vargas* v. *Jusino,* 71 D.P.R. 389 (1950); *Cerra* v. *Corte,* 67 D.P.R. 929 (1947); *Falcón* v. *Cruz,* 67 D.P.R. 530 (1947) y *Rivera* v. *Cardona,* 56 D.P.R. 819 (1940).

anterior a la Ley Núm. 229 de 1942. La razón no puede concebir que al hijo adulterino no reconocido, nacido antes o después del 10 de agosto de 1942, para obtener su filiación le baste cumplir esa simple norma de prueba de la paternidad sin que se le haga pasar por las horcas caudinas del Art. 125 y que al hijo natural nacido antes de esa fecha, para el mismo efecto, se le obligue al estricto cumplimiento de las rigurosas normas de prueba impuestas por ese artículo. (9)

### III

A la fecha de la sentencia—5 de junio de 1958—¿contaba el tribunal sentenciador con facultad para limitar los efectos de la filiación? ¿La tiene este Tribunal Supremo, o la ha tenido alguna vez desde el 25 de julio de 1952? Esta cuestión requiere que tratemos la problemática filiatoria a la luz de nuestra Constitución de 25 de julio de 1952 y de la Ley Núm. 17 aprobada el 20 de agosto de 1952.

Reza, en parte, el Preámbulo de aquélla: "Nosotros, el pueblo de Puerto Rico, a fin de organizarnos . . . sobre una base plenamente democrática, promover el bienestar general . . . y asegurar *para nosotros y nuestra posteridad el goce cabal de los derechos humanos* . . . ordenamos . . . esta Constitución . . . Al así hacerlo declaramos: . . . Que el orden político está subordinado a los derechos del hombre; . . . Que consideramos factores determinantes en nuestra vida . . . la fe en la justicia; . . . la fidelidad a *los valores del ser*

---

(9) En su citada monografía, pág. 47, nos dice Mascareñas:

"Sea lo que fuere, en todo caso deberán ser de aplicación las mismas normas para todos los hijos naturales (en el concepto de la Ley de 1942). Si basta la determinación de la paternidad por cualquier medio para los hijos adulterinos e incestuosos, lo mismo debería bastar para los otros naturales, pues si, en tal caso, éstos tuvieran las posibilidades limitadas a los supuestos del artículo 125 se produciría una situación más favorable para los hijos adulterinos e incestuosos, lo cual no sería justo y, además, dejaría de existir la igualdad que la reforma legislativa pretendió. . . . Puede afirmarse que las normas del Código Civil no son aptas para la Ley de 1942, y que no están de acuerdo con el espíritu de la Ley."

*humano por encima de posiciones sociales, diferencias raciales e intereses económicos;* y la esperanza de *un mundo mejor basado en estos principios.*" (Énfasis nuestro.)

En su Artículo II extiende su Carta de Derechos. En primer lugar figura el referente a la igualdad humana. Se concibe así:

"1. [Dignidad e igualdad del ser humano; discrimen, prohibido.] La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social,* ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de *esencial igualdad humana.*" (Énfasis suplido.)

En su Núm. 5, ese Art. II dispone que "toda persona tiene derecho al fortalecimiento del respeto de los derechos del hombre", y, en su Núm. 7, que "no se negará a persona alguna en Puerto Rico la igual protección de las leyes."

La Comisión de la Convención Constituyente encargada del estudio de la Carta de Derechos, en su informe, en lo pertinente, hizo constar:

"Nacimiento. Se propone eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio. *Se coloca a todos los hijos respecto de sus padres y respecto del orden jurídico en igualdad de derechos.* Las uniones ilícitas pueden y deben estar prohibidas y esta disposición tendrá como una de sus consecuencias el desalentarlas. Pero el fruto inocente de ellas, debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas. Así lo exige el principio de la responsabilidad individual, con arreglo a la cual nadie es culpable por los actos que él mismo no realiza. Aunque la legislación actual ya cubre en casi su totalidad lo aquí expuesto, será menester nueva legislación. A los fines de herencias y propiedades las modificaciones resultantes de esta sección *no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia.*" (Énfasis suplido.)

El 20 de agosto de 1952, se aprobó, con efecto retroactivo al 25 de julio de 1952, la Ley Núm. 17, cuyo título es así:

"Ley Para Establecer la Igualdad de Derecho de los Hijos."
Por su Art. 1 dispone:

*"Todo los hijos* tienen respecto *a sus padres y a los bienes relictos* por éstos, *los mismos derechos que corresponde a los hijos legítimos."* (Énfasis suplido.)

Con estas veinticuatro sencillas palabras el legislador puertorriqueño en 1952 restituyó a un gran sector de su pueblo la esencial igualdad humana concedida medio siglo antes por el Código Civil Revisado de 1902—Arts. 21, 187–199, 794–796 y 913—pero que el discrimen codificado del 9 de marzo de 1911 le había quitado. Esa Constitución y ese estatuto que en parte la instrumenta, se concibieron y aprobaron con el claro propósito y destino de asegurar *para nosotros y nuestra posteridad el goce cabal de los derechos,* la dignidad e igualdad del ser humano y la fidelidad a sus valores por encima de posiciones sociales, diferencias raciales e intereses económicos.

"Nosotros" comprende también a los que el lunes 27 de agosto de 1951 tomaron parte en la elección de los delegados a la Convención Constituyente, confiriendo a ésta el "mandato" para adoptar aquella Constitución, y que para votar en esa elección tuvieron que haber nacido antes del 27 de agosto de 1930. Sin duda, muchos de ellos venían del siglo XIX. Amparando bajo su imperio a todos los que vivían al momento de su adopción y a su posteridad, la Constitución, y la Ley Núm. 17 de agosto de 1952, derraman por igual sobre cada puertorriqueño la bendición de todos sus postulados, sin sujeción a la fecha de su nacimiento, ni a su posición social o económica. No establecen distinción alguna entre el ser humano que nacería bajo su signo y el que nació antes de 1890, dentro del régimen de las Leyes de Toro; ni con el que nació entre el 1 de enero de 1890 y el 30 de junio de 1902, régimen del Código Civil español; ni con el que nació entre el 1 de julio de 1902 y el 8 de marzo de 1911, período cristiano de dignidad humana e igualdad ante la ley para todos los hijos;

ni con el que nació entre el 9 de marzo de 1911 y el 9 de agosto de 1942, período medioevo del estigma, la inferioridad jurídica y el oprobio para unos y de privilegios y ventajas para otros; ni con el que nació entre el 10 de agosto de 1942 y el 25 de julio de 1952, período de evolución progresiva legislativa hacia la completa emancipación jurídica que se alcanza en esa última fecha.

Declararon *ipso jure*, nulo, sin valor ni eficacia, para en adelante, todo precepto y toda disposición de nuestro derecho legislado, sustantiva o adjetiva, que a ellas de cualquier modo se opusiera. Quedó derogada en absoluto toda ley o parte de ley que en una u otra forma establecía o pudiera establecer clases o categorías de hijos por las circunstancias de su nacimiento o que para otorgar derechos tuviera por guía o directriz esas clases o categorías.

Si ellas no distinguieron, carecemos de facultad para distinguir. No debemos perdernos en el laberinto de las injustas distinciones. En la interpretación y aplicación de ellas el postulado básico de igualdad humana ante el Derecho debe ser el faro que nos encamine en la jornada más honrosa, pero también más ingrata, del hombre, la de hacer justicia a sus semejantes. Igualdad para el anciano y para el niño en recibir participación en el disfrute de todo derecho sustantivo; igualdad para todos en el trato jurídico ante el derecho adjetivo en todo proceso de reivindicación social o patrimonial.

Sabemos que la absoluta retroactividad del derecho positivo sería la muerte de la seguridad y de la confianza jurídica; pero también sabemos que la absoluta irretroactividad sería la muerte del desenvolvimiento del derecho. El respeto a los derechos adquiridos, a los hechos consumados, a las situaciones ya existentes, no se opone al establecimiento de reformas sociales constitucionales ni a leyes que se dan en vista de situaciones pasadas. La tendencia moderna, tanto en la doctrina como en la legislación, consiste en limitar todo lo posible el principio de la irretroactividad, excepto en materia de

contratos, que en muchos países, como en Alemania, se mantiene, no obstante, en toda su pureza. Aquí esa tendencia se acoge en el Art. 3 de nuestro Código Civil, al disponer que las leyes no tendrán efecto retroactivo, *si no dispusieren lo contrario*. Hace tiempo que reconocimos la retroactividad del derecho civil procesal, de leyes que regulan o modifican la jurisdicción y competencia de los tribunales y la de los estatutos penales en cuanto favorecen a los acusados y mejoran sus condiciones.

Nuestra Constitución no reprodujo en su texto el mencionado Art. 3 del Código Civil, aunque acogió un concepto afín al principio de la irretroactividad cuando estableció sobre la materia de contratos, en el Núm. 7 de su Art. II la siguiente prohibición: "No se aprobarán leyes que menoscaben las obligaciones contractuales."

Comentando el Art. 3 del Código Civil español,[9a] nos dice Manresa—Tomo 1, pág. 162, séptima ed. 1956:

"Aunque el artículo que comentamos es, a primera vista, muy sencillo, a poco se medite en su aplicación surgen numerosas dudas, que deben resolverse, en la parte relativa al derecho civil, que es donde ofrecen mayores dificultades al examinar las disposiciones transitorias para la aplicación de este Código.

"El art. 3 del Código Civil puede ser considerado como superfluo si quiso ser una norma programática dirigida al legislador, porque no se trata de un precepto constitucional y, menos aún, rígido; y no puede atribuírsele, como a ninguno de los artículos del título preliminar, una jerarquía superior a la de cualquier ley posterior; por otra parte, si lo fuese, la salvedad final 'si no dispusiere lo contrario' haría totalmente estéril el mandato. Si se trata sólo—como ha de admitirse—de una norma dada al juzgador, su alcance no es otro que el de una regla de interpretación; y como la excepción final del mismo determina que el efecto retroactivo, o su contrario, habrán de deducirse del propio contexto de la ley a aplicar, si se admite—como debe hacerse—que puede establecerse la retroactividad tácitamente, resultará que

---

[9a] Que trata de la retroactividad de la ley y que es el antecedente de nuestro Art. 3.

con la simple utilización de las reglas generales de interpretación de la ley se llegaría siempre a la misma conclusión, aunque el artículo del Código no existiera. Respecto al carácter que haya de atribuirse a la regla de la irretroactividad, Gierke sostiene que es una norma prohibitiva, autodirigida al sujeto de la producción jurídica; pero Ferrara niega que constituya un límite legislativo."

Desde el caso de *Charres* v. *Arroyo*, 16 D.P.R. 816, 821 (J. C. Hernández) (1910), tenemos resuelto que el derecho de un hijo natural al reconocimiento se regula por la ley vigente al tiempo de su nacimiento, por considerar que los hechos que se suponen determinativos del reconocimiento tuvieron lugar bajo el régimen de esa ley. Pero nunca hemos decidido que esa doctrina opere como insuperable limitación constitucional al poder legislativo para sustituir o modificar la legislación anterior.

Mascareñas nos dice, a las págs. 14–15 de su citada monografía:

"Legislación aplicable:—

"El Tribunal Supremo tiene declarado reiteradamente que los derechos de filiación de los hijos ilegítimos deben regularse por la legislación vigente en la época del nacimiento.

"Esta doctrina está basada en la regla 1 de las disposiciones transitorias: 'Se regirán por la legislación anterior al Código revisado los derechos nacidos, según ella, de hechos realizados bajo su régimen, aunque dicho Código los regule de otro modo o no los reconozca. Pero si el hecho apareciere declarado por primera vez en el Código civil revisado, tendrá efecto desde luego, aunque el hecho que lo origine se verificare bajo la legislación anterior, siempre que no se oponga o perjudique a otro derecho nacido o adquirido al amparo de dicha legislación anterior.'

"Además, hay que tener en cuenta que la legislación posterior puede variar la situación. Y así, puede verse, por ejemplo, cómo la Ley de 12 de mayo de 1942 dispone que todos los hijos extramatrimoniales nacidos con anterioridad y que no podían reconocerse podrán reconocerse e, incluso, podrán legitimarse por el subsiguiente matrimonio de los padres.

"El principio de que la situación de los hijos y sus derechos

ha de regularse por la legislación de la época en que nacieron es un principio surgido del Derecho positivo y que no impide que el legislador pueda dictar disposiciones en la materia, modificando derechos y obligaciones, como lo hace en la citada Ley de 12 de mayo de 1942 y en otras.

"Pero no se trata de un principio 'tabú', intocable y, por tanto, el legislador puede legislar, tranquilamente, modificando la legislación vigente en el tiempo del nacimiento."

La legislación de la década precedente a la Constitución, en su aspecto sustantivo, reconocía derechos al hijo legítimo, al legitimado, al ilegítimo reconocido y al adoptado, independiente del momento del nacimiento.—Arts. 118, 121, 127, 132, 736 (1) y 902, Código Civil. El pleno disfrute de esos derechos se le negaba únicamente al ilegítimo, nacido antes del 10 de agosto de 1942, que no hubiera sido reconocido por su padre o por los herederos de éste en su acta de nacimiento, en un testamento o en otro documento público.

En su aspecto procesal, aun imperaban las normas de prueba—con categoría de requisitos cuasi sustantivos-impuestas por el Art. 125 del Código Civil. Al adoptarse la Constitución y aprobarse la Ley Núm. 17 esas normas resultaron no aptas para implementar el nuevo régimen igualitario, perdieron entonces su vigencia y aplicación respecto a litigios y procedimientos filiatorios pendientes al 25 de julio de 1952 y a los que se iniciaran en o con posterioridad a esa fecha.

Desde ese día, para la declaración judicial del estado de hijo a todos los efectos de ley—única permitida por la Constitución y la Ley Núm. 17—de no ser aceptado en la contestación o en cualquier otra alegación, o de cualquier otro modo y en cualquier momento del pleito por el padre demandado, o, en su caso, por sus herederos, sólo se necesitaría la comprobación satisfactoria del hecho de la paternidad natural o biológica, por las normas de prueba ordinarias y usuales, debiendo el juzgador resolver el caso de acuerdo con la preponderancia de la evidencia y fundado en conclusiones que represen-

ten el balance más racional, jurídico y justiciero para la resolución del caso.

En *Pabón* v. *Morales*, 79 D.P.R. 154 (1956), por sentencia *per curiam* del 30 de abril de 1956—caso de filiación de un hijo nacido el 22 de julio de 1953—resolvimos que el Art. 125 del Código Civil no era de aplicación y que procedía la declaración del *status* de hijo aun cuando "nunca existió un estado de concubinato entre la demandante y el demandado, ni tampoco se probó la posesión continua del estado de hijo . . . ."

Otra consecuencia o resultado de la Ley Núm. 17, fue la derogación parcial del párrafo segundo de la Sec. 2 de la Ley Núm. 229 de 1942, tal como ese segundo párrafo le fue adicionado por la Ley Núm. 243 de 1945, cuyo texto, repetimos:

"En el caso de que los hijos a que se refiere esta sección no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. La acción para este reconocimiento se tramitará de acuerdo con el procedimiento que fija este título para el reconocimiento de hijos naturales; entendiéndose, sin embargo, que tal reconocimiento sólo tendrá el alcance que aquí se expresa."

Carece de validez toda disposición estatutaria y toda sentencia, decreto o fallo judicial que, en contravención con la letra de la Ley Núm. 17, únicamente le conceda, reconozca o atribuya al estado de hijo de un ser humano, nada más que parte de los derechos unitarios de que disfruta el hijo llamado legítimo. Por ser inherentes e inseparables del estado de hijos, por dimanar *ipso jure* de esa condición, y por no existir desde el 25 de julio de 1952 seres humanos que se puedan considerar hijos "al solo efecto de llevar el apellido de sus padres", ni acción ni sentencia que sólo tenga el singular alcance de pedir o conceder únicamente "el apellido de sus padres", es obvio que el transcrito párrafo en cuanto a las

consecuencias y efectos a que él alude ha quedado derogado. Si procede declararse comprobado satisfactoriamente el hecho de la paternidad, el estado de hijo debe reconocerse a todos los efectos legales, es decir, con los mismos derechos que tiene un hijo legítimo, sin excepción o limitación alguna. ([10])

En *Matías* v. *Rodríguez*, 79 D.P.R. 14, 17 (Pérez Pimentel) (1956)—caso de hija que nació en 1953—modificamos la sentencia de filiación limitada al uso del apellido paterno, dándole eficacia para todos los efectos legales. Allí dijimos, luego de hacer referencia al Art. II, Sec. 1 de la Constitución, y de insertar el texto del Art. 1 de la Ley Núm. 17:

"En virtud de estas disposiciones legales la sentencia que declara a la menor demandante hija del demandado no puede limitar los derechos que la ley le concede como consecuencia de

---

([10]) También, como secuela de la Ley Núm. 229, se creó una peculiar situación respecto a las declaraciones categóricas de los Arts. 112 y 113 de nuestro Código Civil al efecto de que son hijos legítimos los nacidos después de la celebración del matrimonio y los nacidos antes de los trescientos días siguientes a su disolución. Hasta el 10 de agosto de 1952, cuando nacía un hijo de mujer casada y hombre soltero, la barrera del adulterio le impedía al padre natural reconocerlo ante el derecho. Claro que nada impedía, que el padre, como cuestión de hecho, aceptara que procreó un hijo adulterino. El esposo, por obra y gracia de los Arts. 112 y 113—para proteger al hijo y la fidelidad marital—sin que las células sexuales de su mujer se hubieran unido con sus gametos masculinos, se convertía en padre legítimo del hijo de otro. Se producía una especie de partenogénesis jurídica masculina.

Después de entrar en vigor la Ley Núm. 229 esa presunción de legitimidad quedó, sino debilitada, por lo menos pareada con el derecho que esa ley concede al padre natural para que reconozca como hijo suyo al fruto de su unión adulterina, no obstante los preceptos terminantes de los Arts. 112 y 113. La situación que a juicio nuestro se crea es la de dos personas, una considerada el padre jurídico, y la otra, el padre natural, biológico, real y verdadero, a quienes, simultáneamente, la ley concede el derecho de inscribirlo como hijo.

Como padre de ese hijo debería prevalecer el que de ellos primeramente lo inscribió como hijo suyo en el Registro Demográfico y asumió el cumplimiento de las serias y graves responsabilidades paternofiliales, con mejor razón en una época como la presente en que para el padre jurídico es simplemente un hijo y para el natural, también simplemente, es un hijo. Le tocaría al que no lo inscribió como hijo suyo, impugnar ante los tribunales la validez de la inscripción registral.

tal declaración. Carece de eficacia legal cualquier restricción de esos derechos ya que éstos emanan de su condición de hija y son parte integrante de la sentencia. Es por tanto nuestro deber corregir la sentencia apelada para ajustarla a la ley."

El efecto más discutido de la Ley Núm. 17 ha sido el relativo al derecho hereditario respecto al hijo adulterino, nacido antes del 10 de agosto de 1942, cuyo padre no le reconoció y tuvo que acudir a los tribunales para obtener la declaración judicial de hijo. Sabemos que el derecho hereditario no se considera constitucional. El punto, desde *Correa* v. *Sucn. Pizá*, supra, hasta *Márquez* v. *Avilés*, 79 D.P.R. 988 (Per Curiam) (1957), 252 F.2d 715, ha sido resuelto en la negativa por este Tribunal, amparándose, no en los postulados constitucionales, ni en la clara letra y el franco propósito de la Ley Núm. 17 (de los cuales se dijo que tenían efectos prospectivos y no retroactivos), sino en la interpretación de una recomendación formulada en unas once palabras de un informe de una de las varias comisiones de la Convención Constituyente. Nuestra hermética expresión en ese sentido ha sido, más o menos, así:

"En el Informe de la Comisión de la Carta de Derechos y en los debates de la Convención Constituyente se aclaró fuera de toda duda que 'a los fines de herencias y propiedades las modificaciones resultantes de esta sección (aludiendo a la referida sección 1ra. de la Carta de Derechos) *no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia.'* "

A nuestro juicio, el término "nacimientos" no era el correcto. El que debió ser empleado en esa expresión, era "fallecimientos", tratándose de herencias. Nos explicaremos.

Esa Comisión no pudo aconsejar a la Convención que la igualdad en el derecho de participar en la herencia del padre, debía ser otorgada a personas nacidas a partir del 25 de julio de 1952, y no a las nacidas antes de esa fecha, es decir, que se tomara como causa jurídica determinante de la igualdad hereditaria la época del nacimiento. La razón es sencilla: En el régimen sucesorio nuestro el derecho hereditario nace o

surge, no al nacer el individuo, sino al instante de fallecer su causante.—Arts. 599, 600, 601, 602, 603 y 610, Código Civil. El efecto del nacimiento es la determinación de la personalidad y capacidad jurídica del individuo, Art. 24, íd. A menos que se trate de un hijo póstumo, el título de heredero no se adquiere simultáneamente con el hecho del nacimiento. El presupuesto indispensable de la adquisición de derechos hereditarios o su causa legal es la muerte del causante; sin ella no hay a quien suceder. El nacimiento concede una capacidad genérica para en un día suceder. El fenómeno subrogatorio hereditario tiene lugar al ocurrir fallecimientos, no al ocurrir nacimientos. Por eso, repetidamente hemos resuelto que la ley vigente al fallecer el causante es la que determina la adquisición del derecho hereditario en la sucesión cuyas propiedades se distribuirán. Véanse los casos citados sobre esta materia en *Ex parte Orona Acevedo*, 87 D.P.R. 840 (Santana Becerra) (1963), ([11]) y en *Berdecía* v. *Tribunal Superior*, 87 D.P.R. 108 (Blanco Lugo) (1963).

Mientras el padre viva, no puede haber herederos de hecho o de derecho. El hijo se encuentra, respecto a la futura herencia, en una situación jurídica de pendencia, con un derecho patrimonial eventual. Tiene la simple esperanza de heredar. Pero, como dice el catedrático Iglesias Cubría, en su obra *"Los Derechos Patrimoniales Eventuales"*, Oviedo, 1961, pág. 15: "Las simples esperanzas no adquieren carta de natu-

---

([11]) Entre otras cosas, dijimos en ese caso:

"No solamente por razón de las técnicas del derecho, ya que por muchas posibilidades y expectativas que tenga un individuo de heredar su derecho no toma cuerpo ni se plasma sino hasta que ocurre el fallecimiento, también, y lo que es aún más importante, si se toma en cuenta que en el derecho a suceder hay envueltas consideraciones básicas de política pública del Estado, política pública que puede tener que ser alterada a la luz de estados sociales y económicos distintos a través de distintas épocas. Atar el derecho sucesorio a la ley vigente al nacimiento de una persona equivaldría a restringir los poderes del Estado en cuanto a su función de determinar su política pública a lo largo de un prolongado período de tiempo como es el que puede llevar la vida natural."

raleza jurídica; es decir, son irrelevantes para el Derecho."

El paso de bienes del causante al heredero a veces no se puede dar, por ejemplo, cuando el hijo ha muerto antes que su padre, cuando éste lo haya desheredado, cuando sea indigno de heredar conforme a la ley, cuando se hubiera adjudicado todo el caudal relicto a los acreedores, cuando jamás el hijo aceptó la herencia, cuando no se dejó activo ni pasivo al morir el padre.

Es más, el heredero, realmente no adquiere individual y exclusivamente los bienes que le correspondan hasta que no se haga legalmente la partición.—Art. 1021, Idem.

Por esas consideraciones fundamentales sobre el derecho sucesorio, no era propio el uso del término "nacimientos". Lo correcto e inequívoco era aconsejar que las modificaciones resultantes de la sección 1ra. de la Carta de Derechos no deberían ser retroactivas a *fallecimientos* ocurridos antes de su vigencia.

Los delegados no siguieron la sugerencia del Informe, al adoptar la Constitución. No dispusieron en ella que el hijo nacido antes del 25 de julio de 1952 no podría heredar, o que no disfrutaría de igualdad hereditaria. Cuando se aprobó la Ley Núm. 17 disponiendo que *todos* los hijos tendrán respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos, se hizo retroactiva al 25 de julio 1952, es decir, a herencias abiertas en o después de esa fecha, pero no a las motivadas por fallecimientos ocurridos antes. Al incluir a "todos los hijos" como sujetos de esa equiparación legal se refirió a todos los hijos vivos en 25 de julio de 1952 con capacidad para heredar y cuyos padres murieran después de empezar a regir esa ley.

La historia legislativa de la Ley Núm. 17 demuestra definitivamente que el derecho hereditario no se iba a reconocer—como nunca se ha reconocido—a base de la fecha de nacimiento del heredero.

De la interesante exposición que contiene la opinión del

caso *Ex parte Orona Acevedo*, supra, reproducimos los siguientes párrafos:

"A la sesión extraordinaria de la Asamblea Legislativa que comenzó el 28 de julio de 1952, el Gobernador envió una Proclama fechada 31 de julio sometiendo asuntos a ser considerados, entre ellos, 'Legislación instrumentando la Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico eliminando discrímenes por motivo de nacimiento.' El asunto se convirtió en el Proyecto del Senado Núm. 18 que según fue informado al Senado favorablemente por su Comisión Jurídico Civil, quedó redactado de la manera en que dispone la Ley Núm. 17. Aprobado en el Senado, pasó a la Cámara. Al darse cuenta por el Secretario, el Vicepresidente Hon. Benjamín Ortiz, dijo lo siguiente:

'El problema que había ocurrido en cuanto a esta legislación se refería a lo siguiente: Bajo la Constitución, como ustedes saben, se elimina el discrimen por razón de nacimiento; o sea, que todos los hijos son iguales en derechos hereditarios y posición social y legal. Hijos naturales, adulterinos, legítimos, están en la misma situación, con los mismos derechos de herencia. Había una controversia al efecto de si esta legislación debía aplicarse a los hijos que *nacieran después de la Constitución,* mientras otros alegaban que también a los que habían *nacido antes,* o sea, a todos los hijos que *vivan* en la actualidad.

'Este proyecto del Senado cubre a todos los hijos. A los que *han nacido antes* y *los que nazcan después.* De modo que aquellos que favorecen esa tesis entre los cuales me encuentro yo, que debe ser aplicado a todos los hijos, aunque hayan *nacido antes* de la Constitución, pues es la intención del proyecto incluir aún aquellos que hayan *nacido antes.*

'Sr. Santaliz Capestany: ¿Entonces, quedan cubiertos todos los hijos?

'Sr. Ortiz: Quedan cubiertos todos. *Y que se haga constar en Acta que ésa es la intención de la Cámara al aprobar este proyecto: que la legislación se aplique a todos los hijos que hayan nacido antes de la Constitución y después de la Constitución. A todos los hijos que vivan ahora.* Después dice: "Las disposiciones de esta Ley tienen efecto retroactivo al día 25 de

julio de 1952." Como la Constitución fue efectiva el 25 de julio, la Legislación es efectiva conjuntamente con la Constitución.

'Sr. Román García: ¿Pero no podría interpretarse que esto será efectivo al 25 de julio de 1952?

'Sr. Ortiz: No. Lo que quiere decir es que aquellos niños o hijos *que vivían* el 25 de julio tienen los mismos derechos. Los que *vivían* el 25 de julio, y los que nazcan después. (Énfasis en el original.)

'. . . . . . . .

"En la sesión del día siguiente 6 de agosto de 1952 se trajo a consideración de nuevo el Proyecto 18 y tuvieron lugar los siguientes procedimientos, en que el Presidente de la Comisión Jurídico Civil Hon. Arcilio Alvarado informó ampliamente:

'Sr. Santaliz Capestany: Dada la importancia de este proyecto y las implicaciones sociales que tiene el mismo, yo desearía que el Presidente de la Comisión le explicara claramente a la Cámara si en el Artículo 2, cuando dice que las disposiciones de esta ley serán retroactivas al 25 de julio, cubre aquélla a todos los hijos, a todos los hijos legítimos y naturales en paridad de derechos con los hijos legítimos, en el caso en que sus padres murieran después de la fecha de 25 de julio.

'Sr. Alvarado: La contestación a esa pregunta es que sí, definitivamente. Que sí. Yo quisiera hacer una explicación aunque sea . . .

'Sr. Santaliz Capestany: (Interrumpiendo) Otra pregunta, si me permite el compañero. Tengo dos preguntas. La otra pregunta es la siguiente: ¿Entonces, en los casos de hijos naturales o de hijos ilegítimos en que sus padres hayan muerto y se hayan resuelto los casos, los litigios de herencia en las cortes de Puerto Rico de acuerdo con las leyes anteriores a la aprobación y a la adopción de la Constitución por el pueblo de Puerto Rico, no se cubren por esta ley?

'Sr. Alvarado: No se cubren por esta ley aquellos casos en que el causante, o sea, el que trasmite la herencia murió, haya muerto antes del día 25 de julio. Es decir, la situación es la siguiente: La Constitución dispone que todos los hijos son

iguales ante la ley; y esa Constitución empezó a regir el día 25 de julio. Antes del 25 de julio todos los hijos no eran iguales ante la ley. Estaban clasificados en hijos legítimos, en hijos ilegítimos, en hijos adulterinos y tenían derechos distintos según la clasificación distinta de su condición de hijos. Eso cesó el día 25 de julio. Del día 25 de julio, por disposición de la Constitución, todos los hijos son iguales ante la ley.

'Ustedes saben que nosotros empezamos a bregar con este problema no en esta Sesión Extraordinaria sino en la anterior Sesión Extraordinaria cuando estábamos aprobando leyes necesarias para instrumentar los cambios producidos por la Constitución. En aquella ocasión hubo una discrepancia fundamental entre el Senado y la Cámara; discrepancia que no trascendió al público porque fue discutida más bien en privado por Senadores y por Representantes. Pero el Senado llegó a aprobar un proyecto a virtud del cual la igualdad entre los hijos que producía la Constitución *sólo se concedía a los hijos que nacieran después de vigente la Constitución*. Con ese criterio no estuvo conforme la Cámara, no de manera oficial; de manera extraoficial, y por cambios de impresiones entre unos y otros representantes no estuvimos conformes con ese criterio. Creímos entonces que el proyecto debería conceder igualdad a todos los hijos desde que se aprobara la Constitución, *no importa que estén ya nacidos y viviendo* y la edad que tengan, aunque tengan sesenta años, pero desde que se establece la igualdad que es desde el día 25 de julio, desde entonces debe subsistir la igualdad para todos los hijos.

'No pudimos llegar a un acuerdo con el Senado en esta forma extraoficial y entonces aquí lo que hicimos fue que cuando el proyecto vino aprobado del Senado lo remitimos a Comisión y no fue considerado.

'. . . . . . . .

'Ustedes saben que los derechos de herencia se trasmiten por la muerte del causante, por la muerte de la persona que tiene los bienes y que tiene los hijos—el causante.

'Según el proyecto que estamos aprobando, toda persona que muera el día 25 de julio o después, sus hijos serán considerados iguales en la distribución de los bienes, con iguales derechos, igual a un hijo legítimo, no importa que hubieran tenido la condición de ilegítimos antes de esa fecha. Y se

produce la igualdad entre los hijos desde el día 25 de julio.

'Ahora, el proyecto no entra a considerar los casos *de muertes de causantes anteriores al día 25 de julio,* y la situación será que cuando haya muerto el causante antes del 25 de julio el asunto se regirá por la Ley que regía a la fecha de la muerte del causante.

'Entendemos que esto debe ser así, que es justo y razonable que sea así. En primer lugar, hay retroactividad de hoy al 25 de julio que es cuando se produce el cambio constitucional; pero no nos metemos con aquellas herencias ya trasmitidas antes del 25 de julio. A la muerte del causante antes del día 25 de julio si había diferencias entre los hijos nosotros tenemos que respetar esa diferencia; primero, porque no hacerlo es tratar de darle efecto retroactivo a esta Constitución, meternos tal vez en herencias ya adjudicadas, levantar no se sabe cuántos pleitos, mover qué se yo cuántas cuestiones ya adjudicadas y resueltas, lo cual es peligroso.

'. . . . . . . .

'Sr. Alvarado: Sí. Y no habría discrímenes por razón de nacimiento bajo la Constitución. Bajo la Constitución. Ahora, antes de la Constitución había discrímenes por razón de nacimiento.

'Sr. Valentín Vizcarrondo: ¿La Constitución acabó con eso?

'Sr. Alvarado: Acabó con eso, desde que rige; pero una adjudicación de una herencia hecha diez años, veinte años antes, un día antes de regir la Constitución, no se hizo bajo la Constitución. Se hizo bajo una ley que disponía que había diferencias—desagradables, malas, contrarias a nuestra manera de pensar, pero que existían y que tienen que ser respetadas por nosotros. Ahora, cualquier trasmisión de herencia. . .

'Sr. Valentín Vizcarrondo: ¿Por qué respetada, si la Judicatura. . .?

'Sr. Alvarado: No, compañero, esto es una cosa diferente. Son derechos adjudicados al amparo de una ley anterior. En muchos casos los bienes entregados, en muchos casos dispuestos los bienes por los herederos. Si vamos a ir hacia atrás,

¿cuántos años vamos a ir hacia atrás? ¿Cinco, diez, veinte, cincuenta, cien?

'Sr. Valentín Vizcarrondo: No importa. Sencillamente la Constitución dice que todos los hijos son iguales.

'Sr. Alvarado: No, pero es que eso implicaría que moveríamos a los tribunales centenares de pleitos ya adjudicados a virtud de leyes existentes, en vigor, que daban ese derecho. Y me parece que nosotros no debemos promover un caos en esta materia innecesariamente cuando podemos fácilmente establecer la línea divisoria desde que se hace el reconocimiento de esa igualdad y no meternos cuando no estaba hecho el reconocimiento de la igualdad absoluta.

'. . . . . . . .

'Sr. Santaliz Capestany: La Constitución hace a todos los ciudadanos iguales.

'Sr. Alvarado: ¿Me permite el compañero que le explique? Los cubre. *Esta ley no es para los que nazcan después de la Constitución. Nadie ha dicho eso aquí.* Eso no está en la ley. Un hijo nacido *antes* del 25 de julio que tenga 70 años, que haya nacido en el siglo pasado, pero que su padre está vivo todavía, *si el padre muere después del 25,* es decir, *si el derecho de herencia tiene efectividad después del 25 de julio, pues esa persona tiene igual derecho que un hijo legítimo. De manera que no es el nacimiento lo que lo determina.*

'Sr. Santaliz Capestany: ¿Y si murió el padre?

'Sr. Alvarado: Lo que ustedes pretenden requeriría que viráramos para atrás del día 25 de julio a adjudicaciones ya hechas por tribunales a casos ya adjudicados de quiénes son los herederos bajo leyes existentes, vigentes y entonces buenas, para deshacer todo lo hecho, no se sabe hasta cuánto tiempo para atrás, lo cual, a mi juicio, es insensato.

'. . . . . . . .

'Sr. Alvarado: Es decir, la herencia se trasmite por la muerte. Este sistema de igualdad en cuanto a los bienes hereditarios se establece con la Constitución y es efectivo desde el día 25 de julio *para todos los casos en que el causante muere el 25 de julio o después.* Cuando el causante muere antes del

25 de julio entonces la herencia se rige por la legislación vigente en la fecha de la muerte.

'Sr. Díaz Marchand: En otras palabras, ¿qué *no hay diferencias establecidas* por virtud de la época o de la fecha en que *haya nacido el heredero* en este caso?

'Sr. Alvarado: *Correcto, correcto. Así mismo es.*

'Sr. Díaz Marchand: Sino que la diferencia estriba en cuanto a que los padres de quien habría de heredar—el hijo en este caso—estén todavía vivos en este momento.

'Sr. Alvarado: *Eso es.* Que el derecho de herencia se adquiera por la Constitución. Que el derecho de herencia se adquiere por la muerte del causante. Que haya muerto el causante el día 25 de julio o después, no importa *cuándo haya nacido el hijo.*' (Énfasis en el original.)

"En esta etapa intervino el Sr. Santiago Polanco Abreu, sosteniendo la posición del Sr. Alvarado:

'Sr. Polanco Abreu: Creo mi deber unir mi voz a la del compañero Alvarado en este momento en que estamos discutiendo una legislación que yo, desde que ocupé asiento en esta Cámara, he venido defendiendo, presentando proyectos año tras año y que por una u otra razón no habían podido ser aprobados.

'. ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

'De suerte que esta legislación que está ante la consideración de nosotros es el ansia de creo que de la generalidad de nosotros, de todos los que estamos sentados en esta Cámara de Representantes; pero dentro del concepto realista de los principios de derecho expuesto brillantemente por el compañero Alvarado, no tenemos otra alternativa que contestar a los que nos preguntan si esto se refiere a particiones, testamentarías, efectuadas con anterioridad al 25 de julio de que esta legislación nunca podría ser aplicada a eso . . .

'Sr. Santaliz Capestany: (Interrumpiendo) ¿Por qué?

'Sr. Polanco Abreu: Porque ya se había adquirido un derecho, porque ya esos hijos habían adquirido unos derechos, esos mismos hijos naturales habían adquirido unos derechos al amparo de una legislación específica. Pero nótese que nosotros nos enfrentamos a un criterio expuesto por el Senado en un

proyecto de ley, y, sin embargo, ¿cuál era la posición básica nuestra? De que el proyecto como vino fraseado originalmente *solamente tenía el alcance de proteger a los hijos que nacieran después del 25 de julio,* cuando el criterio que sustentamos aquí y que hemos venido sustentando desde hace muchos años es que debe aplicarse *a todos los hijos nacidos con anterioridad a la Ley* siempre y cuando que los padres *mueran después* del 25 de julio.

'.. . . . . . . . . .

'Sr. Ortiz: Señor Presidente: Unas breves palabras para aclarar o expresar mi criterio sobre el punto de vista legal o jurídico que se ha planteado aquí en este asunto.

'En primer lugar quiero recordar que la controversia anterior que se había manifestado en esta Asamblea Legislativa, en la Sesión Extraordinaria pasada no se refería a esto que estamos discutiendo ahora sino a que había algunos que creían que esta legislación debía aplicarse solamente a los hijos que nacieran después de la Constitución, y otros que querían que se aplicara a todos los hijos nacidos antes o después. Yo soy uno que favorezco la segunda tesis, o sea, que se aplique a todos los *hijos* nacidos antes o después de la Constitución, para establecer esa igualdad.

'El Proyecto del Senado se aplica tanto a los hijos que *nazcan después* de la Constitución como a los que *hayan nacido antes* pero que no se hayan materializado todavía derechos adquiridos. Y aquí viene la dificultad de los compañeros.

'El sentido de justicia del compañero Valentín y el compañero Santaliz y de otros compañeros, pues, les indica que si es aplicable esta legislación a los que hayan nacido antes, pues ¿por qué establecer una diferencia en cuanto a que los padres mueran después de la Constitución y por qué no aplicar el mismo principio a aquellos casos en que los padres han fallecido antes? O sea, para establecer la igualdad absoluta, la justicia absoluta. Pero, a pesar de que comprendo la justicia de la posición tenemos que enfrentarnos con unas dificultades constitucionales, porque, por ejemplo, si los padres han fallecido antes eso implica que los hijos que tenía ese padre han adquirido ciertos derechos hereditarios bajo la legislación vigente, que hubo particiones, que hubo distribuciones, escrituras, contratos, que hubo sentencias, pleitos ya

resueltos con todos los derechos correspondientes, y yo aseguro que es un principio de ley constitucional que una legislación posterior no puede afectar derechos adquiridos anteriormente. Y esa es una regla básica y elemental.

'Sr. Román García: Señor Presidente y compañeros de Cámara: Casualmente cuando vino este proyecto ayer ante la consideración de la Cámara, por tener serias dudas que albergaba en mi mente la aprobación de una legislación de esta índole, fue que se levantó, como pudiéramos decir, alguna mareíta. Y este proyecto pasó a Comisión para ser estudiado. Esta mañana el compañero Arcilio Alvarado antes de entrar en la sala empezó a explicarme los alcances de esta legislación. De primera intención tengo que confesar que mis puntos de vista eran iguales que los que sostiene el compañero Valentín y que el que sostuvo el compañero Santaliz.

'Ahora, no debemos cerrarnos a la realidad. La realidad positiva es que si *ya han habido particiones, liquidaciones de herencia, sentencias en los tribunales y todos estos procesos,* que son hechos consumados ya, me parece que una disposición como la que estaba primeramente, y es la que han venido sosteniendo los compañeros Valentín y Santaliz, me parece que una legislación que conllevara, como ha explicado el compañero Ortiz, el anular esas liquidaciones, esas particiones de herencia que se hubieran hecho antes, sería inconstitucional.

'Sr. Valentín Vizcarrondo: ¿Aunque fueran injustas, compañero?

'Sr. Román García: No estamos sobre la cuestión de que fueran injustas. Yo considero que no son injustas por cuanto estuvieron expeditadas y regimentadas por estatutos y leyes que existieron a la fecha en que se hicieron esas liquidaciones o se declararon esas herencias.

'Así pues, yo quiero confesar que el criterio que se ha discutido aquí, se ha esclarecido en la discusión de este proyecto, ha variado por completo el criterio que yo sustentaba hace apenas una media hora tal vez.'

"En la sesión del 8 de agosto se aprobó el Proyecto 18 con todos los votos en la afirmativa, inclusive los de los señores Santaliz Capestany y Valentín Vizcarrondo, y así surgió la Ley Núm. 17." (Énfasis en el original.)

De todo lo que hemos expuesto se desprende la razón para afirmar que resolvimos erróneamente el caso de *Márquez* v. *Avilés*, 79 D.P.R. 988 (Per Curiam) (1957). Los hechos de autos en ese recurso son idénticos a los del presente. Se trata en el mismo de un caso de filiación instado en el año 1954, por siete hijos procreados entre un padre casado y una mujer soltera, nacidos entre los años 1926 y 1940. El padre falleció en 18 de marzo de 1954. Cerca de tres años de estar en vigor la Constitución y la Ley Núm. 17. La sentencia final se dictó por el Tribunal Superior, Sala de Aguadilla, el 10 de mayo de 1956. En lo pertinente es como sigue:

". . . se declara con lugar la demanda enmendada, decretándose como se decreta por la presente que los mencionados Carmen, Nemesio, José Antonio, Ismael, Elba Lydia, Wilson y Edwin Márquez son todos hijos ilegítimos reconocidos de Bonifacio Avilés Pérez, con todos los derechos inherentes como tales hijos incluyendo el derecho a herencia en su participación correspondiente igual para cada uno de ellos lo mismo que a su mencionada hija legítima en los bienes relictos al fallecer su padre. . ."

Como cuestión de hecho, el tribunal de instancia declaró comprobado el concubinato entre el padre y la madre de los demandantes en las fechas en que cada uno fue concebido y nació y que todos ellos ostentaban "la posesión continua del estado de hijos de su referido padre."

No obstante los postulados de igualdad y dignidad del ser humano proclamados aquí constitucionalmente en 1952 y de la Ley Núm. 17, y no obstante la claridad y precisión de las manifestaciones y expresiones legislativas en los debates en torno al alcance, propósitos y efectos de esa Ley Núm. 17, modificamos injustificadamente un fallo a todas luces correcto y ajustado a la reforma constitucional y a la Ley Núm. 17, resultando privados siete hijos del mismo padre de heredarlo, a base de una aplicación mecánica de aquellas once palabras del informe de marras. El efecto inmediato de la decisión de ese recurso fue el de conceder toda la herencia a la

hija legítima y negar toda participación en ella a sus siete hermanos.

Respecto a esta decisión, en su monografía citada, capítulo V, en Rev. C. Abo. P. R. Vol. XXII, Núm. 3, Mayo de 1962, pág. 278, afirma Calderón, Jr.:

"Nos parece que este problema pudo haberse resuelto en la afirmativa, quizás con más solidez en su fundamentación jurídica. Es la ley vigente a la fecha de la muerte del causante la que determina los derechos sucesorios y la ley después de 1952 es, como hemos visto, en el sentido de que todos los hijos tienen respecto a sus padres *y a los bienes relictos por éstos,* iguales derechos que los hijos legítimos. La intención legislativa en toda la legislación reciente sobre esta materia es, indiscutiblemente, hacia la equiparación de los hijos. Ya hemos visto que las leyes de 1942, por ejemplo, mejoraron la condición de los antiguamente llamados ilegítimos y le dieron una causa de acción que antes no tenían. Por lo tanto, creemos que irrespectivamente de cual sea el 'status' del hijo a tono con las leyes vigentes a su nacimiento, pudo haberse resuelto que si su padre muere después de 1952, tiene iguales derechos sucesorales que los hijos legítimos. Pero, repetimos, el Tribunal Supremo ya ha resuelto esto en la negativa y esa es la doctrina prevaleciente."

Con mayor vehemencia repudia Mascareñas nuestra posición en *Márquez* v. *Avilés* y otros casos. Nos dice a la página 49 del Núm. 4, abril–junio 1962, de la Revista de Derecho Puertorriqueño, monografía suya antes citada:

"En segundo lugar, queremos expresar nuestra extrañeza en cuanto a que el principio de no discriminación establecido por la Constitución sea de aplicación solamente a las personas nacidas después de 1952. Después de la Ley de 1942 todos los hijos nacidos fuera de matrimonio son igualmente hijos naturales. Pues bien, ahora la jurisprudencia viene a discriminar: los nacidos antes de 1952 y los nacidos después. Todos son hijos naturales, pero los nacidos antes de 1952 tendrán un tratamiento y los nacidos después de 1952 otro tratamiento. Si la Constitución ha dejado sin efecto los requisitos del artículo 125 del Código, los tiene que haber dejado sin efecto para todos los hijos naturales. No se puede concebir que un principio constitucional sea de

aplicación sólo para los que nazcan después. ¡No habrá discriminación! ¡Ah! pero la continuará habiendo para los nacidos antes. ¡No será inconstitucional!"

Como fin a esta parte de la presente opinión insertamos las orientadoras expresiones que sobre este punto consignó, hace exactamente dos años, el compañero juez Santana Becerra en su opinión concurrente de *Berdecía* v. *Tyrell*, 82 D.P.R. 698, 716–718 (Blanco Lugo) (1961):

"En el plano de la esencial igualdad de la persona que la declaración constitucional persigue, no concibo un estado de derecho que aplique dicha declaración constitucional en lo que al nacimiento respecta, a aquellos que nacieren después de su proclamación, implicando una reserva en cuanto a su vigencia o efectividad que no tiene en su texto ni contempla en su espíritu, y que permitiría continuar en el régimen de la desigualdad y de la indignidad del ser humano por falta de la esencial igualdad, a varias generaciones hasta que las mismas se extingan por el proceso natural de su desaparición. En este sentido significativo es lo expresado por la Comisión de la Carta de Derechos. 'Se propone *eliminar*', dice, el estigma jurídico en contra de los hijos habidos fuera de matrimonio. 'Se coloca a *todos* los hijos', continúa, respecto de sus padres y *respecto del orden jurídico*, en igualdad de derechos.

"En el espíritu de reivindicación humana a través de la esencial igualdad de la persona en que se adoptó esa parte de nuestra Carta de Derechos, no concibo que pueda quedar en pie para la generación ya procreada un estado de derecho que, aun bajo la avanzada legislación sobre los hijos de 1942 a 1952 según ha sido interpretada, mantiene todavía lo que para mí es el contrasentido jurídico-social del padre que engendró y del hijo engendrado que lo es para un fin y que no lo será para otros, como si la naturaleza así se desdoblara. No concibo tampoco dentro del espíritu señalado, el que se contemplara dejar a la generación procreada sujeta al eventual peligro de un retroceso en la legislación de avance vigente al momento de proclamarse la Constitución lo cual, bajo el estado de derecho que apunto, sería factible siempre que no se extendiera a los que nacieren después.

"Me he referido a la esencial igualdad del hijo en la persona,

no en su patrimonio. La diferencia en patrimonio, la 'herencia y propiedades', no crea estigma. Dentro del régimen matrimonial mismo unos hijos han recibido menor patrimonio que otros, sin que por ello no se les haya tenido en la esencial igualdad de sus personas. Y aun en lo que al patrimonio respecta, a partir de la Constitución *todos los hijos* no importa cuándo o la condición en que hayan nacido o se les haya declarado hijos, han de advenir a la herencia en plena igualdad de derechos.

"Tengo la convicción que por imperativo de la declaración constitucional según me es dable entenderla, el artículo 125 del Código Civil no tiene ya razón de ser. Pronunciada la condición en sí de ser hijo se adviene a la esencial igualdad de la persona por la superior declaración constitucional. Los actos que estatuye el artículo 125—particularmente los que hubiere de realizar el propio padre o su familia, de donde surja una posesión de estado —que llevarían al hijo al seno de la familia y a tener un padre ante la ley y la sociedad, o que se lo frustraría de no lograr probarlos, son para mí accidentes, como dijera la Comisión de la Carta de Derechos en su Informe, por encima de los cuales queda la igualdad ante la ley. El artículo 125 me parece ya un anacronismo que cuanto antes debería ir a ocupar el sitio que le corresponde en un derecho de familia que ha pasado a ser histórico." (Énfasis en el original.)

El poder judicial de todos los tribunales para dictar sentencias, o para revocarlas o modificarlas en acciones filiatorias en Puerto Rico, al único efecto de conceder el derecho al uso del apellido paterno y ningún otro derecho disfrutado por el hijo legítimo respecto a su padre y a los bienes relictos a su fallecimiento—si es que en puro derecho existió—quedó absoluta y definitivamente agotado al finalizar el día 24 de julio de 1952. Después de ese momento, o la filiación procedía a todos los efectos de ley—apellido, alimentos, herencia—o no procedía para ningún efecto.

Por eso toda sentencia de cualquier tribunal en casos de filiación dictada al único efecto del uso del apellido paterno en o desde el 25 de julio de 1952 resulta contraria a nuestra Constitución y a la Ley Núm. 17 del 20 de agosto de 1952.

Como precedentes doctrinales quedan revocados los casos

de *Márquez* v. *Avilés*, supra, y *Sánchez* v. *Díaz*, 78 D.P.R. 811 (1955), y el dictum, secuela de *Márquez* v. *Avilés*, supra, en el caso de *Abintestato de Clara Vélez, ex parte*, 81 D.P.R. 653, 665 (1960).

 Para mayor claridad declaramos que nuestros pronunciamientos de mayor sentido en el presente recurso son:

1. Todos los hijos pueden pedir que se declare judicialmente su *status* de hijos de sus padres, con igualdad de trato jurídico;

2. El padre—o en su defecto, sus herederos—puede reconocer de cualquier modo a sus hijos, expresa o tácitamente, sin importar las fechas o circunstancias de sus nacimientos y para todos los efectos de ley;

3. Ninguna declaración judicial del *status* de hijo hará pronunciamiento sobre la legitimidad o ilegitimidad del nacimiento del reclamante ni sobre el estado civil de sus padres. Al reclamante se le denominará simplemente "hijo" y a sus progenitores "padre" o "madre", según fuere el caso;

4. Toda declaración judicial del *status* de hijo se fundará en la comprobación del hecho de la paternidad natural o biológica, sin importar la fecha ni demás circunstancias del nacimiento, bastando que dicha paternidad se pruebe satisfactoriamente, bajo las normas usuales de evidencia, de acuerdo con la preponderancia de las pruebas y conforme a conclusiones que, tomando en consideración las circunstancias concurrentes en el caso, representen el balance más racional, justiciero y jurídico en la resolución del pleito. No se aplicarán en cualquier acción o procedimiento filiatorio, en trámite o que se inste, las normas o requisitos de prueba señalados en el Art. 125 del Código Civil, ed. de 1930, 31 L.P.R.A. sec. 504;

5. Toda declaración judicial de *status* de hijo reconocerá y decretará que el declarado hijo tiene respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos, sin importar la fecha ni demás circunstancias de su nacimiento, con excepción de que,

el derecho hereditario respecto a hijos nacidos fuera de matrimonio con anterioridad al 10 de agosto de 1942 que no tenían la condición de hijos naturales según la legislación anterior y que no fueren reconocidos por la acción voluntaria de sus padres, se les reconocerá respecto a fallecimientos ocurridos a partir del comienzo del día 25 de julio de 1952;

6. El derecho hereditario de todos los hijos, sin excepción alguna, se determinará por la ley aplicable y vigente a la fecha del fallecimiento del causante;

7. El párrafo segundo de la Sec. 2, de la Ley Núm. 229, aprobado el 12 de mayo de 1942—31 L.P.R.A. sec. 502—según quedó enmendada por la Ley Núm. 243 de 12 de mayo de 1945, fue tácitamente derogado por ser contrario a/o irreconciliable con la Ley Núm. 17 de 20 de agosto de 1952, y en tanto y en cuanto dicho segundo párrafo limita los efectos de la acción filiatoria que autoriza al uso del apellido;

8. El Art. 125 del Código Civil, ed. 1930—31 L.P.R.A. sec. 504—en cuanto a sus párrafos tercero y números (1), (2), (3) y (4) quedó tácitamente derogado, por efectos de las Leyes Núms. 229 de 1942, 243 de 1945 y 17 de 20 de agosto de 1952.

Procedamos ahora, en armonía con lo hasta aquí consignado en la presente opinión, a la respectiva disposición de los ocho recursos a que la misma se refiere.

Como se habrá notado, en cada uno de esos litigios el tribunal de instancia determinó afirmativamente el hecho de la paternidad del hijo demandante respecto al padre demandado o al causante de los herederos demandados. No ha sido controvertida, en general, esa determinación de paternidad. En los recursos en que pueda afirmarse que lo ha sido, hemos encontrado que de las alegaciones y admisiones de las partes o de la evidencia admitida, surge manifiesto, indubitado o autenticado ese hecho. Con ello basta para que los reclamantes en cada uno de estos recursos obtengan su filiación a todos los efectos de ley.

En tres de esos recursos—*Camacho* v. *Torres, León* v. *Zayas, Ocasio* v. *Díaz*—el hijo o hija demandante ha nacido antes de entrar en vigor la Ley Núm. 229 de 1942. En el primero de ellos, en diciembre de 1927, en el segundo en 3 de diciembre de 1938 y en el tercero en 26 de enero de 1939, es decir, al 25 de julio de 1952, tenían 24, 13 y 13 años de edad cumplidos. En los restantes cinco recursos habían nacido con posterioridad al 10 de agosto de 1942, pero con anterioridad al 25 de julio de 1952, y estaban, desde luego, cubiertos por el nuevo concepto de hijos naturales creado por esa Ley Núm. 229.

Con excepción del caso de *Cañizares* v. *Godreau*—hijo nacido en 13 de diciembre de 1951, y acción comenzada el 7 de febrero de 1952—en todos ellos los padres respectivos estaban casados al momento de la concepción y nacimiento, pero las acciones se instaron después de estar en vigor la Constitución y la Ley Núm. 17 de 20 de agosto de 1952. Las sentencias se dictaron entre el 25 de junio de 1953 y el 29 de junio de 1962. Con excepción del caso de *Camacho* v. *Torres* en el que el padre falleció en noviembre de 1958, los padres vivían a la fecha de cada fallo.

1. En el recurso de *Ramón Ocasio* v. *Andrés Díaz, Núm. R-85, se confirmará* la sentencia sumaria recurrida, dictada el 5 de junio de 1958 por la Sala de Bayamón del Tribunal Superior, pero modificando la declaración de su párrafo final para que lea y termine así: ". . . y en consecuencia proclamamos a Ramón Ocasio hijo de Andrés Díaz, a todos los efectos legales."

2. En el recurso de *Reinaldo León, etc.* v. *José L. Zayas, Núm. 12490, se confirmará* la sentencia recurrida, dictada por la Sala de San Juan del Tribunal Superior, el 28 de febrero de 1958, modificándola a los fines de que se declare hijo de José L. Zayas al demandante Reinaldo León, a todos los efectos legales.

3. En el recurso de *Félix López, etc.* v. *Nicolás Cancela,*

*Núm. R-275, se revocará* la sentencia dictada el 25 de enero de 1960 por la Sala de Mayagüez del Tribunal Superior, y en su lugar se dictará otra declarando al demandante Félix López hijo del demandado Nicolás Cancela, a todos los efectos legales.

4. En el recurso de *Carmen Gloria Rivera, etc.* v. *Arturo Defontaine, Núm. 11437, se modificará la* sentencia dictada por la Sala de Humacao del Tribunal Superior, el 27 de mayo de 1954, a los fines de declarar a la demandante hija del demandado Arturo Defontaine a todos los efectos de ley, y *así modificada, se confirmará.*

5. En el recurso de *Angelita Robles, etc.* v. *Mario Hernández, Núm. 11657, se modificará* la sentencia dictada por la Sala de Bayamón del Tribunal Superior el 9 de marzo de 1955, a los fines de declarar a la demandante Alba Nydia Robles hija de Mario Hernández, a todos los efectos legales, y *así modificada, se confirmará.*

6. En el recurso de *Iris Cañizares Quiñones, etc.* v. *José Godreau, Núm. 11377, se modificará* la sentencia dictada el 25 de junio de 1953, por la Sala de Ponce del Tribunal Superior, a los fines de declarar al menor demandante Víctor Manuel Cañizares hijo del demandado José Godreau a todos los efectos de ley, y *así modificada, se confirmará* en todos sus pronunciamientos, incluyendo el correspondiente a los alimentos reclamados y a la imposición del pago de honorarios de abogados.

7. En el recurso de *Roberto Castillo, etc.* v. *Manuel Nieves Bonet, Núm. R-62-164, se revocará* la sentencia dictada el 2 de mayo de 1962, por la Sala de Mayagüez del Tribunal Superior, y en su lugar se dictará otra declarando al demandante Roberto Castillo hijo de Manuel Nieves Bonet a todos los efectos de ley.

8. En el recurso de *Esther Camacho Torres* v. *Angelina Torres, Agustín Camacho y los herederos del causante Rafael Arrieta Ríos, Núm. R-62-215,* determinamos que los criterios

de la Sala Sentenciadora en su sentencia del 12 de enero de 1961, del Hon. Juez Luis R. Polo, así como en su sentencia final de fecha 29 de junio de 1962, dictada por el Hon. Juez Miguel A. Velázquez Rivera, no deben prevalecer en cuanto negaron a la demandante derechos hereditarios en la sucesión de su padre; *se modificará la sentencia final* dictada el 29 de junio de 1962 por el Hon. Juez Miguel A. Velázquez Rivera, a los fines de declarar, además, a la demandante Esther Camacho Torres, heredera legítima del causante y padre de ella Rafael Arrieta Ríos, en unión a los demás sucesores de este finado y con arreglo a la legislación vigente al fallecimiento de su padre, y *así modificada esa sentencia final, se confirmará.**

---

*Nota del Compilador: La sentencia dictada por el Tribunal Supremo en este caso dispone en parte lo siguiente:

"Así lo pronunció y manda el Tribunal y firma el señor Juez Presidente, quien está conforme con la opinión y además somete un voto particular concurrente.

El Juez Asociado señor Pérez Pimental hace constar, que por las razones que expondrá en una opinión separada, está conforme en que se revoque el caso de *Márquez* v. *Avilés,* 79 D.P.R. 988, y los que le siguieron, pero que disiente de las siguientes doctrinas adoptadas por la mayoría:

1. Que la admisión de la paternidad o de actos de reconocimiento, hecha por un padre en la contestación a la demanda de filiación equivale a un reconocimiento voluntario a los fines de la Ley Núm. 229 de 12 de mayo de 1942, según fue enmendada por la Ley Núm. 243 de 12 de mayo de 1945.

2. Que la determinación judicial de la existencia de hechos que obligan al padre a reconocer al hijo, equivale también a un reconocimiento voluntario en virtud de la llamada doctrina del reconocimiento implícito o tácito.

3. Que el Art. 125 del Código Civil fue derogado por la Ley Núm. 229 de 1942, según enmendada, y la Ley Núm. 17 de 20 de agosto de 1952.

La inaplicabilidad del citado Art. 125 del Código Civil a los hijos no cubiertos por la Ley Núm. 229 de 1942.

4. La aplicación retroactiva de la Constitución del Estado Libre Asociado de Puerto Rico al derecho filiatorio.

El Juez Asociado señor Santana Becerra se reserva el derecho a expresarse en su oportunidad, si así lo creyere necesario, sobre las materias mencionadas bajo los número tres y cuatro por el Juez Asociado señor Pérez Pimentel."

—O—

## Voto Concurrente del Juez Presidente
## Señor Negrón Fernández.

San Juan, Puerto Rico, a 27 de junio de 1963

Con la opinión que hoy emite el Tribunal por voz del Juez Asociado Señor Hernández Matos, recibe al fin vigencia plena de Derecho vivo, por su sentido de Derecho justo, el fundamental principio de la igualdad del hombre—base esencial en que descansa el postulado de que la dignidad del ser humano es inviolable.

La doctrina de la aplicación del precedente judicial—*stare decisis*—como norma para la estabilidad del Derecho, no puede superar la norma básica de hacer justicia, que se funda en la inherente rectitud del fallo, ni puede negar efecto a la verdad jurídica, que se funda en los valores propios del derecho envuelto.

La doctrina del *stare decisis* tiene que descansar en la virtud misma del precedente que se invoca y ninguna interpretación errónea de la ley—con particular razón una interpretación restrictiva de legislación reparadora que va a la entraña misma de nuestra sociedad—debe sentar plaza eterna en el orden jurídico para consagrar estados negatorios de la personalidad humana.

—O—

## Opinión Disidente y Concurrente en parte emitida por el Juez Asociado Señor Pérez Pimentel.

San Juan, Puerto Rico, a 18 de septiembre de 1963

Ramón Ocasio, nacido antes de la vigencia de la Ley Núm. 229 de 1942, según enmendada en 1945, instó en enero de 1957 una acción de filiación contra Andrés Díaz solicitando "sentencia contra el demandado, declarándolo hijo natural reconocido con todos los derechos inherentes a tal estado". En los únicos dos párrafos de su demanda alegó:

"1. Que el demandante Ramón Ocasio fue procreado en relaciones maritales habidas entre el demandado Andrés Díaz y su señora madre doña Carmen Ocasio, allá para el año 1938 y nació en Bayamón, Puerto Rico, el 26 de enero de 1939, y fue inscrito en el Registro Demográfico bajo el número 7105 el día 4 de febrero de 1939.

"2. Que desde el nacimiento del demandante siempre ha sido tenido, y atendido en todas sus necesidades como hijo por su señor padre, como tal lo ha llamado y llama públicamente, y por su consejo y orden usa su apellido de Díaz, cuya paternidad y apellido necesita el demandante acreditar y legalizar conforme a la ley para todos los efectos legales, ya que el demandado hasta esta fecha no ha cumplido con tal deber, no obstante así habérselo ofrecido, ya que el demandante tendrá que registrarse en el servicio militar de los Estados Unidos, el 27 de este mes, y debe hacerlo con su apellido legal, Díaz."

Después de algunos incidentes preliminares el demandado contestó alegando:

"1. Del párrafo primero de la demanda, el demandado *acepta que el demandante fue procreado en relaciones maritales habidas entre el demandado Andrés Díaz y doña Carmen Ocasio;* por falta de suficiente información para formar una opinión con respecto a su veracidad, el demandado niega general y específicamente todas y cada una de las demás alegaciones contenidas en el primer párrafo de la demanda. (Énfasis suplido.)

"2. Del párrafo segundo el demandado *acepta que desde el nacimiento del demandante siempre lo ha atendido en todas sus necesidades como hijo*. Niega que lo haya llamado públicamente como hijo o que lo llame actualmente. Niega que por su consejo u orden use su apellido de Díaz. Por falta de información niega que el demandante tuviera que registrarse en el servicio militar el 27 de enero de este año. Niega las demás alegaciones del párrafo segundo.

"DEFENSA ESPECIAL. Como defensa especial el demandado expone:

"1. Que desde el día 10 de mayo de 1936 y hasta el presente, el demandado ha estado legalmente casado con doña Sixta Nieves. Por tal razón el demandante no podría ser declarado, como se

pide en la demanda, hijo natural reconocido con todos los derechos inherentes a tal estado.

"POR TODO LO CUAL, solicita el demandado de ese Hon. Tribunal que se sirva dictar resolución de acuerdo con las alegaciones expuestas por el demandado."

El demandante solicitó entonces que se dictara sentencia sumaria declarándole hijo natural reconocido con derecho a llevar el apellido de su padre a tenor con nuestra decisión en el caso de *Cruz* v. *Andrini*, 66 D.P.R. 124 (1946). A los fines de esta moción aceptó el demandante que su padre estaba casado con Sixta Nieves desde el 10 de mayo de 1936. En efecto, el demandante es un hijo adulterino. (1)

Después de haber el demandado radicado una oposición a la referida moción del demandante, el Tribunal dictó sentencia sumaria declarándole hijo natural reconocido de Andrés Díaz *a todos los efectos legales*.

Al no limitar los efectos legales del reconocimiento al uso del apellido del padre demandado, el Tribunal sentenciador resolvió que la contestación radicada en el pleito por el demandado constituía un documento público en el cual el demandado reconocía como hijo suyo al demandante y que por lo tanto se trataba de un reconocimiento voluntario.

En la opinión de la mayoría de este Tribunal se aceptan los fundamentos de la sentencia del Tribunal de instancia y se va más lejos aun al sostenerse que "al partir de esa fecha [fecha en que el demandado radicó su contestación, 10 de junio de 1957] el hecho fundamental de la paternidad natural, ya constante en documento público, había dejado de estar sujeto a la apreciación judicial, se hizo inútil la continuación de la controversia y no era necesario que la misma finara con sentencia para considerar creado el status".

Una vez estemos conformes en que el caso de *Márquez* v. *Avilés*, 79 D.P.R. 988 (1957), debe ser revocado en tanto

---

(1) Para una relación de los hechos en los demás casos nos remitimos a la exposición que de ellos se hace en la opinión de la mayoría.

resuelve que los hijos adulterinos nacidos antes de la vigencia de la Ley Núm. 229 de 12 de mayo de 1942, según enmendada, no tienen derecho a participar en la herencia de su padre, si éste fallece con posterioridad al 25 de julio de 1952, la cuestión que se discute en este recurso respecto a los efectos de admisiones en la contestación, carece de importancia porque el hijo adulterino nacido antes de la vigencia de la citada Ley Núm. 229, tendría derecho, cuando se le declara judicialmente hijo natural del padre demandado, aunque se considere tal reconocimiento como involuntario, a (1) recibir alimentos de su padre, (²) (2) a llevar el apellido del padre (³) y (3) a percibir la porción hereditaria que señala la Ley Núm. 17 de 20 de agosto de 1952.

La cuestión, sin embargo, cobra importancia cuando se trate de hijos adulterinos nacidos antes de la vigencia de la Ley Núm. 229 de 1942 cuando el padre ha fallecido antes del 25 de julio de 1952. La razón es obvia. Si el hijo no es reconocido por la acción voluntaria de sus padres y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. Ley Núm. 229 de 1942, según enmendada. Luego es fundamental determinar si el reconocimiento es voluntario o involuntario pues en este último caso, y por haber fallecido el padre antes del 25 de julio de 1952, tal hijo no tendría los derechos hereditarios que determina la Ley Núm. 17 de 1952, según se resuelve en la opinión de la mayoría.

Sabido es que a partir del 9 de marzo de 1911 solamente podían ser reconocidos los hijos naturales, o sea, los nacidos fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse sin dispensa o con ella. Art. 193 del Código Civil de Puerto Rico de 1902, enmen-

---

(²) Art. 128 Código Civil [31 L.P.R.A. sec. 507]; Ley Núm. 108 de 30 de abril de 1940.

(³) Ley Núm. 229 de mayo 12 de 1942, según enmendada.

dado por la Ley Núm. 73 de 9 de marzo de 1911; *Ex parte Hernández*, 65 D.P.R. 142 (1945). Desde entonces los hijos adulterinos no podían ser reconocidos por sus padres voluntaria o involuntariamente. Por lo menos, el reconocimiento voluntario de un hijo adulterino estaba sujeto a impugnación y no le creaba un *status* de hijo natural reconocido permanente y definitivo. *Fernández* v. *Sucn. Fernández*, 66 D.P.R. 881 (1947). Tampoco podía ser legitimado el hijo adulterino por el subsiguiente matrimonio de sus padres. *Ex parte Hernández*, supra.

Pero en el año 1942 nuestra Legislatura cambió el concepto de hijos naturales al aprobar la Ley Núm. 229 de ese año y disponer, en lo pertinente, lo siguiente:

"Sección 1.—Serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta Ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

"Sección 2.—Los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de esta Ley y que no tenían la condición de hijos naturales según la legislación anterior, podrán ser reconocidos por acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, a todos los efectos legales. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí."

Al nuevo concepto de hijos naturales se le dio efecto prospectivo. La Sec. 1 de la citada ley no alteró el *status* de los hijos adulterinos nacidos con anterioridad a su vigencia; pero la Sec. 2 autorizó el reconocimiento voluntario de estos hijos adulterinos, a todos los efectos legales y declaró además que quedarían legitimados por el subsiguiente matrimonio de sus padres. (4) A los fines de la discusión que sigue debemos tener siempre presente la frase "podrán ser reconocidos por la acción voluntaria de sus padres, y en defecto de éstos por

---

(4) *Correa* v. *Sucn. Pizá*, 64 D.P.R. 987 (1945).

la de las personas con derecho a su herencia", usada en la Sec. 2 de la referida ley, pues cuando la Legislatura adoptó ese lenguaje conocía perfectamente su significado legal según lo había definido este Tribunal desde el año 1909 en el caso de *Gual et al.* v. *Bonafoux et al.*, 15 D.P.R. 559 (1909), y en otros que comentaremos al discutir la doctrina del reconocimiento implícito adoptada por la mayoría en su opinión.

Por ahora basta recordar lo que dijo este Tribunal en el año 1910 en el caso de *Amsterdam et al.* v. *Puente et al.*, 16 D.P.R. 554 (1910), a la página 561 y citamos:

"Se admite que ha habido siempre dos clases de reconocimiento: uno voluntario y el otro obligatorio. La distinción entre estas dos clases de reconocimiento ha quedado definida en el caso de Gual, cuando se habla en él de los derechos consecuentes a un reconocimiento auténtico y solemne de la filiación natural. (Opinión del caso de Gual.) El artículo 131 del Código Civil Español expresa, lo que constituye un acto de reconocimiento solemne, artículo que dice así:

'Art. 131.—El reconocimiento de un hijo natural, deberá hacerse en el acta de nacimiento, en testamento o en otro documento público.'

"Creemos que de las anteriores disposiciones del Código Civil vigentes, así como de la práctica y jurisprudencia sobre el particular, puede correctamente deducirse la conclusión de que sin algún acto que en forma auténtica revele la voluntad del padre, de dar a su hijo tal estado, el hijo tiene solamente un derecho de acción para obligar al padre a que le confiera dicho estado. El artículo 135 del Código Civil Español, y el 189 del Código Civil de Puerto Rico, preveen los casos en que un padre puede ser obligado a reconocer a su hijo ilegítimo. Solamente puede ser obligado a ello por medio de una acción, y puede decirse que tal acción sería innecesaria, únicamente en aquellos casos en que hubieran actos solemnes por parte del padre, que vengan a demostrar que tal obligación ha sido cumplida. Claramente se deduce de estos artículos, que aunque un padre haya ejecutado, como sucede en el caso de autos, una serie de actos tendentes a mostrar que determinada persona era hijo suyo, sin embargo, no puede decirse que él la haya reconocido, dentro de la acepción que legalmente tiene la palabra 'reconocimiento'. Si él puede ser obligado a ello,

entonces hay que convenir en que antes de obligársele, el desiderá
tum no se ha logrado. Bajo tales circunstancias, y hasta que
no haya algún acto solemne, o alguna declaración de parte de un
tribunal, no puede decirse que el hijo ha sido reconocido, ni
puede afirmarse que haya adquirido el estado civil de hijo natural
reconocido."

La existencia de las dos clases de reconocimiento, el
voluntario y el involuntario se reafirmó en una serie de deci-
siones posteriores, entre ellas, *Puente* v. *Puente*, 16 D.P.R.
582 (1910); *Rijos* v. *Folgueras*, 16 D.P.R. 624 (1910); *Calaf*
v. *Calaf*, 17 D.P.R. 198 (1911); *Figueroa* v. *Díaz et al.*, 19
D.P.R. 717 (1913); *Delannoy* v. *Blondet*, 22 D.P.R. 235
(1915); *López* v. *López*, 23 D.P.R. 824 (1915); *Figueroa* v.
*Díaz et al.*, 20 D.P.R. 284 (1914). Resulta evidente que al
aprobarse la Ley Núm. 229, la acción voluntaria, a que la
misma se refiere, no podía ser otra que el "reconocimiento
voluntario" consagrado en las decisiones de este Tribunal y
que no es otro que aquel que realiza el padre en el acta de
nacimiento o en otro documento público según lo autoriza el
Art. 125 del Código Civil. En el año 1942 la Legislatura en-
mendó el Art. 31 de la Ley Núm. 24 de 22 de abril de 1931
para permitir que el reconocimiento de un hijo natural pu-
diera hacerse también en una declaración jurada. Ley Núm.
117 de 12 de mayo de 1943. *Ramos* v. *Rosario*, 67 D.P.R. 683
(1947). Nótese que de acuerdo con la Ley Núm. 229 de 1942,
si el hijo adulterino nacido antes de la vigencia de esa ley no
era reconocido por la acción voluntaria de sus padres, carecía
de acción para obligar a sus padres a reconocerlo. Así lo
resolvimos en *Correa* v. *Sucn. Pizá*, 64 D.P.R. 987 (1945)
(Opinión de 9 de mayo de 1945). Por la solidez de su razona-
miento, copiamos de dicho caso, a la página 989, lo que sigue:

"El punto fundamental en este caso es si las actuaciones de
un padre con posterioridad a 1942, manteniendo a un hijo adul-
terino y admitiendo su paternidad, operan para conferir a tal
hijo nacido antes de 1942, el *status* de un hijo natural; es decir,
si tales 'actuaciones' son el reconocimiento 'por acción voluntaria'

del padre que contempla la sección 2 de la Ley núm. 229. Al enfocarse esta cuestión, debemos tener en cuenta que la Legislatura no aprobó esta Ley en un vacío. Se aprobó a la luz de nuestro Código Civil, especialmente del artículo 125 del mismo. Esto es evidente no sólo de los términos del propio estatuto, sí que también de una discusión en la Sala de Sesiones del Senado entre los senadores Géigel Polanco e Iriarte. Actas del Senado, 1942, págs. 799–801. Al mismo efecto Muñoz Morales, La Ley núm. 229 de 1942 y sus Implicaciones, La Toga, edición del 16 de octubre de 1944, págs. 6–7.

"El artículo 125 del Código define como los hijos naturales 'los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella'. El artículo 125 establece entonces dos métodos para el reconocimiento de un hijo natural: (1) por la acción voluntaria del padre 'en el acta de nacimiento o en otro documento público'; o (2) por procedimiento judicial en el que 'El padre está *obligado* a reconocer al hijo natural: . . . 2. Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia. . . . .' (Bastardillas nuestras.)

"Por tanto es evidente que bajo el artículo 125 se confiere status como hijo natural (1) voluntariamente por el padre sólo mediante instrumento público; o (2) involuntariamente mediante procedimiento judicial que obligue al padre putativo a reconocer al hijo de comportarse el padre en determinada forma. La sección 1 de la Ley núm. 229 de 1942 elimina la barrera del adulterio que en el pasado había interpuesto el artículo 125 contra el reconocimiento de los hijos como hijos naturales. Pero la sección 1 es prospectiva y se refiere únicamente a los hijos nacidos con posterioridad a la fecha de la vigencia de la ley. Y la sección 2, que se refiere a los hijos nacidos con anterioridad a la ley, es limitada; la Legislatura tuvo cuidado con ella para no alterar relaciones ya existentes. Sin embargo, la sección 2 sí provee que tales hijos adulterinos también pueden ser reconocidos como hijos naturales—pero sólo 'por acción voluntaria' de sus padres.

"Cuando la sección 2 es leída a la luz del artículo 125 del Código, es obvio que las actuaciones y manifestaciones del padre admitiendo la paternidad contenidas en la demanda, no son la 'acción voluntaria' que contempla la sección 2. Acción voluntaria, según se indica en el artículo 125, significa el otorgamiento por el

padre de un acta de nacimiento, escritura o cualquier otro documento público. Las alegaciones de la demanda muy bien pudieron dar derecho a la demandante bajo el artículo 125 a obligar al padre a reconocerla involuntariamente como hija natural a tenor con una orden judicial a ese efecto, de no haber sido una hija adulterina. Pero la sección 2 de la Ley núm. 229, al disponer el posible reconocimiento de los hijos adulterinos que, como la demandante, nacieron antes de mayo de 1942, lo limita al reconocimiento voluntario solamente, dentro del significado de dicha frase en el artículo 125 (Actas del Senado, supra; Muñoz Morales, supra). Esto exige una inscripción, un testamento o cualquier otro documento público otorgado por el padre. Y eso no ocurrió aquí."

Pero en el año 1945, la Legislatura aprobó la Ley Núm. 243 de 12 de mayo de ese año para enmendar por adición la Sec. 2 de la Ley Núm. 229 de 1942. (⁵) La enmienda consistió en concederle una causa de acción al hijo adulterino nacido antes de la vigencia de la Ley Núm. 229 que no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, para reclamar su *status* de hijo natural reconocido pero limitado en sus consecuencias legales, al solo efecto de llevar el apellido de sus padres.

La mayoría del Tribunal acaba de resolver que si el hijo

---

(⁵) Dicha Sec. 2 según enmendada, dispone:

"Sección 2.—Los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de esta Ley y que no tenían la condición de hijos naturales según la legislación anterior, podrán ser reconocidos por acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, a todos los efectos legales. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

"En caso de que los hijos a que se refiere esta sección no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. La acción para este reconocimiento se tramitará de acuerdo con el procedimiento que fija el Código Civil de Puerto Rico para el reconocimiento de hijos naturales; *Entendiéndose, sin embargo,* que tal reconocimiento sólo tendrá el alcance que aquí se expresa."

adulterino ejercita la acción de filiación acogiéndose a la citada enmienda del 1945 y el padre demandado en su contestación a la demanda acepta la paternidad o los alegados hechos de posesión continua de estado de hijo, ello equivale y en derecho es, un reconocimiento por la acción voluntaria del padre.

En parte argumentan así:

"La simple circunstancia de establecerse o reconocerse por el padre demandado el vínculo consanguíneo existente entre él y su hijo, en el curso de una acción filiatoria, no significa que el reconocimiento es involuntario. Lo que ello realmente significa es que en su demanda el hijo expuso un hecho cierto y verdadero, y que haciendo honor a esa certeza y verdad, el padre demandado, que la conoce, por su propia determinación la acepta y confiesa. Y realiza libremente algo más que proclamar su condición de progenitor: admite, acepta y confiesa que desde su nacimiento, y siempre, lo ha atendido en todas sus necesidades *como hijo.* . . . . En nuestro sistema procesal se espera la veracidad de las partes, por obligado acatamiento a la Ley y respeto elemental a la justicia. Ellas deben hacer afirmaciones de hecho conformes a la verdad. Las Reglas de Procedimiento Civil no contienen reproche alguno de matiz penal para el demandado que no conteste una demanda o que deje de aceptar la verdad de los hechos bien alegados en la misma. No impiden que dentro de una acción filiatoria un padre demandado, por su acción voluntaria, se disponga a ocupar jurídicamente su puesto de padre y exteriorice espontáneamente las circunstancias que originaron esa situación, con todas las consecuencias jurídicas que procedieran, como aquí lo hizo Andrés Díaz." (Págs. 699 a 700 Opinión.)

Examinemos este extraviado razonamiento jurídico. Andrés Díaz, el padre demandado, no realizó ningún acto voluntario en virtud del cual el hijo demandante, adquirió su *status* de hijo natural reconocido. De haber mediado esa acción voluntaria del padre, el pleito de filiación hubiera sido innecesario. ¿Por qué se instó el pleito? ¿Acaso el demandante no alegó en su demanda que el demandado no había cumplido

con el deber de reconocerlo como hijo? ¿Por qué esta alegación? Porque la demanda se instaba para obligar al padre a reconocerlo ya admitiendo éste los hechos que obligaban al reconocimiento o ya, aunque los negara, el tribunal los declarara probados. El demandado aceptó los hechos ciertos alegados en la demanda. Pero como en la súplica de la demanda se pedía que el tribunal declarara al demandante hijo del demandado "con todos los derechos inherentes a tal estado", podía el demandado entender como aparentemente lo entendió también la mayoría de este tribunal, que el demandante ejercitaba una causa de acción distinta a la que creó la Ley Núm. 243 de 1945 que limitaba los efectos de la acción de filiación del hijo adulterino, a llevar el apellido de sus padres, y compareció en el pleito para alegar un hecho esencial que no surgía de la demanda, a saber: que para la fecha de la "concepción del demandante el demandado estaba legalmente casado con otra mujer".

Por haberse aceptado en la opinión mayoritaria quedamos relevados de insistir sobre la doctrina de que la admisión, aceptación o confesión de hechos en una controversia judicial desempeña una función probatoria: hace prueba contra su autor, releva a la otra parte de la obligación de probarlas, y, generalmente, obligan al juzgador a fallar con arreglo a los hechos admitidos, aceptados o confesados. Pero el Tribunal evade esta regla haciéndola inaplicable a los pleitos incoados al amparo de la Ley Núm. 229, según enmendada, aduciendo como razón para ello, que la admisión, aceptación o confesión expresa del hecho de la paternidad desempeña la función constitutiva de un pleno reconocimiento por acción voluntaria con todas las consecuencias legales "no obstante el intento del padre demandado de someter su naturaleza a sus propios términos y condiciones". De todo esto resulta que cuando en la demanda no se hace la alegación de que el hijo demandante es adulterino, el padre no puede comparecer a alegar y probar ese hecho si por otro lado el hecho de la paternidad es cierto

y por razones de orden moral y de procedimiento judicial viene obligado a aceptarlo. Dos soluciones da el Tribunal a los demandados que se encuentran en esa situación: (1) que no contesten la demanda, y (2) que nieguen los hechos ciertos alegados en la demanda, ya que las Reglas de Procedimiento Civil "no contienen reproche alguno de matiz penal para el demandado que no conteste una demanda o deje de aceptar la verdad de los hechos bien alegados en la misma".

Consideramos poco afortunada esta solución que da el Tribunal al demandado que se ve obligado a contestar la demanda para traer al pleito el hecho esencialísimo, a los fines de la causa de acción que se ejercita, de que el demandante es un hijo adulterino.

En la primera de estas soluciones el Tribunal impone una mordaza al padre demandado, le priva de presentar la verdadera controversia en el litigio, lo acorrala de tal manera que si el demandado se arriesga a contestar con honradez la demanda para establecer el hecho de que el hijo reclamante es adulterino, lo penaliza con el siguiente pronunciamiento: "Vd. ha hecho un reconocimiento voluntario y por tanto el demandante es hijo natural reconocido con todos los derechos inherentes a tal estado". Pero para evitar que esto le ocurra, el Tribunal le aconseja que conteste y niegue los hechos que son ciertos.

El primer efecto, aunque no el peor, de esta proposición, es destruir el propósito y fines que inspiran nuestras Reglas de Procedimiento Civil. Del alegato del recurrente en el caso de *Ocasio*, por su atinada pertinencia, copiamos lo siguiente:

"Volviendo a las Reglas de Enjuiciamiento Civil vigentes, nos parece imposible interpretar las mismas en el sentido de que una admisión de paternidad en una Contestación a una Demanda filiatoria, no está limitada exclusivamente a exonerar o descargar al demandante de la obligación de ofrecer evidencia en el acto del juicio sobre el extremo de la paternidad, y sí que también produce el efecto de tenerse tal admisión de paternidad como un reconocimiento voluntario por haber sido hecho en un docu-

mento auténtico, en el supuesto de que dicha Contestación lo fuera a los citados efectos.

"Si ello fuera así, se derrotaría el citado propósito de las Reglas de Enjuiciamiento Civil, pues sabiendo un demandado en filiación, que es igual que decir, su abogado, que una admisión de paternidad por parte de aquél en una Contestación, Interrogatorio, Pliego de Admisiones, Deposiciones o Conferencia Anterior al Juicio, equivale a un acto voluntario de reconocimiento de paternidad hecho en documento público, y todo ello a la luz de la Ley 229 de 1942, y sus enmiendas, se esmeraría el citado litigante de no hacer semejante admisión, lo que implicaría en su último análisis, tal actitud de su parte, a obligar innecesariamente al demandante a probar la paternidad; o lo que es lo mismo, a retrotraernos al derogado sistema procesal imperante con anterioridad a la promulgación de dichas Reglas de Enjuiciamiento Civil. En otras palabras, que de subsistir la interpretación dada por el Tribunal recurrido a dicha admisión de paternidad hecha por el demandado como una voluntaria, se le estaría penalizando por un honesto y franco cumplimiento de su parte, y también de parte de su abogado, a las referidas Reglas de Enjuiciamiento Civil. " (Págs. 13, 14.)

Un ligero examen de las Reglas de Procedimiento Civil, revelan el propósito de desalentar las controversias de hechos innecesarios, y de condenar la práctica de negar la verdad en los litigios. Véanse, por ejemplo, las Reglas 6.2 y 9. (6)

---

(6) Dichas Reglas disponen:

"6.2. Defensas; modo de negar

"La parte expondrá en términos sucintos y sencillos sus defensas contra cada reclamación interpuesta y admitirá o negará las aseveraciones en que descanse la parte contraria. Si no tuviere conocimiento o información suficiente para formar opinión en cuanto a la veracidad de alguna de las aseveraciones expuestas, lo hará así constar y ello tendrá el efecto de una negación. Las negaciones impugnarán en lo sustancial las aseveraciones que se niegan. Cuando el que hace una alegación intente de buena fe negar solamente una parte de una aseveración, o una condición a una aseveración, especificará aquella parte de ella que sea cierta y material y negará el resto. La parte podrá negar específicamente cada una de las aseveraciones o párrafos de la alegación precedente, o podrá negar, en forma general, todas las aseveraciones o párrafos de dicha alegación, con excepción de aquellas aseveraciones o párrafos que ella admita expresamente; pero si la parte se propone negar de buena fe todas las aseveraciones expuestas

Igual propósito persiguen los Cánones de Ética Profesional que rigen la conducta de los abogados en Puerto Rico. El abogado tiene que ser sincero y honrado. "No es profesional ni honorable—dice en parte el canon 22—no ajustarse a la *sinceridad de los hechos* al examinar los testigos, al redactar affidavits u otros documentos, *y en la presentación de causas.*" (Énfasis suplido.)

Si esto es así, no debe este Tribunal, so pretexto de justificar una decisión, alentar al demandado para que deje de alegar lo que es cierto, o para que niegue la verdad de los hechos ciertos bien alegados.

Es correcto afirmar que en los casos de *Cortés* v. *Cortés*, 73 D.P.R. 693 (1952) y *Rivera* v. *Rivera*, 78 D.P.R. 908 (1956), resolvimos que el reconocimiento voluntario por un padre de su hijo adulterino nacido con anterioridad a la vigencia de la Ley Núm. 229 de 1942, según enmendada, engendra todas las consecuencias que fija la ley, sin que sea posible al padre limitarlas o condicionarlas en forma alguna. La doctrina era aplicable a los hechos de los dos mencionados casos. En el de *Cortés*, el padre reconoció voluntariamente a

en dicha alegación precedente, podrá hacerlo mediante una negación general, sujeto a lo establecido en la Regla 9."

"REGLA 9. DE LAS FIRMAS EN LAS ALEGACIONES

"Toda alegación de una parte representada por abogado será firmada por lo menos por un abogado de autos con su propio nombre, expresando su dirección. Una parte que no esté representada por abogado firmará su alegación y expresará su dirección. Excepto cuando se disponga específicamente de otro modo por regla o por ley, no será necesario jurar las alegaciones ni acompañarlas de declaración jurada. La firma de un abogado equivale a certificar el haber leído la alegación; que de acuerdo con su mejor conocimiento, información y creencia está bien fundada; y que no ha sido interpuesta para causar demora. Si una alegación no estuviere firmada, o lo hubiere sido con el propósito de frustrar los objetivos de esta regla, podrá ser eliminada como simulada y falsa, y el pleito podrá continuar como si no se hubiere notificado tal alegación. La violación voluntaria de esta regla por parte de un abogado dará lugar a que se le someta a acción disciplinaria. Igual acción se tomará si se introducen materias difamatorias o indecorosas o se utiliza lenguaje ofensivo o soez."

su hijo adulterino Nicolás Cortés Córdova en una escritura pública otorgada en 15 de septiembre de 1943. En un testamento abierto otorgado posteriormente el padre hace un legado a su citado hijo y declara que le concedió el derecho a usar su apellido. En una declaración jurada firmada en octubre de 1947, el citado padre reconoció también como hijo natural suyo a Buenaventura Cortés Ríos "con derecho a usar mi apellido". A base de los anteriores hechos resolvimos que la acción voluntaria del padre a que se refiere la Sec. 2 de la Ley Núm. 229 de 1942, según enmendada, exige el reconocimiento por parte de éste en el acta de nacimiento, en un testamento o en cualquier otro documento público o en una declaración jurada. Dijimos entonces a la pág. 705: "La propia Ley Núm. 229 de 1942, según enmendada, limita el derecho de hijos, que anteriormente no tenían la condición de hijos naturales, a llevar el apellido de sus padres exclusivamente, a aquellos hijos que no fuesen reconocidos por acción voluntaria de sus padres. Por lo tanto, aquellos hijos que fuesen reconocidos por acción voluntaria de sus padres, como ocurre en el caso de autos, tienen derecho, no solamente a usar el apellido de sus padres, sino también a la participación hereditaria que determine la ley. El hecho en sí del reconocimiento conlleva las consecuencias legales que ya hemos mencionado y el causante no puede, con sus expresiones, coartar o limitar esas consecuencias legales, ni cercenar los derechos hereditarios de sus hijos naturales válidamente reconocidos al igual que un testador no puede privar de su legítima a herederos forzosos. Una vez el padre reconoció válidamente a esos dos hijos, él no podía limitar personalmente los alcances de la ley."

En el caso de *Rivera*, el demandado firmó como padre el certificado de nacimiento de su hija Olga Iris. Resolvimos que al firmar el demandado como padre el certificado de nacimiento de Olga Iris, "ipso facto se estableció la filiación de ésta, sin necesidad de determinación o de confirmación ulterior por los tribunales y dicho acto de reconocimiento volunta-

rio engendra todas las consecuencias que fija la ley, sin que sea posible al padre limitarlas o condicionarlas en forma alguna".

De suerte que en ambos casos los hijos fueron reconocidos por la acción voluntaria de sus padres, en escritura pública, en declaración jurada y en el acta de nacimiento, respectivamente. La Ley Núm. 229 es clara y terminante. Un reconocimiento así verificado lo es a todos los efectos legales. En tales casos los padres están impedidos de limitar los efectos de la ley; pero cuando el padre no ha acudido voluntariamente al Registro Demográfico para firmar el acta de nacimiento del hijo, ni ha otorgado voluntariamente una escritura pública o un testamento o cualquier otro documento público o ha firmado una declaración jurada reconociendo al hijo, sino que por el contrario el hijo se ve obligado a recurrir a los tribunales para obligar a su padre a que lo reconozca y éste en su contestación acepta digamos, la paternidad pero a su vez alega y prueba, o se admite, como ocurrió en este caso, que el demandante es un hijo adulterino, y se dicta sentencia por el tribunal declarando al demandante hijo reconocido del padre demandado, a los solos efectos de llevar el apellido de éste, no es el padre quien está limitando los efectos de tal reconocimiento sino que lo es la propia Ley Núm. 229 al declarar en su Sec. 2 que en caso de que los hijos a que se refiere esa sección no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. No puede ser una acción voluntaria de su parte la del padre que es demandado ante los tribunales para que realice una acción que antes se ha negado a realizar, y que al ser emplazado se ve obligado, tanto por las Reglas de Procedimiento Civil como por los Cánones de Ética Profesional, según expusimos anteriormente, a aceptar los hechos ciertos bien alegados. Lamentablemente este Tribunal ha confun-

dido los efectos de una admisión en una alegación con los alcances de una acción voluntaria de reconocimiento. Admitiendo que una alegación en los autos de un litigio es un documento público y que conforme al Código Civil y a nuestra jurisprudencia, uno de los medios de reconocimiento de un hijo es mediante el otorgamiento de un documento público, para que el reconocimiento hecho en documento público, constituya una acción voluntaria del padre, según el significado que la Legislatura le dio al concepto "acción voluntaria" en la Ley Núm. 229 de 1942, según enmendada, es imprescindible que el otorgamiento del documento público nazca de la acción libre y espontánea del padre o de su libre albedrío o determinación y no por fuerza o necesidad extraños a aquélla; pero cuando obligado por un requerimiento judicial y en cumplimiento de la obligación que le imponen las reglas procesales el padre "otorga" el documento público (contestación a la demanda) reconociendo la paternidad, no puede afirmarse en buena lógica ni en correcta hermenéutica legal, que el padre realizó un reconocimiento por su acción voluntaria, a los fines de las consecuencias legales que bajo los términos de la Ley Núm. 229, conlleva tal reconocimiento. Esto por sí solo hace inaplicable y distinguible el caso de *Ex parte Morales*, 30 D.P.R. 907 (1922).

Para la mayoría del Tribunal el caso de *Álvarez* v. *Álvarez*, 77 D.P.R. 909 (1955), no constituye un precedente persuasivo y claro está, no lo constituye porque es contrario a su criterio. Difícilmente puede obligarse a alguien a creer lo que no quiere creer pero por la fuerza de las razones o fundamentos que apoyan el caso de *Álvarez*, nos permitimos transcribir del mismo a la página 913, lo que sigue:

"Es innecesario discutir si el acta de la conferencia es o no un documento público, o los medios por los cuales puede demostrarse la existencia del reconocimiento voluntario de que habla la Ley 229, según quedó enmendada, puesto que en el caso de autos, está totalmente ausente la acción voluntaria de reconocer a los

apelantes como hijos de Álvarez Santana, para todos los efectos legales.

"Nos dicen los apelantes que la conferencia se celebró a instancias de los apelados, y que éstos, herederos forzosos de Álvarez Santana, 'por acción perfectamente voluntaria, libre y espontáneamente reconocieron que los demandantes-apelantes son hijos del mismo padre . . . es decir: admitieron voluntariamente la paternidad . . ., verificando un reconocimiento voluntario', añadiendo que "No hubo contención en cuanto a la acción filiatoria. Por el contrario, por acción voluntaria quedaron los demandantes-apelantes reconocidos, cumpliéndose taxativamente con la Ley 229 de 12 de mayo de 1942 . . ., según fue enmendada por la núm. 243 de 12 de mayo de 1945 . . .'.

"Los apelados tenían perfecto derecho a solicitar la conferencia. Más aún, era deber del letrado de los apelados el pedirla, si entendía que así podían simplificarse las cuestiones litigiosas, y evitar la presentación de evidencia sobre uno o más extremos del pleito, y ese hecho no puede dar lugar a la inferencia de que la gestión de dicho letrado fue hecha con propósitos ajenos a los fines de la Regla 16 de las de Enjuiciamiento Civil, o para que tuviera consecuencias distintas a las que provienen normalmente y pueden anticiparse de ese procedimiento. Celebrada la conferencia, los abogados estaban en el deber de cooperar para que la citada Regla sirviera sus propósitos, y sin duda alguna que hubiera demostrado obstinación censurable el letrado de los apelados, si constándole el hecho de que los apelantes eran hijos de Álvarez Santana, hubiera rehusado admitirlo, obligándoles a ofrecer prueba en el juicio para establecerlo. La conferencia con anterioridad a la vista del litigio, no puede tener éxito sin la franca y decidida cooperación de la judicatura y de los miembros del foro, y las decisiones enfatizan la importancia de esa cooperación. El Tribunal Supremo de Wisconsin, al referirse a ello, en *Klitzke* v. *Herm*, 242 Wis. 456, 8 N.W.2d 400, expresó su criterio, diciendo: 'Se conviene generalmente en que para lograr el propósito del procedimiento con antelación al juicio, y conseguir que sirva el fin útil que tiene en el proceso de decidir, debe existir espíritu de cooperación entre el Tribunal y los abogados que representan a los litigantes . . . Aunque el Juez . . . lleva pesada responsabilidad, no debe perderse de vista que los abogados . . . son casi igualmente responsables de los resultados de la conferencia . . . Si ellos por su beligerancia, testarudez o contumacia

obstruyen la causa del proceso judicial, al fin deben esperar el tener que sufrir las consecuencias de su mala conducta.' Esa cooperación difícilmente podría obtenerse, si el procedimiento de la conferencia con anterioridad al juicio se desnaturaliza, convirtiéndolo en un trámite lleno de sorpresas y peligros.

"Cuando se hizo la admisión, cumplió el letrado de los apelados con el deber que tenía de facilitar el trámite judicial, y benefició a los apelantes al relevarles de la necesidad de probar el hecho admitido. No hay razonamiento alguno que nos permita llegar a la conclusión de que esa admisión tiene el alcance que le atribuyen los apelantes. Resolver lo contrario equivaldría a alentar la falta de franqueza en las conferencias con anterioridad al juicio, y a sancionar tácticas dilatorias y actitudes reñidas con su propósito, y ese medio, de reconocido valor para simplificar las contiendas judiciales, recibiría rudo golpe, de consecuencias extremadamente perjudiciales para su eficacia."

Con el rechazo del caso de *Álvarez* la mayoría pasa a elaborar la doctrina del supuesto reconocimiento implícito o tácito autorizado por la Ley Núm. 229.

Sostiene la opinión de la mayoría que la Ley Núm. 229 de 1942 permite el reconocimiento tácito o implícito. La definición de esta doctrina la encontramos en la opinión emitida por el hoy Juez Presidente de este Tribunal, Sr. Negrón Fernández, en el caso de *Elicier* v. *Sucn. Cautiño,* supra, y de la cual citamos:

"Creo que la doctrina sentada en *Correa* v. *Sucn. Pizá,* supra, y seguida en los casos de *Cruz* v. *Andrini,* 66 D.P.R. 124 y *Fernández* v. *Sucn. Fernández,* 66 D.P.R. 881, debe ser revocada y una nueva interpretación y alcance dados a la expresión por *acción voluntaria,* en el sentido de que bajo los incisos 1 y 2 del párrafo 3ro. del artículo 125 del Código Civil, ed. 1930, que establecen, respectivamente, que el padre está obligado a reconocer al hijo natural (1) cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad y (2) cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia, *el reconocimiento declarado en pleito instado por el hijo a ese fin, lo es por acción voluntaria, dentro del alcance y pro-*

*pósito de la sección 2 ya mencionada"* [se refiere a la sección 2 de la Ley 229 de 1942]. (Énfasis suplido.)

Si esto fuera así, tendríamos que llegar a la conclusión inevitable de que la Legislatura realizó un acto inútil al enmendar en el año 1945 la Ley Núm. 229 para conceder a los hijos adulterinos una causa de acción para reclamar su filiación cuando no eran reconocidos por acción voluntaria de sus padres o de las personas con derecho a su herencia, a los fines de llevar el apellido paterno. Porque el resultado de la doctrina del reconocimiento tácito o implícito sería el de que todos los reconocimientos serían siempre voluntarios ya éstos se hicieran voluntariamente por el padre en el acta de nacimiento, en testamento, en escritura pública o en una declaración jurada, o ya emanara dicho reconocimiento de una sentencia judicial dictada en pleito en el que el hijo alegó y probó que existía un escrito indubitado del padre en que expresamente reconocía la paternidad, o que se hallaba en la posesión continua del estado de hijo natural del padre demandado.

¿Cuándo ocurriría un reconocimiento forzoso que a tenor con la Ley Núm. 243 de 12 de mayo de 1945 concedería al hijo adulterino nacido antes de 1942, el derecho a llevar el apellido de su padre? Nunca, de acuerdo con la opinión de la mayoría. Sin embargo, nadie puede negar con buen juicio que la Legislatura estatuyó dos clases de reconocimiento de los hijos adulterinos nacidos antes de 1942. Uno es el realizado por la acción voluntaria del padre o de las personas con derechos a su herencia. Éste reconocimiento lo es a todos los efectos legales. El otro reconocimiento es el forzoso, el que la ley permite mediante acción judicial cuando dichos hijos no fueren reconocidos por la acción voluntaria de sus padres o de las personas con derecho a su herencia. Este reconocimiento es limitado al solo efecto de llevar el apellido de sus padres.

Ello no obstante, la mayoría del Tribunal, hace caso omiso del mandato legislativo, ignora la Ley Núm. 243 de 1945 y decreta, por vía de interpretación, que todos los reconocimien-

774

tos son voluntarios. ¿Es que acaso, según se insinúa en la opinión de la mayoría, es únicamente involuntario el reconocimiento cuando el padre demandado alega y prueba, desde luego, que los actos de reconocimiento que le imputa el hijo, los realizó involuntariamente bajo violencia o intimidación, por miedo o por error, o por piadosa devoción hacia el prójimo? De ser ello así, sencillamente no habría reconocimiento porque en ese caso no procedería una sentencia decretando la filiación del hijo demandante. Pero independientemente de que el Tribunal se haya arrogado poderes legislativos anulando la voluntad de la Asamblea Legislativa al no darle efectividad a la Ley Núm. 243 de 1945, veamos como ejemplo la irrazonabilidad del reconocimiento implícito o tácito.

Un hijo adulterino nacido antes de 1942 demanda en filiación a su alegado padre. Invoca como causal de reconocimiento hallarse en posesión continua del estado de hijo natural del padre demandado y alega para justificar tal estado, actos realizados por el mismo padre y su familia, los que en realidad de verdad son falsos. Contesta el padre demandado negando todos los hechos expuestos en la demanda, y finalmente que sea el padre del hijo demandante. Durante el juicio el demandante presenta prueba testifical, falsa y fabricada, para sostener la demanda. El padre demandado a su vez presenta prueba veraz para refutar la del demandante. Sin embargo, al dirimir el conflicto en la prueba y probablemente influenciado por sus propias creencias e idiosincracia el juez da crédito al demandante y a su prueba y dicta sentencia decretando su filiación. El demandado agota todos los recursos legales para revocar o anular o dejar sin efecto esa sentencia. Libra la gran batalla de su vida en los tribunales para que no prevalezca la injusticia de imputarle una falsa paternidad del hijo demandante. Pero todo resulta infructuoso y el demandado será, por mandato de una sentencia, el padre del hijo demandante. Éste es un reconocimiento por acción voluntaria del padre, según la opinión mayoritaria. Porque no se diga que

recurrimos a un ejemplo extremo. Pecaríamos de ingenuos si creyéramos que toda sentencia judicial se funda en la verdad de los hechos en controversia. Algún comentarista del Derecho ha dicho, con razón, que algunas sentencias se explican porque los atracos no solamente se cometen en las encrucijadas, sino también en los tribunales de justicia.

En el ejemplo, que acabamos de exponer, mientras la mayoría del Tribunal le dice al padre demandado que ha reconocido voluntariamente al hijo demandante, a pesar de su tenaz resistencia y oposición a las pretensiones del demandante tendrá que pensar con razón que a la fuerza ahorcan.

Volviendo a la opinión de la mayoría se dice en ella que la interpretación dada por este Tribunal a la frase "acción voluntaria", se apartó grandemente de la regla de oro (se refiere indudablemente a una de las reglas de hermenéutica legal) provista en el Art. 19 de nuestro Código Civil que dispone que el medio más eficaz y universal para descubrir el verdadero sentido de una ley *cuando sus expresiones son dudosas*, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla. Pero, ¿cuáles son las expresiones dudosas en la Ley Núm. 229? ¿Para qué crear una duda donde no existe con el único fin de poder invocar el citado Art. 19 del Código Civil? Porque si algo hay claro es que la Ley Núm. 229 de 1942 facultó a los padres o a las personas con derecho a su herencia, para hacer lo que antes de esa fecha les estaba prohibido, o sea, reconocer voluntariamente a todos los efectos legales, a los hijos ilegítimos (adulterinos e incestuosos) nacidos antes de la vigencia de dicha ley. Es decir, para equipararlos, mediante el reconocimiento voluntario, a los hijos clasificados por el Código Civil como hijos naturales reconocidos. Pero, ¿cuál era la situación jurídica de esos mismos hijos adulterinos que no eran reconocidos por la acción voluntaria de sus padres o de las personas con derecho a su herencia? No tenían otros derechos que los reconocidos a los hijos ilegítimos y a los cuales

ya nos hemos referido. Carecían de toda acción con la excepción de aquélla dirigida a reclamar alimentos de sus padres; pero en el año 1945 la Legislatura enmendó la Ley Núm. 229 para conceder a estos hijos adulterinos el derecho a reclamar su filiación al solo efecto de llevar el apellido de sus padres. Nótese que si bien la ley enmendatoria (Ley Núm. 243 de 12 de mayo de 1945) fue aprobada tres días después de resuelto el caso de *Correa* v. *Sucn. Pizá,* supra, el proyecto que se convirtió en dicha ley, ha debido ser presentado en la Legislatura mucho antes de haberse resuelto el caso de *Correa.* Creo que esto debe ser claro para los que conozcan el trámite legislativo para la aprobación de una ley. Ello implica, que conociendo la Legislatura que el reconocimiento voluntario es aquel que hace el padre en el acta de nacimiento, en testamento, en escritura pública o en declaración jurada, el hijo adulterino nacido antes de 1942, que no fuera reconocido en esa forma, no tenía derecho a ejercitar una acción de filiación, y optó por concederle ese derecho aunque lo limitó al solo efecto de llevar el apellido de sus padres. Era pues claro para los legisladores que un reconocimiento obtenido por sentencia, no era un reconocimiento por acción voluntaria de sus padres o de las personas con derecho a su herencia.

La aplicación de la doctrina del reconocimiento implícito o tácito es irreconciliable con la acción legislativa de aprobar la Ley Núm. 243 de 1945, enmendatoria de la Ley Núm. 229 de 1942.

Otra doctrina, a mi juicio errónea, sancionada por la opinión de la mayoría, es la de que la Ley Núm. 229 de 1942 según enmendada, no requiere otra prueba que la de la paternidad. Es decir, que la citada Ley Núm. 229 derogó implícitamente el Art. 125 del Código Civil que es el que establece los casos en que el padre viene obligado a reconocer al hijo. La doctrina fue expuesta por el hoy Juez Presidente, Señor Negrón Fernández en una opinión disidente en el caso de *Armaiz* v. *Santamaría,* 75 D.P.R. 579 (1953), y cuyo texto se copia

completo en la opinión. La Ley Núm. 229, según enmendada, en lo pertinente dispone:

"En caso de que los hijos a que se refiere esta sección no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. *La acción para este reconocimiento se tramitará de acuerdo con el procedimiento que fija el Código Civil de Puerto Rico para el reconocimiento de hijos naturales;* Entendiéndose, sin embargo, que tal reconocimiento sólo tendrá el alcance que aquí se expresa." (Énfasis suplido.) (Ley Núm. 243 de 1945.)

Para la mayoría del Tribunal la disposición "La acción para este reconocimiento se tramitará de acuerdo con el procedimiento que fija el Código Civil de Puerto Rico para el reconocimiento de hijos naturales", no tiene significación alguna y si la tuviera, como la tiene, el Tribunal enmienda la ley para quitársela. [7] Además de los argumentos expuestos en nuestras decisiones contra el criterio de nuestro Juez Presidente, copiamos a continuación, por su acierto, el comentario a dicho criterio hecho por Calderón, Jr., en el Tomo XXIII, pág. 264, de la Rev. C. Abo. P.R.:

". . . La más trascendental y revolucionaria fue la emitida por el Juez Asociado Sr. Negrón Fernández con la cual concurrió el Juez Asociado Sr. Belaval. Se analiza en dicha opinión el propósito legislativo de la Ley núm. 229, esto es, eliminar las diferencias entre las distintas categorías de hijos ilegítimos que existían en nuestra legislación, y se concluye que 'para dar, por lo tanto, sentido real y plenitud de expresión a ese propósito legislativo, debemos interpretar y aplicar la Ley núm. 229 en forma que se equipare verdaderamente a unos y a otros no meramente en su nomenclatura jurídica, sino en sus oportunidades reales de filiación'. Considera esta opinión que de aplicarse el artículo 125 para el reconocimiento forzoso de los hijos

---

[7] Los tribunales no deben borrar judicialmente una disposición a menos que se demuestre que ella es contraria al propósito legislativo. *Clínica Juliá* v. *Sec. de Hacienda,* 76 D.P.R. 509 (1954).

adulterinos, incestuosos, etc., ahora llamados naturales, no se cumpliría el propósito expresado, habida cuenta la situación en que éstos se encuentran con relación a los naturales propios. Ello es así porque es casi imposible para el hijo adulterino o incestuoso probar el concubinato de sus padres o la posesión continua de estado que exige la ley como fundamento para la acción de reconocimiento forzoso. Por lo tanto, según se dice en la opinión, para consagrar los principios de igualdad humana expresados en la Constitución del Estado Libre Asociado de Puerto Rico, preconizados por destacados representantes de la doctrina moderna, es preciso concluir que la acción de estos hijos ilegítimos propios para su reconocimiento forzoso debe regirse por el artículo 129 del Código Civil, o sea por las disposiciones referentes al derecho a alimentos a que éstos son titulares una vez probada la paternidad. Así, demostrada judicialmente la paternidad, queda ipso jure establecido el reconocimiento. El Juez no cree que en el caso que analizamos se probara el concubinato ni la posesión continua de estado, y entiende que debe desecharse por antijurídica la regla de que la prueba en casos de posesión de estado debe ser robusta y convincente. Sin embargo, confirma la sentencia por el fundamento de que se probó la paternidad.

"En nuestra opinión, esta decisión, plausible por más de un concepto, no se ajusta estrictamente a las normas jurídicas vernáculas sobre el poder interpretativo de los jueces. El juez tiene ciertos límites infranqueables al interpretar el propósito legislativo. Según Legaz y Lacambra, 'el Juez, al aceptar el contenido de la ley [. . .] podrá determinar su interpretación en un sentido o en otro, pero sólo hasta cierto punto; pues aun cuando dependa de su voluntad el optar por una interpretación restrictiva o extensiva [. . .] es evidente que esta libertad no puede ir tan lejos que signifique una alteración del sentido de la ley: prueba de que no sólo lo que en la ley está claramente establecido, y, por tanto no necesita interpretación, sino incluso el sentido total de la misma, aun en lo que tiene de más indeterminado, representa una barrera que no puede ser salvada por el intérprete en tanto que permanece en su función de juzgador y no se arroga la de legislador'. En el presente caso, la Ley 229 llama a todos los hijos nacidos fuera de matrimonio naturales. No dispone expresamente que el reconocimiento de tales hijos deberá tramitarse de acuerdo con el Código Civil; mantiene silencio sobre este particular. Sin embargo, según bien apunta el Juez Asociado,

Sr. Ortiz en la opinión concurrente mayoritaria, 'entendemos que fue el propósito esencial del legislador al aprobar la sección 1 de la citada Ley núm. 229 de 1942 el de eliminar cualquier posible diferencia entre hijos naturales y adulterinos nacidos con posterioridad a la vigencia de la ley. No fue el propósito el de eliminar los requisitos de prueba contenidos en el artículo 125. De haber sido tal la intención legislativa, la Asamblea Legislativa hubiese derogado o enmendado expresamente dicho artículo. No hubo derogación implícita, ya que la creación de la igualdad entre hijos nacidos fuera de matrimonio no es incompatible con la necesidad de demostrar el "status" de tales hijos mediante cierta clase de prueba'. La Legislatura, al crear la Ley núm. 229, estaba consciente de la existencia del artículo 125, el cual regula las acciones filiatorias de los hijos naturales. Al darle el nombre de 'naturales' a los ilegítimos nacidos después de la ley y no derogar el artículo 125, demuestra que fue su propósito que éstos también se rigieran por dicho artículo. Podría ser que a la luz de ciertas tendencias expuestas en la opinión del Juez Negrón Fernández, el criterio antes expuesto no sea el más justificado. Pero no compete al juez el variar lo dispuesto por el legislador, ni amoldarlo arbitrariamente a sus propios conceptos, por más sabios que sean. Dice Cardozo: '¿Dónde ha de hallar el Juez el Derecho en que él funda su sentencia? Hay momentos en que la fuente es obvia. La regla adecuada al caso puede ser suplida por la Constitución o por la ley. Si es así, el juez no tiene que buscar más allá. Establecida la relación, su deber es obedecer. La Constitución, deroga el Derecho de los jueces. En este sentido la "judge-made-law" es secundaria; subordinada al Derecho creado por los legisladores'. No puede el juez actuar a base de lo que él cree que el legislador quiso hacer, menos aún cuando se ha dejado vigente el artículo regulador de la materia. 'Las leyes han de ser interpretadas a base de lo que la Asamblea Legislativa hizo y no a base de lo que ésta dejó de hacer'. . . . ." (Págs. 264 a 267.)

La pretendida derogación del Art. 125 del Código Civil por la Ley Núm. 229, creó un serio problema al Tribunal respecto a los hijos naturales en el concepto de la legislación anterior a dicha ley. Así se reconoce en la opinión de la cual copiamos: "La razón no puede concebir que al hijo adulterino no reconocido, nacido antes o después del 10 de agosto de

1942, para obtener su filiación le baste cumplir esa simple norma de prueba de la paternidad sin que se le haga pasar por las horcas caudinas del Art. 125 y que al hijo natural nacido antes de esa fecha, para el mismo efecto, se le obligue al estricto cumplimiento de las rigurosas normas de prueba impuestas por ese artículo." Mas a base de una cita del profesor Mascareñas se despacha el asunto de la manera más fácil y sencilla resolviéndose que el principio de igualdad ante la Ley en el trato jurídico requiere que la norma de la simple prueba de la paternidad se haga extensiva también a los *hijos naturales* nacidos antes de 1942. Lo que equivale decir, en otras palabras, que la Ley Núm. 229 derogó el Art. 125 del Código Civil en tanto en cuanto define los casos en que el padre venía obligado a reconocer al hijo natural según éstos se conocían antes de 1942. Claro está el problema surge, porque se ha querido sostener contra toda razón jurídica que la Ley Núm. 229 derogó dicho Art. 125 respecto a los hijos adulterinos e incestuosos. Decidido así, se colocaba a los hijos naturales en situación desventajosa ante los adulterinos e incestuosos. Ya hemos apuntado, la salida que buscó el Tribunal cuando se encontró en esa encrucijada.

Un somero examen de la citada Ley Núm. 229, demostrará que dicho estatuto no afecta en absoluto ni se refiere a los *hijos naturales* nacidos antes de su aprobación.

La Sec. 1 declara hijos naturales a todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de dicha Ley, independientemente de que sus padres hubieran podido o no contraer matrimonio al tiempo de la concepción de dichos hijos.

Los hijos nacidos antes de la Ley Núm. 229, continuaron siendo legítimos, naturales o adulterinos o incestuosos según se definen en el Código Civil. En nada alteró esta ley el *status* del antiguo *hijo natural*. Siguió siendo aquél nacido de padres que al tiempo de la concepción o nacimiento del hijo podían contraer matrimonio.

Lo que es más importante aun, esta Sec. 1 de la Ley se limita a cambiar el antiguo concepto de "hijo natural" pero no altera las disposiciones del Código Civil, que señalan expresamente los casos en que el padre viene obligado a reconocer al hijo natural, aun cuando se trate de uno nacido después de 1942. A menos que el Tribunal, ejerciendo funciones legislativas, agregue a dicha ley una disposición derogatoria del Art. 125 del Código Civil, dichos hijos naturales solamente podrán obligar a sus padres a reconocerlos cuando se encuentren en los casos señalados en el indicado Art. 125. Pero más específicamente, en cuanto a los hijos naturales nacidos antes de la Ley Núm. 229, esta Sec. 1 ni siquiera los menciona o hace referencia a ellos.

La Sec. 2, tampoco altera el *status* del hijo natural nacido antes de la Ley Núm. 229, ni cambia el procedimiento para su reconocimiento. Dicha Sec. 2 faculta al padre o a las personas con derecho a su herencia, para reconocer voluntariamente y a todos los efectos legales a los hijos nacidos antes de 1942 que no tenían la condición de hijos naturales según la legislación anterior. En caso de que estos hijos no sean así reconocidos, se les concede el derecho de reclamar su filiación pero al solo efecto de llevar el apellido de sus padres, debiendo seguir el procedimiento que fija el Código Civil para el reconocimiento de hijos naturales. Siendo esto así, ¿en virtud de qué precepto de ley o de qué regla de hermenéutica legal se afirma que la Ley Núm. 229 de 1942 derogó el Art. 125 del Código Civil en cuanto a los hijos naturales nacidos con anterioridad a la vigencia de dicha ley?

Se sostiene finalmente en la opinión de la mayoría que en virtud de las disposiciones del Artículo II de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico referente a la igualdad humana [8] y de las de la Ley

_____

[8] "1. [Dignidad e igualdad del ser humano, discrimen prohibido]. La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza,

Núm. 17 aprobada en 20 de agosto de 1952, que concede a todos los hijos los mismos derechos que corresponden a los hijos legítimos (⁹) equipararse en igualdad de derechos a todos los hijos incluyendo a los que habían nacido antes y después del año 1890, borrando así la distinción que la legislación anterior establecía entre los hijos legítimos, los naturales y los adulterinos e incestuosos.

Concurrimos con el criterio mayoritario en que a partir del 25 de julio de 1952, todos los hijos de padres fallecidos con posterioridad a dicha fecha, tienen respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos. Así lo dispuso el poder legislativo al aprobar la Ley Núm. 17 de 1952. Es en virtud de esta ley y no de la Constitución que todos los hijos nacidos antes del 25 de julio de 1952 gozan de los mismos derechos hereditarios que corresponden a los hijos legítimos, si los padres fallecieron después de dicha fecha. Y ello es así porque la ley vigente al fallecer el causante es la que determina la adquisición del derecho hereditario. *Ex parte Orona Acevedo*, 87 D.P.R. 840 (1963) y *Berdecía* v. *Tribunal Superior*, 87 D.P.R. 108 (1963). Otra cosa distinta es afirmar que la Constitución eliminó o borró retroactivamente la distinción o categorías de hijos establecidas por la legislación anterior. La Constitución que aquí estudiamos, tiene carácter prospectivo y no retroactivo. Ni se le dio efecto retroactivo expresamente, ni ello se infiere de sus cláusulas. El discrimen por razón de nacimiento quedó absolutamente prohibido a partir de los nacimientos ocurridos en o después del 25 de julio de

color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnaron estos principios de esencial igualdad humana."

(⁹) Dicha ley dispone:

"Artículo 1.—Todos los hijos tienen respecto a su padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos.

"Artículo 2.—Las disposiciones de esta Ley tienen efecto retroactivo al día 25 de julio de 1952."

1952. Así lo reconoció con buen juicio jurídico nuestro Juez Presidente cuando en el caso de *Figueroa* v. *Díaz*, 75 D.P.R. 163 (1953), se expresó así: "Las cadenas que en nuestra legislación aún ataban el destino de los hijos nacidos fuera de matrimonio al discrimen de la inferioridad jurídica y al oprobio de la indignidad social—y que en buena interpretación de ley y en buena justicia hubieran podido aflojarse en parte en *Vargas* v. *Jusino*, 71 D.P.R. 389 (1950), op. dis., pág. 396 —saltaron en pedazos al impacto de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, *cuya promulgación derogó ipso jure en cuanto a los hijos nacidos en, o con posterioridad a dicha fecha*, los preceptos del Código Civil y de las demás leyes que en una u otra forma establecían clases y categorías de hijos, por razón de nacimiento." ([10]) Invocó entonces el Informe de la Comisión de la Carta de Derechos a la Convención Constituyente, sometido el 14 de diciembre de 1951, explicativo entre otros casos, de la prohibición contra el discrimen por razón de nacimiento y que lee:

"Se propone eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio. Se coloca a todos los hijos respecto de sus padres y respecto del orden jurídico en igualdad de derechos. Las uniones ilícitas pueden y deben estar prohibidas y esta disposición tendrá como una de sus consecuencias el desalentarlas. Pero el fruto inocente de ellas, debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas. Así lo exige el principio de la responsabilidad individual, con arreglo a la cual nadie es culpable por los actos que él mismo no

---

([10]) El señor Calderón, Jr. estuvo conforme con el efecto prospectivo de la Constitución en su artículo *"La Igualdad Jurídica Filial en Puerto Rico,"* publicado en el Vol. XVI de la Rev. C. Abo. P.R. Al efecto copiamos:
"A partir del 25 de julio de 1952, por lo tanto, quedó borrada en Puerto Rico, para los hijos nacidos con posterioridad a la vigencia de la Constitución y de la Ley Núm. 17 antes citada, la nomenclatura jurídica tradicional respecto a las diversas clases de hijos; desde entonces todos son hijos, a secas, con idénticos derechos. Las nuevas tendencias se anotaron una victoria plena y decisiva, dando al traste con la regulación tradicional."

realiza. Aunque la legislación actual ya cubre en casi su totalidad lo aquí dispuesto, será menester nueva legislación. A los fines de herencias y propiedades las modificaciones resultantes de esta sección no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia."

La mayoría sostiene, sin embargo, que los redactores de este Informe se equivocaron al usar el término "nacimientos" porque en realidad lo que quisieron decir fue "fallecimientos". De suerte que según la mayoría, el Informe quiso decir que a los fines de herencias y propiedades las modificaciones resultantes de la Sec. 1, Art. II de la Constitución no deberán ser retroactivos a fallecimientos ocurridos antes de su vigencia. En esta forma la mayoría, no descarta el Informe como medio de interpretación pero lo cambia fundamentalmente a su capricho. Porque nos parece una exageración atribuirlo a los distinguidos abogados que formaron parte de la Comisión de la Carta de Derechos haber confundido el significado común y corriente o el significado en sus alcances jurídicos, de dos términos tan distintos como lo son *"nacimiento"* y *"fallecimiento"*. No se puede afirmar así porque sí, que la Convención Constituyente no adoptó ese Informe. Ni se combatió ni se discutió en los debates. No se rechazó, pues, el alcance que el Comité le dio a la citada Sección respecto al carácter retroactivo de la misma. Siguió el Comité el principio de la no retroactividad de la Constitución en cuanto a la prohibición del discrimen por razón de nacimiento.

Las constituciones como las leyes no tienen efectos retroactivos a menos que expresamente así lo dispongan o se infiera de sus disposiciones sin lugar a dudas que tal fue el propósito legislativo. *Ayman* v. *Teachers Retire Bd. of City of N.Y.*, 211 N.Y.S.2d 198; *Schalow* v. *Schalow*, 329 P.2d 592; *Drennen* v. *Bennett*, 322 S.W.2d 585; *Minnesota Baptist Convention* v. *Pillsbury Academy*, 74 N.W.2d 286; *State* v. *Kansas City & Memphis Ry. & Bridge Co.*, 174 S.W. 248; *Employees Retirement System* v. *Ho.*, 352 P.2d 861; *Shreve-*

*port* v. *Cole*, 32 L.Ed. 589; *White* v. *U.S.*, 191 U.S. 545; 11 Am.Jur. 641; 16 C.J.S. 121.

Ni las disposiciones de nuestra Constitución ni el historial legislativo en la materia que estudiamos tienden a indicar que la Asamblea Constituyente tuvo el propósito o la intención de que dichas disposiciones constitucionales operaran retrospectivamente.

Mas si fuera cierto que la Constitución borró retroactivamente las diferencias y clasificaciones entre los hijos; si todos merecen entonces igual trato jurídico, ni importa la fecha de su nacimiento, entonces, o la Ley Núm. 17 de 1952, según ha sido interpretada por la mayoría y con cuya interpretación concurrimos, es inconstitucional en tanto establece una distinción entre los hijos adulterinos cuyos padres fallecieron antes del 25 de julio de 1952 y aquéllos cuyos padres fallecieron con posterioridad a dicha fecha, o existe una irreconciliable contradicción en la posición asumida por la mayoría. Como para nosotros la Constitución no opera retrospectivamente, la Ley Núm. 17 de 1952 es constitucional según la hemos interpretado.

*Para terminar señalaremos que los pronunciamientos finales enumerados del 1 al 8 en la opinión mayoritaria, constituyen, a nuestro juicio, un nuevo Código Civil en materia de filiación aprobado por este Tribunal.*